IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FEB 2 1 2006

CLERK, U.S. DISTRICT COURT
RICHMOND, VA.

| | |
|---|---|
| MICRON TECHNOLOGY, INC. and MICRON SEMICONDUCTOR PRODUCTS, INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| RAMBUS INC., | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 3:06CV132

06 - 269

## Complaint

### (For Violations of (1) 18 U.S.C. §§ 1961 et seq. (Civil RICO); and (2) Va. Code §§ 18.2-499, -500 (Statutory Conspiracy) and Civil Conspiracy)

Plaintiffs Micron Technology, Inc. ("Micron Technology") and Micron Semiconductor Products, Inc. ("Micron Semiconductor") (sometimes referred to collectively as "Micron"), by and through their undersigned counsel, allege as follows on the basis of personal knowledge and otherwise on the basis of information and belief:

1.      Rambus Inc. ("Rambus"); its management, including Messrs. Tate, Crisp, Farmwald, and Karp; its legal counsel, Messrs. Steinberg and Vincent; and upon information and belief, other persons listed below (collectively, the "Rambus Group") engaged in a long-running corrupt scheme designed to use litigation or the threat of litigation to obtain massive royalties from DRAM manufacturers and suppliers of other semiconductor products.

2.      From its inception, Rambus' business model was to collect royalties based on its patent portfolio − a portfolio based primarily on patents stemming from its first patent application, U.S. Patent Application No. 07/ 510,898 (the "'898 application"). Rambus filed dozens of applications based on the '898 application (the "'898 family"), and it subsequently

1

asserted patent infringement claims based on patents from the '898 family against Micron and

other manufacturers in various jurisdictions in the U.S. and Europe.  However, Rambus'

efforts to collect royalties or obtain infringement damages were threatened by problems with

the '898 family that were known to the Rambus Group.  In an effort to eliminate these threats,

the Rambus Group conspired to destroy or suppress material evidence and submit false

testimony to hide or deny such problems with the '898 family.

3.       Recently-discovered evidence demonstrates, for example, that Rambus is not

the rightful owner of the '898 family.  Although Rambus and others listed below submitted

false testimony and sought to suppress material evidence about the ownership of the '898

family, evidence now demonstrates that Rambus' lead inventor and co-founder P. Michael

Farmwald ("Farmwald") had previously assigned the '898 family and other inventions,

pursuant to one or more employee assignment agreements, to a prior employer MIPS

Computer Systems, Inc. ("MIPS").

4.       There were other problems with the '898 family as well, including potential

problems regarding unenforceability and invalidity.   Indeed, Rambus' patent attorney had

repeatedly warned Rambus that Rambus' conduct during the prosecution of the '898 family

subjected Rambus to a risk that its patents would be found unenforceable.  Again, the Rambus

Group conspired to destroy or suppress material evidence and submit false testimony to hide or

deny these problems.

5.       As a central part of this conspiracy, Rambus and its management adopted a

litigation strategy premised on the destruction of any evidence undermining its anticipated

litigation claims, including claims for patent infringement.  In August 1998, Rambus

management arranged for burlap bags to be distributed to all Rambus employees, with

instructions to fill the bags with documents relating to multiple subject matters, including subject matters relevant to Rambus' anticipated patent infringement claims. On September 3, 1998 – described in internal Rambus e-mails as "Shred Day" – while Rambus was planning litigation against the DRAM manufacturers on these patents, it had a private shredding service destroy 185 burlap bags filled with documents (and an additional 60 boxes of documents). Afterward, Rambus personnel spot-checked employees to ensure full compliance.

6.      The next summer, Rambus was still actively preparing for litigation. A June 1999 Rambus document describes steps for "Licensing/Litigation Readiness." One of the steps listed was to "Organize 1999 shredding party at Rambus." Soon thereafter, in August 1999, Rambus destroyed an additional 150 burlap bags (the equivalent of 188 banker's boxes) filled with documents.

7.      These first two shred events were not only in clear anticipation of specific litigation against Micron and others. They were a central part of Rambus' litigation plan itself.

8.      Rambus continued its destruction of relevant evidence even after the litigation began. In December 2000, while litigation with Micron and others was pending, Rambus launched a third shredding event. Ignoring the instructions of its own outside litigation counsel to preserve relevant evidence, Rambus indiscriminately shredded 460 burlap sacks of documents (the equivalent of 575 banker's boxes).

9.      Believing it had substantially destroyed the harmful impeaching documents, the Rambus Group then repeatedly submitted false testimony to this and other courts. Although much of the testimony submitted by them has been subsequently demonstrated to be intentionally false and misleading, the Rambus Group has nevertheless persisted in the same

pattern of misconduct, which has enabled it even recently to obtain favorable settlements and to continue pursuing its improper litigations to this day.

10.    This Court threw out Rambus' patent claims in the *Infineon* matter based on spoliation and unclean hands.  This Court dismissed the same patent claims with prejudice in the *Samsung* matter after Samsung's claims based on spoliation and unclean hands forced Rambus to provide Samsung with a covenant not to sue and an agreement to pay Samsung's attorneys' fees.  Nevertheless, Rambus has persisted in asserting the ***exact same*** discredited patents against Micron in federal court in Delaware and related patents in the '898 family against Micron in both Delaware and Northern California.

11.    In connection with the infringement suit Rambus had initiated against Infineon, this Court concluded in 2004 that Rambus' document destruction plan was intended "to destroy discoverable documents as part of its litigation strategy." *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 298 (E.D. Va. 2004).  This Court held that the "crime/fraud" exception applied to defeat any claims of privilege that Rambus had sought to assert with respect to the document destruction that had occurred.  *See also Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 680 (E.D. Va. 2001) ("[T]he record in this case shows that Rambus implemented a 'document retention policy,' in part, for the purpose of getting rid of documents that might be harmful in litigation").  *See also In re Rambus Inc.*, 7 Fed. App'x 925, 927 (Fed. Cir. 2001) (denying Rambus' writ of mandamus to prevent the production of documents under the fraud exception to the attorney-client privilege).

12.    Plaintiffs Micron Technology and Micron Semiconductor have been direct victims of the Rambus Group's wrongful scheme and have been forced, among other things, to expend valuable resources, including attorneys' fees and management and employee time and

attention, on litigation triggered by Rambus' inappropriate assertion of patent infringement and other claims. Micron thus seeks relief, including treble damages, pursuant to the civil provisions of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961 et seq.), as well as under the statutory conspiracy and civil conspiracy provisions of Virginia Law (Va. Code §§ 18.2-499, -500).

### Parties

13.     Plaintiff Micron Technology is a Delaware corporation with its principal place of business in Idaho. Micron Technology is a semiconductor company that, among other things, develops and manufactures computer memory products in the United States and abroad. Micron Technology has a leading-edge fabricating facility in Manassas, Virginia, at which it has manufactured various kinds of semiconductor memory products, including Dynamic Random Access Memory or "DRAM," a common type of computer memory in a variety of different computing and electronics applications.

14.     Plaintiff Micron Semiconductor is a Delaware corporation with its principal place of business in Idaho. Micron Semiconductor is a wholly-owned subsidiary of Micron Technology. Micron Semiconductor sells computer memory products in Virginia and throughout the United States.

15.     Micron is one of the world's leading developers of DRAM technology. Micron has invested billions of dollars into the research and development of DRAM products. As a result of its innovation, Micron has been awarded over 13,000 U.S. patents and has over 5,000 additional patents pending at the U.S. Patent Office. Micron also has thousands of issued or pending foreign patents. Micron was one of the top 10 recipients of U.S. patents in the world for each of the past six years.

16.     Defendant Rambus is a Delaware corporation with its principal place of business in California.  Rambus asserts patent rights to certain DRAM interface technology.  Rambus' proprietary type of DRAM interface technology is known as "Direct Rambus DRAM" or "RDRAM" technology.  Rambus does not manufacture any products itself, but relies on licensing and litigating over its patent portfolio for revenue.  From its founding, Rambus' business plan has been to obtain patents and either (a) extract supracompetitive licensing fees from, or (b) bring suit against the DRAM manufacturers and producers of related products.  The improper litigation conduct that is at the heart of this lawsuit is and has been a key component of Rambus' business plan and strategy.

### Other Key Persons Involved in the Illegal Scheme

17.     Geoffrey Tate was formerly the chief executive officer of Rambus, and is now the chairman of its board of directors.  This Court found he gave false and misleading testimony regarding Rambus' patent strategies.  *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681 (E.D. Va. 2001).

18.     Richard Crisp was formerly a Rambus employee and subsequently a paid consultant to Rambus.  This Court found that he gave false and misleading testimony regarding Rambus' patent strategies as well.  *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681-82 (E.D. Va. 2001).

19.     Farmwald is a co-founder of Rambus and a listed inventor on the '898 patents.  He was formerly a vice president and chief scientist of Rambus.  He was and is a director on its board.  On the stand *at trial* in Virginia, Farmwald gave demonstrably false and misleading testimony related to the conception of the Rambus patents.

20.    Joel Karp was formerly a vice president of Rambus.  In July 2000, he ended his employment with Rambus and became a paid "consultant" to the company.  He is one of the primary architects of the three-year document destruction program that Rambus now calls a "document retention" policy.

21.    Neil Steinberg was originally outside counsel to Rambus.  In April 1999, he became in-house counsel at Rambus and later became vice president of intellectual property.  He is a patent lawyer who practices regularly before the United States Patent and Trademark Office in Virginia.  Steinberg provided legal counsel to Rambus while a partner in the law firm Steinberg & Whitt, LLP, which had an address in or near Reston, Virginia.  As an attorney, he was professionally bound to exercise his independent judgment, and had duties separate and independent from pursuing the interests of his client, including to obey the law and follow the rules of professional conduct.  He too has offered demonstrably false testimony in a case before this Court.

22.    Lester Vincent is or was outside patent prosecution counsel to Rambus.  As an attorney, he was professionally bound to exercise his independent judgment, and had duties separate and independent from pursuing the interests of his client, including to obey the law and follow the rules of professional conduct.  In response to specific and repeated instructions from Rambus, Vincent substantially purged his Rambus-related files, including patent prosecution files of the patents Rambus asserted against Micron and others in litigation.

23.    These persons had a personal stake in conspiring to injure Micron in its trade or business and derived some direct economic benefit from the alleged illegal conduct.  For example, Rambus implemented certain incentive stock plans for success in its litigations.  These plans were for its employees and its officers and directors in particular.  Under these and

other stock option programs, members of the Rambus Group personally made at least $100 million during the period from 1998 to the present.

24.     On information and belief, other persons also participated in and were an integral part of the acts and omissions alleged in this complaint.

### Jurisdiction and Venue

25.     This Court has jurisdiction over Micron's claims for violations of the federal Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1961 et seq., under 18 U.S.C. §§ 1964(a) and 1964(c) and 28 U.S.C. §§ 1331 and 1337.

26.     This Court also has jurisdiction under 28 U.S.C. § 1367 over Micron's claims for violations of Virginia Code §§ 18.2-499 and -500.

27.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §§ 1391 and 1392.  Rambus resides in, can be found in, has an agent in, and/or transacts or has transacted business in this district.  A substantial number of the transactions, acts, and omissions at issue were done, overseen, or approved by members of the Rambus Group within this district, or have resulted in harm within this district.

### Statement of Facts

**A.   DRAM Interface Technology**

28.     Rambus' scheme relates to the technology known as DRAM, which is a common type of computer memory used in a variety of different computing and electronics applications.  The most significant application of DRAM is for use as main memory in personal computer systems.

29.     "DRAM interface technology" includes (a) those portions of a DRAM product that dictate how the DRAM physically and electrically attaches to, and interoperates with, complementary products in a computer system (such as memory controllers, chipsets, or

8

microprocessors), (b) those portions of these complementary products that dictate how the complementary products physically and electrically attach to, and interoperate with, the DRAM, and (c) the physical and electrical communication path in between (a) and (b). The DRAM interface involves only a small fraction of a full DRAM product, whether measured in terms of physical area or technological contribution.

30.    Various types of DRAM interface technologies are in use today, such as "SDRAM," "DDR SDRAM," and "DDR2 SDRAM." SDRAM, DDR SDRAM, and DDR2 SDRAM technology were all developed by an open-industry standard-setting organization consisting of DRAM customers, suppliers, and other firms.

31.    Defendant Rambus promoted and licensed a proprietary type of DRAM interface technology known as "Direct Rambus DRAM" or "RDRAM" technology.

32.    Plaintiff Micron develops DRAM interface technology and manufactures, distributes, and sells DRAM products, including SDRAM, DDR SDRAM, and DDR2 SDRAM products. In addition, Micron has licensed RDRAM technology from Rambus and developed one or more RDRAM products based on that technology. Micron manufactures DRAM products at its fabricating facility in Manassas, Virginia.

**B.    One of Rambus' Co-Founders Invents A Purportedly New DRAM Interface Technology, But While Still Employed By MIPS**

33.    In 1986, Farmwald (later to become one of defendant Rambus' co-founders) was employed by FTL, Inc. ("FTL"). Soon thereafter, MIPS, a company that specialized in the design of high-speed computers, acquired FTL.

34.    In connection with the sale of FTL to MIPS, Farmwald became an employee of MIPS. As a condition of his employment, Farmwald entered an invention and non-disclosure agreement with MIPS. On information and belief, that agreement assigned to MIPS inventions

conceived by Farmwald while he was an employee of MIPS that were related to the business or research and development of MIPS.

35.    While at MIPS, Farmwald worked on the development of computer memory boards, a "backplane bus," and a "bus interface" for a new high-speed computer, known as the R6000. This "bus interface" allowed the memory boards to connect to a common backplane bus. Farmwald worked to research and develop a memory interface that could keep pace with the R6000 computer.

36.    Farmwald perceived there to be a performance gap between the throughput of the computer's processor and that of its memory, sometimes referred to as a supposed "memory bottleneck problem." While at MIPS, Farmwald undertook to research a possible solution to this "memory bottleneck problem" by shortening the physical distance between processor and memory and creating a "little backplane bus." This work, and other work performed by Farmwald at MIPS, formed the very basis of the inventions in his '898 application.

37.    At trial in this Court in the *Infineon* matter in 2001, Farmwald and Mark Horowitz, a co-founder of Rambus and a listed inventor on the Rambus patents, testified (and counsel for Rambus asserted) that in October 1988, Farmwald met with Mark Horowitz and Mark Johnson at a restaurant, St. Michael's Alley, in Palo Alto, California, and discussed the "bus interface" that Farmwald claimed he had conceived.

38.    Farmwald and Horowitz further testified (and counsel for Rambus asserted) that this "St. Michael's Alley" meeting occurred after Farmwald left MIPS and occurred while Farmwald was employed as a professor at the University of Illinois.

39.     That testimony is false.  At the time of the "St. Michael's Alley" meeting
Farmwald was still an employee of MIPS and was still subject to his MIPS assignment
obligations.  In fact, Farmwald did not leave his full-time employment at MIPS until
December 1988 – nearly two months after the "St. Michael's Alley" meeting.  During that
time, Farmwald's invention assignment obligations to MIPS remained intact.

40.     Nor was Farmwald employed by the University of Illinois at that time.
Farmwald did not begin his employment with the University of Illinois until November 1988 –
after the St. Michael's Alley meeting.

41.     Farmwald's invention of the purportedly new DRAM interface thus occurred
while Farmwald was employed by MIPS.  Farmwald's invention of the purportedly new
DRAM interface was directly related to MIPS' business and research and development.  In
fact, MIPS had already used, researched and developed various features of this invention.
Pursuant to Farmwald's assignment obligations to MIPS, all rights to those inventions were
assigned to MIPS.

42.     Recently-produced documents confirm not only that Farmwald was aware that
he developed his ideas for the '898 patents while at MIPS, but also that Farmwald took
affirmative steps to hide that fact from MIPS.  For example, in August 2005, Rambus
produced to Micron for the first time an e-mail exchange between Farmwald and Crisp (which,
on information and belief, Rambus had withheld in its entirety from Infineon) in which Crisp
asks Farmwald about whether Farmwald's inventions predated similar work done in the late
1980's by a group known as Scalable Coherent Interface or "SCI."  In support of his argument
that his inventions predated SCI's work, Farmwald flatly admits, "I actually had the idea for

11

Rambus while still at MIPS in very early 1988, possibly even 1987, but kept quiet about it until I got to Univ. of Illinois (for obvious reasons)."

43.    Farmwald and Horowitz founded Rambus in March 1990 and filed Rambus' first patent application, the '898 application, on this purportedly new DRAM interface in April 1990.  Having "kept quiet" about his inventions that belonged to MIPS, Farmwald then misrepresented to the U.S. Patent and Trademark Office that "no assignment . . . affecting the rights and property herein conveyed has been made to others by the undersigned."  Rambus has since been issued numerous patents that are based on, and claim priority to, the '898 application.  Nearly all of the patents Rambus has asserted and continues to assert against Micron and the other DRAM manufacturers are based on the '898 application.

**C.    The Evidence Destruction Scheme**

44.    By at least 1998, Rambus and its senior management – including, among others, Farmwald, Horowitz, then chief executive officer Geoffrey Tate, then vice president Joel Karp, and employee Richard Crisp – developed a plan to extract licensing fees for Rambus on a vast array of current and future DRAM products, including SDRAM and DDR SDRAM products.  This plan was developed in coordination with Neil Steinberg, a former outside counsel to Rambus who in April 1999 became in-house patent counsel and later Rambus' vice president for intellectual property, and was executed in part by Lester Vincent, Rambus' patent prosecution counsel.

45.    Consistent with its prior business strategy, Rambus' plan was to seek fees based on a percentage of the value of the entire DRAM product – rather than the fraction of a DRAM product associated with the DRAM interface, where Rambus' claimed inventive contribution lay.  From at least 1998, Rambus understood that the fees it planned to demand were so high that they would inevitably lead to litigation.

12

46.     Beginning in at least early 1998, Rambus and its management developed a plan to file lawsuits against DRAM manufacturers, such as plaintiff Micron, Infineon, and Hynix. A contemporaneous Rambus document set out the plan: "Get all infringers to license our IP with royalties, RDRAM (if it is a broad license) OR sue." They specifically identified the Eastern District of Virginia as an ideal forum.

47.     At various times, Rambus contemplated complaints based on patent infringement, breach of contract, fraud, unfair competition, and antitrust violations.

48.     Rambus' stated goal was to use litigation to "[c]ollect royalties on all DRAM and controllers forever."

49.     Rambus and its management knew, however, that any effort to assert patent rights related to DRAM interface technology would be threatened if harmful evidence were available in discovery. Thus, Rambus and its management, including members of the Rambus Group, embarked in early 1998 on a scheme to obstruct justice by destroying such evidence. Rambus vice president Karp prepared a purported "document retention" policy for this purpose. Contemporaneous documents show that the effort to identify and destroy relevant evidence was often described as the company's "licensing/litigation" or "licensing and litigation" strategy.

### "Shred Day" 1998

50.     The document destruction program got underway by the summer of 1998, when Karp and Rambus' then outside counsel presented the new document program to Rambus' employees. The presentation included slideshows explaining how the program would work.

51.     During this period, Rambus and its management implemented a destruction program that resulted in the eradication of large numbers of electronic files, including all the backup tapes for the Macintosh computers in use during the first years of Rambus' existence.

In July 1998, Joel Karp at Rambus sent over 1,000 backup tapes to an outside vendor with specific instructions to have those backup tapes "demagnetized" – that is, to have them erased so that the information on those tapes would be permanently destroyed.

52.    Next, in August 1998, Rambus and its management arranged for burlap bags to be distributed to all Rambus employees, with directions that the employees collect for shredding various categories of documents relevant to the patents and patent infringement claims that Rambus was planning to assert against DRAM manufacturers, including Micron. These categories included:

(a)    Rambus' prosecution of its patents;

(b)    the relationship of Rambus' patent applications and pending claims to industry standards;

(c)    presentations to Rambus' board of directors regarding intellectual property and assertion/litigation plans;

(d)    potentially damaging or invalidating prior art related to patents asserted against DRAM manufacturers, including Micron, as part of Rambus' litigation strategy; and

(e)    Rambus' draft license agreements and documents related to the negotiations for such license agreements.

53.    Then, on September 3, 1998, Rambus arranged for a truck from a private shredding company to arrive at Rambus' headquarters to pick up the documents that Rambus' employees had collected in the previously-distributed burlap bags. So much material was collected – 185 burlap sacks and 60 additional boxes of documents – that the truck had to return another day to haul it all away.

54.    Multiple internal Rambus emails refer to September 3, 1998 as "Shred Day." At the conclusion of "Shred Day," Rambus held a party with beer and pizza to celebrate the completion of the shredding project.

55.    Following "Shred Day," Rambus vice president Karp conducted "spot checks" to determine whether employees had fully complied with the instructions to collect, bag and destroy the listed categories of documents.

56.    Sworn testimony confirms that the goals of the document destruction included rendering the documents unavailable in upcoming litigation. On April 14, 2001, Rambus vice president of engineering Allen Roberts testified that Rambus vice president Karp had directed him to purge his files at least in part because "such materials are discoverable in subsequent litigations."

57.    Tony Diepenbrock, a lawyer in Rambus' in-house legal department, testified on April 11, 2001 that he understood that one of the reasons behind "Shred Day" was that "some of that stuff is discoverable."

**"Shred Day" 1999**

58.    Rambus, its management and others continued their evidence destruction program in 1999. They focused on the destruction of evidence that Rambus knew would be at the heart of any antitrust and patent lawsuits that it intended to bring or suspected might be brought against it if its scheme succeeded.

59.    A June 27, 1999 document identifying Rambus' goals for the third quarter of 1999 listed as goals under the heading "Licensing/Litigation Readiness":

"E.    Prepare litigation strategy against 1 of 3 manufacturers (re: 3D)

"F.    Ready for Litigation with 30 days notice

"G.    Organize 1999 shredding party at Rambus."

60. Consistent with these "goals," Rambus, its management, and others organized a second document shredding event on August 29, 1999 – during which Rambus destroyed an additional 150 burlap bags filled with documents (the equivalent of 188 banker's boxes of documents).

**"Shred Day" 2000**

61. In January 2000, Rambus filed suit against Hitachi, the first of several lawsuits against DRAM manufacturers. Soon thereafter, Rambus asserted patent infringement claims against Infineon and several other DRAM manufacturers, including Micron, in the U.S. federal courts, as well as courts in Italy, Germany, France, and the United Kingdom.

62. Shortly before commencing the litigation against Infineon, Rambus instructed Lester Vincent, Rambus' former outside patent prosecution counsel who had drafted many of Rambus' patent claims, to destroy additional evidence, including documents relating to certain of the patents asserted against Infineon and still being asserted against Micron.

63. In the spring of 2000, Cecelia Gonzalez, Rambus' outside counsel in the litigation against Hitachi, asked Rambus' then-intellectual property vice president Neil Steinberg why she could not locate within Rambus' files entire categories of documents relevant to the case. Steinberg told Gonzalez that there had been a large document shredding campaign in 1998. Gonzales told Steinberg that Rambus had a duty to maintain documents and could not destroy any materials pertaining to the litigation.

64. Yet, in December 2000, while Rambus was litigating against Micron and other companies on antitrust, fraud, and patent claims, and while pretrial discovery was underway in connection with the then-scheduled 2001 trial in Rambus' case against Infineon, Rambus, its management, and others undertook a third shredding event. In a repeat of the "Shred Days" in

1998 and 1999, the December 2000 "Shred Day" resulted in the destruction of 460 burlap bags full of documents – the equivalent of 575 banker's boxes.

**D.    The U.S. District Court for the Eastern District of Virginia Concludes That Rambus' Document Destruction Scheme Was Intended to Destroy Discoverable Documents**

65.    In connection with Rambus' litigation against Infineon, Rambus sought to cover up the details of its document destruction by asserting privilege over thousands of documents.  This Court conducted an *in camera* review of 4,673 documents as to which Rambus had claimed privilege, and concluded that Rambus' document destruction plan was intended "to destroy discoverable documents as part of its litigation strategy." *Rambus, Inc. v. Infineon Techs.* AG, 222 F.R.D. 280, 298 (E.D. Va. 2004).

66.    In an earlier opinion in the case, the Court noted as well that Rambus' "document retention policy" had been implemented, at least in part, "for the purpose of getting rid of documents that might be harmful in litigation." *Rambus, Inc. v. Infineon Techs. AG*, 155 F. Supp. 2d 668, 682 (E.D. Va. 2001).

67.    The Court found that the "crime/fraud" exception was applicable to Rambus' assertions of attorney-client and work product privilege and ordered Rambus to produce documents regarding Rambus' development and implementation of its document destruction program. *Id.* at 680.

**E.    Rambus and Its Management Provide False Testimony to Hide the Document Destruction Scheme**

68.    In connection with pending lawsuits against Micron and other DRAM manufacturers, including Rambus' lawsuit against Infineon in the Eastern District of Virginia, Rambus' management testified in a false or misleading manner to cover up the company's document destruction.

69.     For example, in the *Micron* case in Delaware, Neil Steinberg, formerly outside counsel to Rambus and later its in-house counsel and vice president of intellectual property, falsely testified under oath on August 1, 2001 that "Shred Day 1998" was the only time when Rambus employees were given burlap bags to collect documents for shredding.  Mr. Steinberg so testified, despite admitting that he had prepared for his testimony by interviewing a number of Rambus employees who had been involved in the document destruction program, including Geoffrey Tate, David Mooring, Richard Crisp, Allen Roberts, and representatives from Rambus' information technology group, all of whom would have known the falsity of the testimony.

70.     Mr. Steinberg also testified falsely that (a) no slide presentation was shown to Rambus employees regarding its document destruction policy and (b) no instructions regarding the destruction of documents were provided to Rambus employees during that meeting. Documents that Rambus attempted to withhold under claims of privilege (but which Rambus was later forced to produce) establish that Rambus employees had been shown slide presentations that instructed them to destroy e-mails and other evidence.

71.     Robert Kramer, Rambus' 30(b)(6) corporate representative in the *Hynix* case in California, and Rambus' current director of litigation, like Mr. Steinberg, falsely testified that "Shred Day" 1998 had been the sole instance when Rambus employees had used burlap bags to collect documents for shredding.  Mr. Kramer also falsely testified that Rambus' board of directors had received no presentations regarding "Shred Days."  In addition, Mr. Kramer falsely testified that Rambus had not produced certain documents in litigation simply because those documents had been "corrupted," when in fact Rambus had simply withheld them from production.

72.     Richard Crisp, another Rambus employee, testified in his first deposition in the *Infineon* case that he "never, ever" participated in Rambus' patent drafting efforts. However, when he was confronted with documents obtained after the piercing of the attorney-client privilege, he was forced to admit that he had directed which patent claims should be filed. This Court found Mr. Crisp's testimony to be false or misleading. *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681 (E.D. Va. 2001).

73.     At a May 2004 deposition, Mr. Crisp refused to answer, on the basis of attorney-client privilege, questions about what Daniel Johnson, Jr., Rambus' outside counsel, said about document retention and destruction at Rambus. After the Virginia Court ordered Mr. Crisp to answer questions on that topic, Mr. Crisp was deposed the following October and asked those questions again. But rather than comply with the Court's order, Mr. Crisp claimed that he had forgotten what he "remembered in May 2004 regarding the comments by Mr. Johnson" merely because five months had gone by.

74.     Geoffrey Tate, then Rambus' chief executive officer, also testified in his first deposition that he did not believe that Rambus drafted claims to cover certain DRAM technology. Tate even testified that he did not know whether he was aware that patent claims could be modified. At trial, however, he admitted, upon being confronted with belatedly-obtained impeaching documents, that he knew that Rambus was amending its patent applications to cover that same DRAM technology. *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681-82 (E.D. Va. 2001).

75.     On March 12, 2001, following this Court's order piercing the attorney-client privilege under the crime-fraud exception, Rambus took the extraordinary step of filing a mandamus petition with the Federal Circuit Court of Appeals seeking to vacate this Court's

order and prevent the disclosure of what it knew to be damning documents. Consistent with Rambus' previous testimony – including the testimony of Tate and Crisp – Rambus' Federal Circuit brief vehemently denied the conduct underlying this Court's order, stating that Crisp did not counsel any lawyers or other Rambus employees regarding pending patent applications, and that he did not know Rambus had pending patent applications relating to SDRAM at the time. Only after the Federal Circuit denied mandamus relief and Rambus was forced to turn over these harmful documents did Rambus' position and testimony change.

76.    Even after the District Court's ruling in the *Infineon* case, Rambus and its management have continued to misrepresent the facts of the company's document shredding.

## F.    The Document Destruction Scheme and Subsequent False Cover-Up Testimony Involved Numerous Violations of Federal, Virginia, and California Law.

77.    The document destruction scheme, and the subsequent proffering of knowingly false testimony to hide that scheme, are grounds for criminal sanctions as felonies under 18 U.S.C. §§ 1341, 1343, 1503, and 1512, as misdemeanors and/or felonies under Va. Code §§ 18.2-434, -436, and -460, and as misdemeanors under Cal. Penal Code § 135.

## G.    Rambus Co-Founder Farmwald Falsely Testified About the Timing of His Inventions

78.    In various litigations, including the litigation against Infineon in the Eastern District of Virginia, Rambus co-founder Farmwald has falsely testified about the timing of his inventions of DRAM interface technology. Farmwald's intent has been to conceal that he conceived of and developed those inventions while still employed by MIPS, and that, by operation of an invention assignment obligation, he had in fact assigned to MIPS the ownership of those inventions.

79.    Farmwald falsely testified in the *Infineon* case that he was employed at the University of Illinois and no longer at MIPS at the time of the October 1988 meeting in which

he described his DRAM interface inventions to Messrs. Horowitz and Johnson. However, Farmwald did not terminate his employment with MIPS until December 16, 1988 and was therefore still bound by his assignment obligations at the time he conceived of the '898 inventions.

80.     Rambus improperly withheld from Micron and other litigants evidence that would refute Rambus' false conception and ownership story. For example, Rambus possessed backup tapes containing information showing that Farmwald developed the '898 inventions while still employed at MIPS. Yet Rambus withheld these documents from Micron for nearly five years of litigation and only recently produced them. Infineon did not ever benefit from having this document. Rambus discovered over 1,000 backup tapes during the *Infineon* litigation, including tapes containing information relevant to the ownership of the '898 family, and on information and belief Rambus never informed the Court nor Infineon of the existence of those tapes. Instead, it rushed a settlement with Infineon that resulted in substantial payments to Rambus.

81.     Farmwald also falsely testified that he joined the University of Illinois in mid-1988, also before his October 1988 meeting with Horowitz and Johnson. In fact, Farmwald joined the University of Illinois faculty on November 9, 1988.

82.     Farmwald's perjurious testimony, and Rambus' purposeful effort to withhold from discovery documents that would have established the falsity of the testimony, are grounds for criminal sanctions as felonies under 18 U.S.C. §§ 1341, 1343, 1503, and 1512, as misdemeanors and/or felonies under Va. Code §§ 18.2-434, -436, and -460, and as misdemeanors under Cal. Penal Code § 135.

## H.    Equitable Tolling and Continuing Conspiracy

83.    Micron's discovery of the wrongful conduct alleged in this complaint was delayed by the fraudulent concealment, continuing deceptive acts, practices, and omissions, and continuing conspiracy of Rambus and its management, including members of the Rambus Group.

84.    Until recently, Micron did not know the fact of, and/or the extent of, the wrongful conduct alleged herein.  The evidence referenced in this complaint was at all relevant times in the possession, custody, and control of Rambus and Rambus' management.

85.    The communications and meetings concerning the wrongful conduct by and between these persons, as specifically alleged in this complaint, were conducted in secret, were maintained as confidential, and could not, in the exercise of reasonable diligence, have been discovered earlier by Micron.

86.    Rambus and its management took affirmative steps to conceal their wrongful conduct, as specifically alleged in this complaint.  They fraudulently concealed their wrongful conduct by various means and methods not reasonably discoverable by Micron.

87.    The wrongful conduct, as specifically alleged in this complaint, also involved multiple, continuous, deceptive acts, practices, and omissions by Rambus and its management over a period of many years, and there is a likelihood that this conduct is continuing.  Micron is informed and believes that Rambus has been continuing and is still performing overt acts in furtherance of the illegal conduct.

88.    Because the illegal conduct, as specifically alleged in this complaint, was kept secret by Rambus and its management, Micron did not know of defendant's secret agreements.

89.    Micron could not have discovered the illegal conduct at an earlier date by the exercise of due diligence because of defendant's deceptive practices and techniques of secrecy.

90.    As a result of the fraudulent concealment by Rambus and Rambus'

management, all applicable statutes of limitations have been tolled.

### Count I

### Conducting the Affairs of the
### "Corrupt Litigation Enterprise"
### in Violation of 18 U.S.C. § 1962(c) of Civil RICO

91.    Micron realleges and incorporates by reference the preceding allegations of this

complaint.

### Rambus, Rambus' Management, Tate, Karp, Steinberg, Vincent and Crisp and/or Others Repeatedly Destroyed Evidence They Knew Would Have to Be Produced in the Litigations

92.    In an effort to eliminate the threat of known problems with the '898 family,

Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or

others conspired to destroy or suppress material evidence and submit false testimony to hide or

deny such problems.

93.    As part of this conspiracy, Rambus, Rambus' management, Tate, Crisp,

Farmwald, Karp, Steinberg, Vincent, and/or others instituted a document destruction policy

with a purpose and effect to was to intentionally destroy documents they knew would be

discoverable and probative in numerous litigations and official proceedings.

94.    A key part of this strategy to dispose of critical evidence and to hide that fact

from Rambus' litigation adversaries was the deliberate decision not to maintain any record of

which documents were destroyed, in an attempt to prevent litigation adversaries from

establishing a nexus between specific documents and claims or defenses in those litigations.

95.    The document destruction took place at the same time they were planning or

already conducting their comprehensive litigation strategy, when Rambus had a clear duty to

preserve these documents for use as evidence.

96.    Believing they had substantially destroyed the harmful impeaching documents, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others then repeatedly submitted false testimony to this and other courts.

### Rambus, Rambus' Management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent and/or Others Used Instrumentalities of Interstate and Foreign Commerce

97.    As an integral part of the continuing conspiracy and course of conduct described above, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others repeatedly and continuously used and affected the instrumentalities of interstate commerce, including the mails, wires, overnight delivery services, air travel, and other forms of interstate commerce in the United States within the meaning of 18 U.S.C. § 1962.

98.    Their conduct, acts, and omissions were an integral part of the overall pattern and practices described in this complaint, including using the facilities of United States interstate commerce for their scheme to pervert the ends of justice and to defraud Micron and other companies by pressing false claims and suppressing relevant, discoverable evidence in litigation.

99.    The conduct, acts, and omissions of Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others set forth above were an integral part of the overall pattern and practices described herein, including obstructing justice and prosecuting improper litigation using United States interstate commerce to attempt to wrongfully collect potentially billions of dollars from Micron and other manufacturers.

100.    As an integral part and result of this conduct and these acts and omissions intended to deprive the litigations of their legitimacy, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others knowingly:

(a)     used the mails in U.S. or foreign commerce to commit one or more frauds in violation of 18 U.S.C. § 1341;

(b)     used the wires in U.S. or foreign commerce to commit one or more frauds in violation of 18 U.S.C. § 1343;

(c)     corruptly endeavored to and did influence and impede one or more officers, namely, judges, of the courts of the United States in violation of 18 U.S.C. § 1503(a);

(d)     corruptly endeavored to and did influence, obstruct, and impede the due administration of justice in the courts of the United States in violation of 18 U.S.C. § 1503(a);

(e)     knowingly and corruptly attempted to and did persuade one or more other persons and engaged in misleading conduct toward those persons with intent to influence or prevent the testimony of those persons in one or more official proceedings in violation of 18 U.S.C. § 1512(b);

(f)     knowingly and corruptly attempted to and did persuade one or more other persons and engaged in misleading conduct toward those persons with intent to cause or induce them to withhold testimony and withhold records, documents, and other objects from an official proceeding in violation of 18 U.S.C. § 1512(b);

(g)     knowingly and corruptly attempted to and did persuade one or more other persons and engaged in misleading conduct toward those persons with intent to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding in violation of 18 U.S.C. § 1512(b);

(h)     knowingly and corruptly attempted to and did alter, destroy, mutilate, or conceal a record, document, or other object with the intent to impair the object's integrity or availability for use in an official proceeding in violation of 18 U.S.C. § 1512(c); and/or

(i)    knowingly and corruptly attempted to and did obstruct, influence, and impede one or more official proceedings in violation of 18 U.S.C. § 1512(c).

101.    All these acts constitute RICO "predicate acts" under 18 U.S.C. § 1961, and were intended to and did deprive the litigations of their legitimacy.

102.    In the course of and as an integral part of their unlawful conduct and conspiracy, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others communicated using the mails and wires in interstate commerce to carry out their unlawful conduct and conspiracy, including sending e-mails, using the telephones, and sending materials through the mails and through private interstate carriers to destroy documents and conceal their destruction of documents.  Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others made repeated filings in this Court and other courts that used these interstate facilities as an integral and necessary part of their conduct and conspiracy.

**Rambus, Rambus' Management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent and/or Other Persons Engaged in a "Pattern" of Racketeering Activity**

103.    The conduct of Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others involved substantially more than "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity" and therefore constituted a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(b).

104.    As set forth above, this pattern consisted of repeated, continuous acts that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated events.

105.    As also set forth above, this pattern lasted for a significant period of time, from at least early 1998 and continuing to the present.  To the extent the partial discovery of the scheme has caused Rambus and other participants in the enterprise to curtail somewhat or modify their scheme, absent such discovery, their scheme would have continued indefinitely into the future on as broad and substantial a basis as it had prior to partial discovery.

106.    It was the purpose of the pattern and practice to deprive Micron and other parties with which Rambus was litigating or threatening to litigate of crucial, relevant evidence, and to obstruct and hinder the due administration of justice in the courts of the United States by depriving them of material evidence relating to the issues in the litigation in which they were engaged.  By depriving the litigations of their legitimacy (by, among other things, avoiding an honest determination of the merits) Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others expected to obtain unwarranted sums, either as a result of perverted judgments or extortionate settlements based on an incomplete record of evidence in, among other ways:

(a)    hiding evidence of Rambus' anticompetitive conduct;

(b)    hiding the true state of affairs of Rambus' patents;

(c)    hiding the true state of affairs of Rambus' other financial transactions and business operations;

(d)    making it appear that Rambus had legitimate patent and other intellectual property rights;

(e)    making it appear that Rambus had legitimate contractual rights;

(f)    making it appear that Rambus' litigation claims were more meritorious than they actually were;

(g)     attempting to obtain or extort potentially billions of dollars from Micron and other parties based on a false record and perverted evidence;

(h)     using false and perjured testimony to hide its destruction of documents;

(i)     using false and perjured testimony to mislead the courts; and/or

(j)     enriching Rambus and the others, including its officers and employees, through these acts and fraudulent practices.

107.    As part of their pattern and practice, and in furtherance of their illegal and fraudulent acts, from at least as early as 1998 to the present, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others deceived the courts and other parties with whom they were litigating or threatening to litigate.

108.    Beginning at least as early as 1998 and continuing to the present, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud and to obstruct justice, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others on numerous occasions used and caused to be used wire communications in interstate and foreign commerce, by both making and causing to be made wire communications.

109.    Each such use of a wire communication in connection with the described schemes and artifices to defraud and to obstruct justice by means of false pretenses constitutes a separate and distinct violation of 18 U.S.C. § 1343.

110.    Rambus, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent are each a United States person within the meaning of 18 U.S.C. § 1957(d).  A substantial part of the activities described above was conducted within the United States or by a United States

person, each was engaged in for the purposes described in the preceding paragraphs, and each

constitutes a separate and distinct activity indictable under 18 U.S.C. §§ 1956, 1957, and 2314.

111.    From at least 1998 and continuing to the present, Rambus, Rambus'

management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others on numerous

occasions repeatedly engaged in acts indictable under 18 U.S.C. § 1341 (relating to mail

fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1503 (relating to obstruction of

justice), and/or 18 U.S.C. § 1512 (relating to further obstruction of justice), and/or used the

United States mails as well as wire and other communications in interstate commerce in

connection with these acts, and thereby continually engaged in "racketeering activity" within

the meaning of 18 U.S.C. § 1961(1)(B) in the course of the described criminal schemes.

112.    The repeated violations of 18 U.S.C. §§ 1341, 1343, 1503, and 1512 by

Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or

others extended over a period of years and involved distinct and independent criminal acts.

They were neither isolated nor sporadic events, but involved the regular and repeated violation

of law to accomplish their desired ends in the course of the continuing business of the "Corrupt

Litigation Enterprise."

113.    These acts were related to each other by virtue of (a) common participants

(Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent, as well

Rambus' inside and outside counsel), (b) common victims (the DRAM manufacturers), (c)

common methods of commission (through the same course of destroying relevant evidence

and discoverable documents and then lying to cover up this destruction), and (d) a common

purpose and common result (of suing to extract potentially billions of dollars from Micron and

other persons while concealing their criminal activities).

114.    As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

115.    These repeated and continuing violations of the provisions of 18 U.S.C. § 1961(5) cited above were neither isolated nor sporadic events, but involved a callous and calculated series of repeated and systematic violations of law in order to conceal and promote criminal activity in the course of the continuing business of the "Corrupt Litigation Enterprise." These activities therefore constitute a further component of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

116.    These violations of 18 U.S.C. § 1962(c) caused Micron to suffer direct injury to its business and property.

### Rambus, Rambus' Management, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent Operated the "Corrupt Litigation Enterprise"

117.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

118.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others operated and controlled the "enterprise" consisting of an association in fact of themselves and Rambus (the "Corrupt Litigation Enterprise") within the meaning of 18 U.S.C. § 1961(4).

119.    It was their common purpose in using and operating the association in fact of the "Corrupt Litigation Enterprise" to obstruct justice and commit the other predicate acts set forth above to deprive the litigations of their legitimacy so that Rambus and its co-conspirators could extract potentially billions of dollars in judgments or settlements from Micron and other DRAM manufacturers and to engage in the other acts and omissions described above that were

designed to conceal their wrongful acts and prevent them from being discovered, all as set forth in detail above.

120.    The association in fact of the "Corrupt Litigation Enterprise" was and is an enterprise distinct from Rambus itself.

**Rambus, Rambus' Management, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent Conducted the Affairs of the "Corrupt Litigation Enterprise" Through a Pattern of Racketeering**

121.    The "Corrupt Litigation Enterprise" had the purpose of and was used for:

(a)    hiding evidence of Rambus' anticompetitive conduct;

(b)    hiding the true state of affairs of Rambus' patents;

(c)    hiding the true state of affairs of Rambus' other financial transactions and business operations;

(d)    making it appear that Rambus had legitimate patent and other intellectual property rights;

(e)    making it appear that Rambus had legitimate contractual rights;

(f)    making it appear that Rambus' litigation claims were more meritorious than they actually were;

(g)    attempting to obtain or extort potentially billions of dollars from Micron and other parties based on a false record and perverted evidence;

(h)    using false and perjured testimony to hide its destruction of documents;

(i)    using false and perjured testimony to mislead the courts; and

(j)    enriching Rambus and others, including its officers and employees, through these acts and fraudulent practices.

122.    Throughout its existence, the "Corrupt Litigation Enterprise" had a continuity of structure and personnel, including (a) various members of Rambus' management, (b)

31

Rambus' in-house and outside counsel involved in its litigation, (c) one or more of Tate, Crisp, Farmwald, Karp, Steinberg, and/or Vincent, and (d) other persons as yet unidentified.

123.    Throughout its existence, the "Corrupt Litigation Enterprise" had an ascertainable structure (the interrelated association in fact) distinct from that inherent in the pattern of racketeering (the destruction of documents and pursuit of improper litigation) and associated through time, joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making in the plan and conduct to destroy documents relevant to Rambus' improper litigation while at the same time prosecuting that litigation, all for the unlawful purposes and with the unlawful effects described in this complaint.

124.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others therefore managed, operated, conducted and participated in the conduct of the affairs of the "Corrupt Litigation Enterprise" through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

### Rambus, Rambus' Management, Tate, Crisp, Farmwald, Karp, Steinberg, and Vincent Acted With Criminal Intent

125.    The conduct of Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others was not merely reckless or negligent.

126.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others engaged in the conduct, acts, and omissions described above willfully and with actual knowledge of their illegality and actual purpose to the detriment of the DRAM manufacturers, including Micron.

**Micron Has Been Directly Injured in Its Business and Property**

127.    Micron has been directly injured in its business and property by reason of these persons' violation of 18 U.S.C. § 1962(c).  Its losses, in an amount to be proven at trial, are a direct result of the conspiracy set forth above.

## Count II

### Conspiring to Conduct the Affairs of the "Corrupt Litigation Enterprise" in Violation of 18 U.S.C. § 1962(d) of Civil RICO

128.    Micron realleges and incorporates by reference the preceding allegations of this complaint.

129.    By the conduct, acts and omissions set forth in detail above, from at least 1998 and continuing to the present, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others agreed and conspired to manage, operate, conduct, and participate in the conduct of the affairs of the "Corrupt Litigation Enterprise" through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(d).

130.    From at least 1998 and continuing to the present, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others, being persons intimately involved in transactions and the affairs of the "Corrupt Litigation Enterprise" – who were engaged in, and the activities of which affected, interstate commerce – unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the "Corrupt Litigation Enterprise" through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).

131.    Part of this conspiracy was that Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others committed and agreed to commit two or

more (and numerous) repeated fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the "Corrupt Litigation Enterprise" through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) described above.

132.    In furtherance of the conspiracy and to effect the objects thereof, Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or Others committed and caused to be committed a series of overt acts, including those specifically alleged in paragraph 106 above.

133.    Micron has been directly injured in its business and property by reason of these persons' violation of 18 U.S.C. § 1962(d).  Its losses, in an amount to be proven at trial, are a direct result of the conspiracy set forth above.

### Count III

### Statutory and Civil Conspiracy
### (Violation of Va. Code §§ 18.2-499, -500 (1950, as amended))

134.    Micron realleges and incorporates by reference the preceding allegations of this complaint.

135.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others agreed to and did combine, associate, agree, mutually undertake, or concert together for the purpose of willfully and maliciously injuring Micron in its reputation, trade, and business within the meaning of Va. Code §§ 18.2-499 and -500 (1950, as amended). Each of these persons had a personal stake in conspiring to injure Micron in its trade or business and derived some direct economic benefit from the alleged illegal conduct.  For example, Rambus implemented certain incentive stock plans for success in its litigations. These plans were for its employees and Geoffrey Tate in particular.

136.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others combined, by their concerted action, to accomplish their criminal and unlawful purposes set forth above.

137.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others combined, by their concerted action, to accomplish their purposes set forth above by criminal or unlawful means.

138.    Rambus, Rambus' management, Tate, Crisp, Farmwald, Karp, Steinberg, Vincent, and/or others combined together to effect a preconceived plan and unity of design and purpose to accomplish those illegal goals specifically alleged in paragraphs 106 and 132 above.

139.    Micron has been directly and proximately injured in its business and property by reason of the violation by the defendant of Va. Code §§ 18.2-499 and -500 (1950, as amended) and their engagement in a civil conspiracy in an amount to be proven at trial.

**Prayer for Relief**

Wherefore, plaintiffs Micron Technology and Micron Semiconductor pray for judgment against defendant for:

1.      An award of compensatory and punitive damages;

2.      An award of enhanced damages, up to and including trebling of Micron's damages, pursuant to 18 U.S.C. § 1964 for Rambus' violations of 18 U.S.C. §§ 1961 et seq.; Va. Code § 18.2-500 for Rambus' violations of Va. Code § 18.2-499; and/or as otherwise permitted by law;

3.      The restitution of all amounts that Rambus has received from Micron as a result of its wrongful conduct;

4.      An award of the costs and expenses of suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964 for Rambus' violations of 18 U.S.C. §§ 1961 et seq.; Va. Code § 18.2-500 for Rambus' violations of Va. Code § 18.2-499; and/or as otherwise permitted by law;

5.      An award of pre-judgment and post-judgment interest at the maximum legal rate;

6.      A permanent injunction against the illegal acts and practices alleged herein, including the pursuit of patent, antitrust, and other legal claims as to which relevant evidence was spoliated by Rambus' management and others, as permitted by law; and

7.    Such other and further relief as the Court may deem just and proper.

Dated:  February 2|, 2006

HUGH M. FAIN, III (VSB No. 26494)
DANA D. MCDANIEL (VSB No. 25419)
M.F. CONNELL
     MULLINS, JR. (VSB No. 47213)
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Telephone:  (804) 697-2000
Facsimile:  (804) 697-2100

JOHN B. QUINN
WILLIAM C. PRICE
JON R. STEIGER
DOMINIC SURPRENANT
DIANE C. HUTNYAN
QUINN EMANUEL URQUHART
     OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
(motions for admission
     pro hac vice to be filed)

Counsel for Plaintiffs
Micron Technology, Inc. and
Micron Semiconductor Products, Inc.