IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICRON TECHNOLOGY, INC., and            )
MICRON SEMICONDUCTOR PRODUCTS,          )
INC.,                                   )
                                        )
            Plaintiffs,                 )
                                        )   Civil Action No. 06-269 – KAJ
      v.                                )
                                        )
RAMBUS INC.,                            )
                                        )
            Defendant.                  )


**OPENING BRIEF IN SUPPORT OF DEFENDANT RAMBUS INC.'S  MOTION TO DISMISS**


MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Rodger D. Smith (#3778)
1201 N. Market Street
P.O. Box 1347
OF COUNSEL:                             Wilmington, DE  19899-1347
                                        (302) 658-9200
V. Bryan Medlock, Jr.                   *Attorneys for Defendant Rambus Inc.*
Charles W. Douglas
Thomas K. Cauley, Jr.
SIDLEY AUSTIN LLP
Bank One Plaza
One South Dearborn Street
Chicago, IL  60603
(312) 853-7000

Gregory P. Stone
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071
(213) 683-9100

May 26, 2006

# **TABLE OF CONTENTS**

Page

Introduction ....................................................................................................................... 1

Summary Of Argument ....................................................................................................... 3

Argument ............................................................................................................................ 5

    I.      Standard Of Review ............................................................................................ 5

    II.     The Governing Statute Of Limitations Time-Bars Micron's RICO Claims (Counts I And II) ................................................................................................. 6

          A.     Micron Filed The Complaint After The Four-Year Statute Of Limitations Applicable To Its RICO Claims Had Expired ......................... 6

          B.     Micron's Fraudulent Concealment Allegations Cannot Toll The Statute Of Limitations ............................................................................. 11

    III.    Micron's RICO Claims Fail on the Merits. ....................................................... 15

          A.     Micron's Section 1962(c) RICO Claim Fails Because The "Association In Fact" Enterprise Alleged By Micron Is Not Distinct From Rambus. ...................................................................... 15

          B.     Micron Has Not Pled A RICO Injury. ...................................................... 19

          C.     Micron's Allegations Of Mail And Wire Fraud Lack The Specificity Required By Rule 9(b) .......................................................... 21

          D.     Micron Fails To Plead A Viable Section 1962(d) Conspiracy Claim. ........................................................................................................ 23

    IV.    Micron's State Law Conspiracy Claim (Count III) Fails Because A Corporation Cannot Conspire With Itself. ......................................................... 24

    V.     The *Noerr-Pennington* Doctrine Bars Micron's Complaint. ............................. 27

Conclusion ....................................................................................................................... 30

## TABLE OF AUTHORITIES

### CASES

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
 483 U.S. 143 (1987)..........................................................................................6

*Al-Abood v. El-Shamari*,
 217 F.3d 225 (4th Cir. 2000) .......................................................................1

*Am. Chiropractic Assoc. v. Trigon Healthcare, Inc.*,
 151 F. Supp. 2d 723 (E.D. Va. 2001) ........................................................26

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
 193 F.3d 85 (2d Cir. 1999)...........................................................................16

*Anderson v. Ayling*,
 396 F.3d 265 (3d Cir. 2005)...........................................................................1

*Bachman v. Bear Stearns & Co.*,
 178 F.3d 930 (7th Cir. 1999) ......................................................................16

*Bath Petroleum Storage v. Market Hub Partners, L.P.*,
 229 F.3d 1135, 2000 WL 1508873 (2nd Cir., Oct. 11, 2000)....................27

*Bausch v. Philatelic Leasing, Ltd.*,
 728 F. Supp. 1201 (D. Md. 1990) ...............................................................13

*Berg v. First Interstate Insurance Co.*,
 915 F.2d 460 (9th Cir. 1990) ......................................................................20

*Bessette v. Avco Finance Services, Inc.*,
 230 F.3d 439 (1st Cir. 2000)........................................................................16

*Blanck v. McKeen*,
 707 F.2d 817 (4th Cir. 1983) ......................................................................13

*Blystra v. Fiber Tech Group, Inc.*,
 407 F. Supp. 2d 636 (D.N.J. 2005) .........................................................6, 11

*Brittingham v. Mobile Corp.*,
 943 F.2d 297 (3d Cir. 1991)..........................................................16, 18, 19

*Callahan v. A.E.V., Inc.*,
 182 F.3d 237 (3rd Cir. 1999) ................................................................20, 21

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) ............................................................................................15

*Charles E. Brauer Co., Inc. v. Nationsbank of Virginia, N.A.*,
   466 S.E.2d 382 (Va. 1996) ...........................................................................24, 25

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999) .............................................................27, 28, 29, 30

*Dornberger v. Metropolitan Life Insurance Co.*,
   961 F. Supp. 506 (S.D.N.Y. 1997) ....................................................................19

*Eastern R.R. Presidents Conference v. Noerr Motor Freight*,
   365 U.S. 127 (1961) ............................................................................................27

*Evancho v. Fisher*,
   423 F.3d 347 (3d Cir. 2005) ................................................................................5

*Fitzgerald v. Chrysler Corp.*,
   115 F.3d 225 (7th Cir. 1997) .......................................................................16, 19

*Forbes v. Eagleson*,
   228 F.3d 471 (3d Cir. 2000) ....................................................................12, 13, 14

*Gatz v. Pomsoldt*,
   397 F. Supp. 2d 719 (D. Del. 2003) ..................................................................23

*Glessner v. Kenny*,
   952 F.2d 702 (3d Cir. 1991) ..........................................................................23, 24

*Greenville Public Co. v. Daily Reflector*,
   496 F.2d 391 (4th Cir. 1974) .............................................................................25

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
   492 U.S. 229 (1989) ..............................................................................................1

*Hartnett v. Schering Corp.*,
   2 F.3d 90 (4th Cir. 1993) ...................................................................................14

*Hiers* v. *Cave Hill Corp.*,
   51 Va. Cir. 208, 2000 WL 145359 (Jan. 6, 2000) ............................................25

*Hockenberry v. Diversified Ventures, Inc.*,
   2005 WL 1458768 (M.D. Pa. June 20, 2005) ...................................................12

*Holmes v. Securities Investment Protection Corp.,*
  503 U.S. 258 (1992)...................................................................................19, 20

*International  Brotherhood of Teamsters, Local 734 Health Workers and Welfare Trust v. Phillip Morris, Inc.,*
  196 F.3d 818 (7th Cir. 1999) ...................................................................27

*In re InterCo. Inc.,*
  128 B.R. 229 (Bkrtcy. E.D. Mo. 1991)......................................................26

*Klehr v. A.O Smith Corp.,*
  521 U.S. 179 (1997)...............................................................................6, 10

*Lighting Lube, Inc. v. Witco Corp.,*
  4 F.3d 1153 (3d Cir. 1993).........................................................................23

*Little Professor Book Co. of Reston Va., Inc. v. Reston North Point Village Ltd. P'ship,*
  41 Va. Cir. 73, 1996 WL 1065614 (Sept. 27, 1996)...................................25

*Lum v. Bank of America,*
  361 F.3d 217 (3d Cir. 2004).............................................................6, 21, 22

*McCullough v. Suter,*
  757 F.2d 142 (7th Cir. 1985) ....................................................................15

*Moffat Enterprises, Inc. v. Borden, Inc.,*
  763 F. Supp. 143 (W.D. Pa. 1990)............................................................19

*NCNB National Bank v. Tiller,*
  814 F.2d 931 (4th Cir. 1987) ....................................................................16

*Parker & Parsley Petroleum Co. v. Dresser Industrial,*
  972 F.2d 580 (5th Cir. 1992) ....................................................................16

*Pennepac International, Inc. v. Rotonics Manufacturing, Inc.,*
  2001 WL 569264 (E.D. Pa., May 25, 2001).........................................27, 28

*Prousalis* v. *Jamgochian,*
  38 Fed. Appx. 903, 905 (4th Cir. 2002).....................................................25

*Professional Real Estate Investors v. Columbia Pictures Industrial, Inc.,*
  508 U.S. 49 (1993)........................................................................20, 21, 29

*Prudential Insurance Co. of America v. U.S. Gypsum Co.,*
  359 F.3d 226 (3d Cir. 2004).................................................................*Passim*

*Rambus, Inc. v. Infineon Techs. A.G.*,
   155 F. Supp. 2d 668 (E.D. Va. 2001) ....................................................................1, 8

*Rockstroh v. A.H. Robins Co.*,
   602 F. Supp. 1259 (D. Md. 1985) ...........................................................................13

*Rotella v. Wood*,
   528 U.S. 549 (2000) .................................................................................................6

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985) ........................................................................................*Passim*

*Selman v. American Sports Underwriters, Inc.*,
   697 F. Supp. 225 (W.D. Va. 1990) ...................................................................24, 26

*Sosa v. Direct TV*,
   437 F.3d 923 (9th Cir. 2006) ...........................................................................27, 28

*Steele v. Hospital Corp. of America*,
   36 F.3d 69 (9th Cir. 1994) .......................................................................................19

*Studiengesellschaft Kohle, mbH v. Hercules, Inc.*,
   748 F. Supp. 247 (D. Del. 1990) .......................................................................12, 14

*United Mine Workers of America v. Pennington*,
   381 U.S. 657 (1965) ................................................................................................27

*United States v. Navarro-Ordas*,
   770 F.2d 959 (11th Cir. 1985) .........................................................................16, 17

*Weinberger v. Retail Credit Co.*,
   498 F.2d 552 (4th Cir. 1974) .....................................................................12, 13, 14

*Wood v. Carpenter*,
   101 U.S. 135 (1879) ................................................................................................14

## STATUTES

18 U.S.C. § 1341 ...............................................................................................................11

18 U.S.C. § 1343 ...............................................................................................................11

18 U.S.C. § 1503 ...............................................................................................................11

28 U.S.C. 1367(c) .............................................................................................................25

18 U.S.C. § 1961 .................................................................................................... *Passim*

18 U.S.C. § 1962(c) ...............................................................................................15

Cal. Penal Code § 135 ...........................................................................................11

Va. Code § 18.2-434 ..............................................................................................11

Va. Code § 18.2-436 ..............................................................................................11

## **MISCELLANEOUS**

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923
      (1970) .............................................................................................................1

Manual of Complex Litigation (4th Ed.) ...........................................................2

Defendant Rambus Inc. ("Rambus") respectfully submits this Opening Brief in support of its motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint filed by plaintiffs Micron Technology, Inc. and Micron Semiconductor Products, Inc. (together, "Micron") for failure to state a claim upon which relief can be granted.

## INTRODUCTION

Micron's Complaint charges Rambus with violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").  Congress intended the RICO statute to apply to patterns of "long-term criminal conduct" (*H.J., Inc.* v. *Northwestern Bell Telephone Co.*, 492 U.S. 229, 241-42 (1989)), in order to "eradicat[e] organized crime in the United States" (Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923 (1970)).  The Third Circuit rejects claims that do not meet the specific requirements Congress set forth for RICO causes of action.  *E.g., Anderson* v. *Ayling*, 396 F.3d 265, 268-71 (3d Cir. 2005); *see also Al-Abood* v. *El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (denying RICO claim for failure to establish RICO's elements, and observing that "this case is not sufficiently outside the heartland of fraud cases to warrant RICO treatment").

Micron's RICO allegations produce precisely the type of claims that the Third Circuit and other federal courts have rejected for failure to meet the requirements under RICO. Micron first attempts to transform isolated instances of alleged document spoliation and purportedly false testimony into fraud claims, and then attempts to transform those improper fraud claims into RICO claims.  Micron's effort to force the "square peg" of its litigation misconduct allegations into the "round hole" of the RICO statute should be rejected at this initial pleading stage.

The Manual for Complex Litigation (4th Ed.) ("*Manual*") makes clear that courts should weed out defective RICO cases, like the present one, on motions to dismiss. The *Manual* specifically states that the initial pleadings play an "important role" because "[c]ertain issues persistently appear in RICO litigation and can significantly affect the viability of the claim." *Manual* at 708, 718. Consequently, the *Manual* suggests "[a]ddressing these issues early in the case" because they "can reveal the presence of fatal flaws in the complaint before the court or the parties expend significant resources." *Id.* at 708. The threshold issues identified in the *Manual* include whether the statute of limitations bars the claims, whether the plaintiff suffered a RICO injury sufficient to confer standing, and whether the plaintiff alleged that the purported wrongdoing proximately caused the plaintiff's alleged injury (*id.* at 708-717) – Rambus demonstrates below that Micron's RICO claims merit dismissal on all three of those independent grounds.

The *Manual* also emphasizes the "prominent role" played by Rule 9(b) in ensuring "that complaints sounding in fraud entail more than general and vague statements of alleged misrepresentation, and plaintiffs who fail to plead the underlying predicate acts with the specificity demanded by Rule 9(b) risk dismissal of their RICO claims." *Id.* at 704. Micron plainly failed to meet the specificity requirements of Rule 9(b) because it provides no details whatsoever regarding any alleged act of mail or wire fraud.

## SUMMARY OF ARGUMENT

The claims asserted in Micron's Complaint should be dismissed for several, independent reasons. As an initial matter, Micron's RICO claims fail because they are untimely. A four-year statute of limitations applies to RICO claims, and those claims accrue on the date when the plaintiff knew or should have known of the alleged injury.[1] Micron was fully aware of its alleged injury by at least August, 2001 – more than four years before Micron filed this Complaint on February 21, 2006.[2] On August 31, 2001, Micron moved this Court for sanctions against Rambus founded upon the very same allegations it asserts here. Specifically, Micron stated that "Rambus had engaged in a pattern of serious litigation-related misconduct" that consisted of "providing false deposition testimony" and "willfully destroy[ing] documents." (Micron Mem. in Support of Motion for Sanctions, p. 1, (August 31, 2001) (D.I. 398) ("Sanctions Motion").) The language of the August 31, 2001 Sanctions Motion forestalls any argument that Micron did not, as of that date, have knowledge of the injury (and wrongful conduct) that it alleges here. Accordingly, the statute of limitations on Micron's RICO claim expired (at the latest) on August 31, 2005 – more than five months before Micron filed this Complaint.

Moreover, Micron's Section 1962(c) RICO claim in Count I fails on the merits because Micron cannot establish two elements essential to such a claim. *First*, Micron's RICO claim fails to meet Section 1962(c)'s requirement that the RICO defendant (Rambus) be distinct from the RICO "enterprise" that it allegedly controls. Micron's alleged RICO enterprise consists

---

[1] Micron's failure to plead a proper RICO injury at all, which is necessary to confer RICO standing upon Micron, constitutes one of the pleading deficiencies discussed below.

[2] Micron originally filed this Complaint in the Eastern District of Virginia on February 21, 2006, and it was subsequently transferred to the District of Delaware after this Court enjoined Micron from pursuing its RICO claims in Virginia.

only of Rambus and its agents.  But a corporation is not distinct from its agents, and therefore Micron's RICO claim is doomed because it fails the distinctiveness requirement.  *Second*, Micron has not pleaded an actionable RICO injury.  Micron's alleged injury is the attorneys' fees and costs of litigation incurred in connection with Rambus's patent infringement claims. Because Micron does not (and could not) contend that Rambus's alleged wrongful conduct proximately caused such injury, Micron has failed to plead an actionable RICO injury. Accordingly, its RICO claim must be dismissed.

Furthermore, to the extent that Micron relies upon mail and wire fraud as the predicate acts underlying its Section 1962(c) RICO claim, its allegations fall woefully short of the particularity required by the Third Circuit under Rule 9(b).  Micron fails to identify even a single specific act of mail or wire fraud or the party who committed the act, let alone describe the time, place or other specifics required by Rule 9(b).

Micron's Section 1962(d) RICO conspiracy claim in Count II also lacks merit. Initially, Micron's RICO conspiracy claim requires the support of an underlying violation of Section 1962(c), and for the reasons identified above Micron has not properly alleged one. Furthermore, to maintain a RICO conspiracy claim, a plaintiff must allege an agreement among the alleged co-conspirators that extends beyond merely an agreement to commit the alleged predicate acts.  Micron does not allege such a conspiracy, and therefore its RICO conspiracy claim fails.

Micron's state law conspiracy claim should also be dismissed.  Under well-settled Virginia law, it is legally impossible to establish a conspiracy among a corporation and its employees and other agents because a corporation cannot conspire with itself.  Micron's alleged

4

conspiracy comprises only Rambus and its employees and agents. Accordingly, Micron's state law conspiracy claim fails.

Finally, all of the claims in Micron's Complaint are barred by the *Noerr-Pennington* doctrine. With the Complaint, Micron attacks Rambus for asserting patent infringement claims against Micron and other computer memory manufacturers. In fact, Micron seeks a permanent injunction preventing Rambus from filing future lawsuits. But Rambus has a fundamental Constitutional right, secured by the *Noerr-Pennington* doctrine, to petition the courts to protect its patent rights. That doctrine precludes Micron from using RICO, civil conspiracy or any other cause of action designed to stop Rambus from pursuing its patent infringement claims, or otherwise to deter Rambus from asserting its rights in court.

## ARGUMENT

## I.    STANDARD OF REVIEW.

A court properly grants a motion to dismiss under Rule 12(b) where, after assuming "as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom, and viewing them in the light most favorable to the plaintiff . . ., it appears to a certainty that no relief could be granted under any set of facts that could be proved" consistent with the allegations. *Evancho* v. *Fisher*, 423 F.3d 347, 351 (3d Cir. 2005) (citations omitted). Importantly, "[h]owever, a court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Id.* (citations omitted).

Additionally, to the extent that Micron bases its claims on allegations of fraud, such allegations must meet the pleading standards imposed by Federal Rule of Civil Procedure 9(b) or face dismissal under Rule 12(b). The particularity requirements of Rule 9(b) serve to "place the defendant[] on notice of the precise misconduct with which they are charged, and to

safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum* v. *Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004) (citation omitted). Rule 9(b) obligates Micron to plead the specific circumstances of its fraud assertions in order to provide a "measure of substantiation into [its] allegations of fraud." *Id.* (citation omitted).

## II. THE GOVERNING STATUTE OF LIMITATIONS TIME-BARS MICRON'S RICO CLAIMS (COUNTS I AND II).

### A. Micron Filed The Complaint After The Four-Year Statute of Limitations Applicable To Its RICO Claims Had Expired.

In Counts I and II of its Complaint, Micron asserts a claim for a direct RICO violation under Section 1962(c), and a claim for conspiracy to violate RICO under Section 1962(d). The Supreme Court has established that the Clayton Act's four-year statute of limitations applies to all civil RICO claims. *Klehr* v. *A.O Smith Corp.*, 521 U.S. 179, 183 (1997) (citing *Agency Holding Corp.* v. *Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987)). The Third Circuit has determined that the four-year RICO statute of limitations period begins to run when plaintiffs knew or should have known of their injury and the source of their injury. *See Prudential Ins. Co. of America* v. *U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004); *see also Blystra* v. *Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 641 (D.N.J. 2005). Knowledge of the alleged injury and its source triggers the limitations period even if the plaintiff remains ignorant of the acts comprising the alleged "pattern" of predicate acts that would give rise to a RICO claim. *See Rotella* v. *Wood*, 528 U.S. 549, 554-55 (2000).[3] The relevant injury is one to the plaintiff's "business or property" purportedly caused by a RICO "predicate act" (*i.e.*, a violation

---

[3] In *Rotella*, the Supreme Court rejected the "injury and pattern" test, under which a plaintiff must recognize both the injury and that a RICO pattern of predicate acts caused the injury, because that test extended the limitations period too far and thus stood contrary to "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella*, 528 U.S. at 555. Although not applicable, even that test is satisfied here because Micron alleged the same "pattern" of misconduct by Rambus more than four years ago.

of one of the criminal statutes identified in 18 U.S.C. § 1961). *See Sedima, S.P.R.L.* v. *Imrex Co., Inc.*, 473 U.S. 479, 497 (1985) (stating that "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern").

  At the very latest, Micron knew of its alleged injury and its source by August 31, 2001, when Micron moved to sanction Rambus for the very same conduct and injury alleged in the Complaint. All of the predicate acts Micron proffers in the Complaint (*e.g.*, Cmplt. ¶¶ 77, 100-01) stem from two categories of alleged "wrongful conduct": (a) the destruction of certain Rambus documents in 1998, 1999 and 2000 (*e.g.*, *id.* ¶¶ 44-64); and (b) allegedly false testimony provided by Rambus witnesses in litigation concerning Rambus's patents (*e.g., id.* ¶¶ 37-42, 68-76, 78-82). The Sanctions Motion that Micron brought against Rambus in this Court on August 31, 2001 vividly demonstrates that Micron knew of its alleged injury and Rambus's allegedly wrongful conduct as of that date – which was more than four years ago. In that motion, Micron described allegations made in the Eastern District of Virginia in the *Rambus* v. *Infineon* litigation that mirror Micron's RICO allegations.

  Specifically, in the present Complaint, Micron alleges that Rambus and its management "conspired to destroy or suppress material evidence and submit false testimony to hide or deny" "known problems" with Rambus's patents. (Cmplt. ¶ 92.) Micron further alleges that the "conspiracy" was carried out through the "institut[ion of] a document destruction policy with a purpose and effect [] to intentionally destroy documents they knew would be discoverable" (*id.* ¶ 93, *see also id.* ¶¶ 44-64), and the related submission of "false testimony to this and other courts" (*id.* ¶ 96, *see also id.* ¶¶ 37-42, 68-76, 78-82). Those allegations in turn serve as the basis of an alleged "pattern" of RICO predicate acts that supposedly injured Micron.

(*Id.* ¶¶ 12, 16, 100-01, 103-06.)   Indeed, Micron expressly states that the alleged "improper litigation conduct" lies "at the heart of this lawsuit."  (*Id.* ¶ 16.)

Micron made precisely the same allegations more than four years before the Complaint was filed in its August 31, 2001 Sanctions Motion.  In that motion, Micron stated that "Rambus executives . . . thwarted discovery by providing false deposition testimony" and charged that "Rambus willfully destroyed documents 'for the purpose of getting rid of documents that might be harmful in litigation.'"  (Sanctions Motion at 1.)  Indeed, Micron even characterized Rambus's actions as "a *pattern* of serious litigation-related misconduct" (*id.* (emphasis added)), just as it does in the Complaint (Cmplt. ¶¶ 16, 93, 96, 103-06).  Micron grounded its Sanctions Motion largely on the August 10, 2001 opinion issued in *Rambus, Inc.* v. *Infineon Techs. A.G.*, 155 F. Supp. 2d 668 (E.D. Va. 2001) ("*Infineon* Order"), and cites to that order as the basis for several allegations.  (*E.g.*, Cmplt. ¶¶ 17-18.)  The chart attached hereto as Exhibit A sets forth a side-by-side comparison of five of the key allegations in the Complaint and the nearly identical allegations addressed in the *Infineon* Order, which demonstrates that Micron knew of its purported injury, and the basis of its claims, by at least August of 2001.

Micron's Sanctions Motion thus establishes that Micron had actual knowledge of its alleged injury from Rambus's purported predicate acts as of August 31, 2001, and consequently that the four-year statute of limitations began to run, at the latest, on that date.  Accordingly, the statute of limitations on Micron's RICO claims expired, at the latest, on August 31, 2005, rendering them untimely.  At the very least, the Sanctions Motion demonstrates that on August 31, 2001 Micron had knowledge of its injury sufficient to place it on "inquiry notice," and thus that Micron "should have known" of its alleged injuries as of that time.  Such notice alone starts the statute of limitations period running.

In *Prudential*, the Third Circuit held that the plaintiff's RICO claims were time-barred because the plaintiff "should have known" of its injury more than four years before the complaint was filed based upon far less compelling circumstances than those present here. In that case, plaintiff, Prudential, asserted RICO claims and sought damages based upon the presence of asbestos-containing materials ("ACMs") in its commercial real estate buildings. *Prudential*, 359 F.3d at 234. Prudential filed its complaint on October 20, 1987, and therefore the issue was whether Prudential knew of its injuries more than four years before that date. *Id.* at 231, 233. The Court found, *inter alia*, that "[m]ultiple incidents and tenant complaints in Prudential's own buildings [prior to 1983] should have [] provided Prudential notice of the ACM-related injuries it alleges in the amended complaint" (*id.* at 235) and Prudential admitted that its "employees 'had some awareness of asbestos as an issue in certain of Prudential's buildings during the late 1970s and early 1980s'" (*id.* at 236). Accordingly, the Third Circuit held that Prudential "should have known" of its injuries more than four years prior to filing its complaint. *Id.* Here, the accusations of document destruction and false testimony contained in the August 31, 2001 Sanctions Motion mirror the allegations in the Complaint. Therefore, at the very least, Micron "should have known" of both its injury and its source as of the date of the Sanctions Motion.

Furthermore, Micron cannot save its claims by pointing to the two allegations of improper litigation conduct that occurred within the four-year statute of limitations period: (a) the testimony of Richard Crisp, a former Rambus employee, during a 2004 deposition in the *Infineon* matter (Cmplt. ¶ 73); and (b) Rambus allegedly "withholding" certain "backup tapes" (*id.* ¶ 80). The Supreme Court in *Klehr* expressly held that when a predicate act injures a plaintiff outside of the limitations period, later predicate acts occurring within the statute of

limitations period do not render a RICO claim timely if, as here, the plaintiff has "not shown how any new [predicate] act could have caused [it] harm over and above the harm that the earlier acts caused." *Klehr*, 521 U.S. at 190. As noted above, the only injury alleged in the Complaint is the attorneys' fees and other litigation costs that Micron incurred. But Micron nowhere alleges, and one cannot conceive, that Mr. Crisp's allegedly false testimony in the *Infineon* matter harmed Micron *at all*, because Micron was not even a party to the *Infineon* litigation. Nor does Micron allege that such allegedly false testimony imposed an additional or greater injury to Micron's business or property than that caused by any earlier wrongful conduct. Thus, Mr. Crisp's allegedly incorrect testimony cannot restart[4] (or extend) the limitations period.

Similarly, the fact that "*Infineon* did not ever benefit from having" the "backup tapes" (Cmplt. ¶ 80 (emphasis added)) could not possibly have harmed *Micron*. And, because Micron now has those tapes, it cannot have suffered any injury (and certainly not any additional or greater injury) on account of Rambus allegedly having "withheld" of them. (*Id.* ¶ 80.) Micron also cannot render its RICO claims timely by pointing to "recently produced documents" (presumably the "backup tapes") that, according to Micron, demonstrate the falsity of testimony in the *Infineon* litigation regarding the ownership of the patents at issue. (*Id.* ¶¶ 5, 80.) Again, that testimony occurred in the *Infineon* litigation and, therefore, could not have harmed Micron here.

The only recently-produced document to which Micron references in its Complaint is an e-mail from Mr. Farmwald. (*E.g.*, Cmplt. ¶¶ 3, 33-43.) Micron alleges that e-

---

[4] The Supreme Court in *Klehr* also emphasized that, because it rejected the Third Circuit's prior "last predicate act" test, in which the statute of limitations began to run only after the commission of the last predicate act that made up the alleged "pattern," the commission of a predicate act within the limitations period cannot "help [plaintiff] recover for the injuries caused" by acts outside of the limitations period. *Klehr*, 521 U.S. at 190.

mail shows that Rambus does not own the patents at issue because Mr. Farmwald had the idea for his invention while employed by MIPS. (*Id.* ¶ 42.) But Micron alleged in its amended complaint, filed in Case No. 00-792 in February of 2001, that Mr. Farmwald, a co-inventor, worked at MIPS when he made the invention and, consequently, that Rambus does not own the patent. (Am. Cmplt. ¶ 106.) Thus, Micron cannot claim that it only recently learned of an argument or defense to Rambus's infringement claims. Accordingly, Micron cannot use the alleged withholding of backup tapes to revive its untimely RICO claim.[5]

In light of Micron's knowledge of its alleged injury on August 31, 2001, the four-year statute of limitations applicable to its RICO claims unquestionably began to run no later than that date. The limitations period therefore expired, at the latest, on August 31, 2005 – five and a half months before Micron filed the Complaint. Consequently, RICO's four-year statute of limitations bars Micron's Section 1962(c) claim and Section 1962(d) conspiracy claim. *See, e.g., Prudential*, 359 F.3d at 236, 238; *Blystra*, 407 F. Supp. 2d at 641.

**B.    Micron's Fraudulent Concealment Allegations Cannot Toll The Statute Of Limitations.**

In an effort to cure the untimeliness of its claims, Micron offers several allegations directed at tolling the running of statute based upon Rambus's purported "fraudulent concealment" of the alleged "wrongful conduct." (Cmplt. ¶¶ 83-90.) As with all allegations of fraud, pleading fraudulent concealment requires the plaintiff to plead the elements of that defense to the statute of limitations with the specificity required by Rule 9(b), which Micron has failed to

---

[5] Moreover, "withholding" of documents in civil litigation does not constitute a valid RICO predicate act. The obstruction of justice and related statutes cited by Micron (Cmplt. ¶ 82) do not encompass the failure to produce documents in ordinary litigation, but rather require directly defying a judicial order, the use of physical intimidation or similar conduct. *See, e.g.* 18 U.S.C. §§ 1341, 1343, 1503 and 1512; Va. Code §§ 18.2-434, -436, and -460. Indeed, only the cited California statute even superficially appears to encompass Rambus's alleged wrongdoing, but that statute is only a misdemeanor (Cal. Penal Code § 135) not punishable by imprisonment of more than one year, and thus is not a valid state law predicate act (18 U.S.C. § 1961(1)(A)).

do.[6]  *See, e.g., Studiengesellschaft Kohle, mbH* v. *Hercules, Inc.*, 748 F. Supp. 247, 253 n.4 (D. Del. 1990).

Micron's claim of fraudulent concealment is facially defective because, as the Sanctions Motion starkly reveals, the alleged wrongdoing was not "concealed."  In the August 31, 2001 Sanctions Motion, Micron accused Rambus of "a pattern of serious litigation-related misconduct" that included improper destruction of documents and false testimony.  (Sanctions Motion at 1.)  That is precisely the "wrongful conduct" Micron alleges in its new RICO claims. The Sanctions Motion therefore belies Micron's contention that "[u]ntil recently, Micron did not know the fact of . . . the wrongful conduct alleged herein."  (Cmplt. ¶ 84.)  Accordingly, Micron cannot credibly claim that it had no knowledge of, or failed to discover, the facts that form the basis of its claim after August 31, 2001.  Thus, the notion of fraudulent concealment has absolutely no application here.  *See Hockenberry*, 2005 WL 1458768, at *3.

Nor does Micron's assertion that it did not know the "extent of" the alleged wrongful conduct (Cmplt. ¶ 84) toll the statute of limitations.  As the Fourth Circuit observed:

> [i]t is not necessary that [plaintiff] knew, in 1976, all of the persons involved in, or all of the details of, [defendants'] alleged torts. [Plaintiffs'] action is time-barred *as long as they were "on notice" of the conduct about which they complain.*

*Blanck* v. *McKeen*, 707 F.2d 817, 819-20 (4th Cir. 1983) (emphasis added).  Both the "wrongful conduct" alleged in the Complaint and in the Sanctions Motion concerned identical conduct – destruction of documents and purportedly false testimony.  (*Compare* Cmplt. ¶¶ 44-64, 68-76

---

[6] To toll a statute of limitations based upon fraudulent concealment, a plaintiff must adequately allege that:  (1) the defendant engaged in affirmative acts of concealment designed to mislead the plaintiff regarding the facts supporting the claims; (2) the plaintiff exercised reasonable diligence to uncover the facts supporting the claims; and (3) plaintiff failed to discover the facts supporting the claims within the statutory period.  *See Forbes* v. *Eagleson*, 228 F.3d 471, 486-87 (3d Cir. 2000); *Prudential*, 359 F.3d at 237-38; *Hockenberry* v. *Diversified Ventures, Inc.*, 2005 WL 1458768, *2 (M.D. Pa. June 20, 2005); *Weinberger* v. *Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974).

with Sanctions Motion at 1-2.)   Micron even characterized that conduct the same way, summarizing Rambus's alleged actions in the Sanctions Motion as "a pattern of serious litigation-related misconduct" (Sanctions Motion at 1), and stating in the Complaint that "improper litigation conduct [] is at the heart of this lawsuit" (Cmplt. ¶ 16).  Thus, Micron cannot now claim that fraudulent concealment tolled the statute of limitations beyond the August 31, 2001 date of the Sanctions Motion.  *See Forbes*, 228 F.3d at 487 (rejecting fraudulent concealment argument because "the unmistakable historical facts demonstrate that the plaintiffs were aware or should have been aware of the facts supporting their [RICO] claim long before" the date four years before the Complaint was filed); *Blanck*, 707 F.2d at 819-20; *Weinberger*, 498 F.2d at 555-56.[7]

Micron's assertion that it "could not have discovered the illegal conduct at an earlier date by the exercise of due diligence because of defendant's deceptive practices and techniques of secrecy" (Cmplt. ¶ 89) likewise rings hollow.  Indeed, as the Sanctions Motion shows, Micron knew of facts sufficient to bring the RICO claims it asserts here in August of 2001.  Micron had an obligation to use due diligence in pursuing its RICO claims, and Micron failed to meet that obligation.  *See Prudential*, 359 F.3d at 228 (rejecting fraudulent concealment argument for lack of diligence because of failure to investigate known problems that revealed basis of case); *Hartnett* v. *Schering Corp.*, 2 F.3d 90, 93 (4th Cir. 1993) (media coverage, existing litigation and case law revealed possible cause of action, requiring diligent investigation).

---

[7] In fact, even if Micron had not filed the Sanctions Motion, the Eastern District of Virginia's August 10, 2001 *Infineon* Order (upon which Micron based the Sanctions Motion) alone placed Micron "on notice" of its claims.  *See Bausch* v. *Philatelic Leasing, Ltd.*, 728 F. Supp. 1201, 1206 (D. Md. 1990) (noting "the principle that knowledge of a lawsuit puts plaintiffs on notice of the potential consequences" (citing *Rockstroh* v. *A.H. Robins Co.*, 602 F. Supp. 1259, 1268 (D. Md. 1985) (pending litigation in other jurisdiction defeated finding of fraudulent concealment)).

Micron cannot justify its decision to wait four and a half years after learning of the document destruction and allegedly false testimony before bringing its RICO claims.

Finally, Micron has not adequately pleaded under Rule 9(b) that Rambus acted to conceal the alleged wrongdoing. Indeed, Micron alleges only in the most conclusory manner that Rambus took any actions to conceal its alleged wrongdoing, averring that "Rambus and its management took affirmative steps to conceal their wrongful conduct, as specifically alleged in this complaint" (Cmplt. ¶ 86) and that "the illegal conduct, as specifically alleged in this complaint, was kept secret by Rambus and its management" (*id.* ¶ 88). Simply stating that "Rambus and its management took affirmative steps to conceal" does not suffice – allegations describing the actual steps taken are required. *Forbes*, 228 F.3d at 486 (no fraudulent concealment unless plaintiff demonstrates "*active misleading* by the defendant") (emphasis added); *Hercules*, 748 F. Supp. at 253 (requiring identification of "affirmative acts" and "active concealment"); *Weinberger*, 498 F.2d at 555 ("merely intoning the word 'fraudulently' in a complaint is not sufficient" to raise fraudulent concealment defense); *see also Wood* v. *Carpenter*, 101 U.S. 135, 143 (1879) (finding "concealment by mere silence is not enough . . . [t]here must be some trick or contrivance intended to exclude suspicion and prevent inquiry").[8]

In sum, Micron does not (and cannot) allege any basis on which to toll the statute of limitations. Accordingly, the statute of limitations on Micron's RICO claims began to run (at the latest) on August 31, 2001 and expired on August 31, 2005, rendering those claims untimely.

---

[8] Micron cannot salvage its fraudulent concealment argument through the addition of the generic "as specifically alleged in this complaint" language to its conclusory allegations. (Cmplt. ¶ 86.) Micron tellingly does not cite to specific paragraphs in the Complaint that allege Rambus's acts of concealment, and none exists.

### III.    MICRON'S RICO CLAIMS FAIL ON THE MERITS.

#### A.    Micron's Section 1962(c) RICO Claim Fails Because The "Association In Fact" Enterprise Alleged By Micron Is Not Distinct From Rambus.

In Count I, Micron asserts that Rambus violated Section 1962(c) of the RICO statute. (Cmplt. ¶ 116.) A Section 1962(c) RICO claim entails a "person" (*i.e.*, the defendant) conducting the affairs of an "enterprise" (of which the defendant is a member) through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). The Supreme Court described the concisely elements of a Section 1962(c) claim as requiring "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496. Additionally, the RICO statute defines "enterprise" to include legal entities such as corporations and partnerships, as well as "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In the Complaint, Micron attempts to plead the non-legal-entity, "association in fact" enterprise, consisting of Rambus and its employees and other agents. (Cmplt. ¶ 118 (asserting that Rambus and its agents "operated and controlled the 'enterprise' consisting of an association in fact of themselves and Rambus (the 'Corrupt Litigation Enterprise')").

The Supreme Court requires that a RICO defendant be distinct from the RICO enterprise it purportedly controls. *See Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161 (2001) (explaining that "[i]n ordinary English one speaks of employing, being employed by or associating with others, not oneself"); *see also McCullough* v. *Suter*, 757 F.2d 142, 144 (7th Cir. 1985) (Section 1962(c) applies to a person (*i.e.*, defendant) "associated with or employed by an enterprise," and thus the "person" and the "enterprise" must be separate because "you cannot associate with yourself"). Following that principle, the Third Circuit has expressly held that when a corporation is the defendant in a RICO case, the "enterprise" cannot consist of that corporation and its employees and agents, because such persons simply conduct the affairs of the

corporation. *See Brittingham* v. *Mobile Corp.*, 943 F.2d 297, 301 (3d Cir. 1991) (distinction between "person" and "enterprise" "would be eviscerated if a plaintiff could successfully plead that the enterprise consists of a defendant corporation in association with employees, agents or affiliated entities acting on its behalf"), *overruled on other grounds by Jaguar Cars, Inc.* v. *Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258 (3d Cir. 1995). Other federal appellate courts have reached the same conclusion. *See, e.g., Fitzgerald* v. *Chrysler Corp.*, 115 F.3d 225, 227 (7th Cir. 1997) (holding enterprise consisting of subsidiaries, dealers and financial institutions not properly pleaded, and noting "what possible difference, from the standpoint of . . . RICO, can it make that Chrysler sells its products to the consumer through franchised dealers rather than through dealerships it owns"); *see also Anatian* v. *Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85 (2d Cir. 1999) (employees together with defendant corporation cannot constitute an enterprise); *Parker & Parsley Petroleum Co.* v. *Dresser Indus.*, 972 F.2d 580, 582 (5th Cir. 1992) ("association in fact" of corporation's employees merely amounts to the "defendant corporate entity functioning through its employees in the course of their employment"); *Bessette* v. *Avco Fin. Servs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000).[9]

The members of Micron's alleged "Corrupt Litigation Enterprise" include defendant Rambus,[10] "Rambus' management," Geoffrey Tate (Rambus's former CEO), Richard

---

[9] Under that same rationale, courts reject for lack of distinctiveness alleged "association in fact" enterprises consisting of a corporation and its parent or subsidiary corporations. *See NCNB Nat'l Bank* v. *Tiller*, 814 F.2d 931, 936 (4th Cir. 1987), *overruled on other grounds by Busby* v. *Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990), ("a 'person' is not distinct from an 'enterprise' when a corporation and its wholly-owned subsidiary are involved"); *Bachman* v. *Bear Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999) ("[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself").

[10] The plain language of the statutory definition of "enterprise" in Section 1961(4) limits "association in fact" enterprises to those comprised of individuals: "enterprise includes . . . any union or group of *individuals* associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As such, although courts have found to the contrary (*e.g.*, *United States* v. *Navarro-*

Crisp (former Rambus employee), Michael Farmwald (Rambus's founder and former vice-president), Joel Karp (former Rambus vice-president), Neil Steinberg (former Rambus in-house counsel) and Lester Vincent (Rambus's former patent prosecution counsel).  (Cmplt. ¶ 118; *see also id.* ¶¶ 17-22.)  "Rambus' management" inherently consists of Rambus employees, and therefore is not distinct from Rambus under the authorities cited above.  Further, each of the individuals named above served as a Rambus employee or attorney, and Tate and Farmwald continue to serve on Rambus's board of directors.  (*Id.* ¶¶ 17-22.)  The Complaint is far from precise on this and innumerable other issues, but to the extent that Micron associates wrongful conduct with members of the "enterprise," such conduct simply constitutes agents of Rambus conducting Rambus's affairs.  For instance, Micron alleges that "Rambus and its senior management," including Farmwald, Tate, Karp and Crisp "developed a plan to extract licensing fees for Rambus based on a vast array of current and future DRAM products," and "[t]his plan was developed in coordination with Neil Steinberg" and "was executed in part by Lester Vincent, Rambus' patent prosecution counsel."  (Cmplt. ¶ 44; *see also id.* ¶¶ 46, 49.)  But Micron also avers that "[f]rom its inception, Rambus' business model was to collect royalties based on its patent portfolio."  (*Id.* ¶ 2.)  Accordingly, Micron's alleged "scheme" consists only of Rambus's employees and agents carrying on the business of Rambus.  Nowhere in the Complaint does Micron allege any misconduct representing something other than an agent of Rambus conducting Rambus's affairs.

In its *Brittingham* decision, the Third Circuit rejected a RICO claim because – as is the case here – the "association in fact" enterprise was not distinct from the corporate

---

*Ordas*, 770 F.2d 959, 969 (11th Cir. 1985)), those decisions ignore the plain language of the statute and offer no justification for concluding that the term "individual" includes corporations. Accordingly, Micron's inclusion of Rambus as a member of the alleged "association in fact" alone should preclude a finding that Micron has pleaded a proper RICO enterprise.

defendant.  In *Brittingham*, the plaintiff named Mobil Corp. ("Mobil") and a Mobil subsidiary as

defendants in a RICO claim premised upon alleged false advertising of plastic trash bags.

*Brittingham*, 943 F.2d at 299-300.  The alleged "association in fact" consisted of Mobil, its

subsidiary and the advertising agencies that marketed the trash bags.  *Id.* at 300.  The district

court found that plaintiffs did not allege an enterprise distinct from the defendant, Mobil, and

entered judgment for the defendant.  The Third Circuit affirmed, reasoning as follows:

> We believe that a 1962(c) enterprise must be more than an
> association of individuals or entities conducting the normal affairs
> of a defendant corporation.  A corporation must always act through
> its employees and agents, and any corporate act will be
> accomplished through an association of these individuals or
> entities.

*Id.* at 301.  The Court went on to hold that:

> [W]hen a defendant is itself a collective entity, it is more likely
> that the alleged enterprise is in reality no different from the
> association of individuals or entities that constitute the defendant
> or carry out its actions.   Unlike individual defendants, a
> corporation can act only through its employees and agents.  . . .
> Without allegations or evidence that the defendant corporations
> had a role in the racketeering activity that was distinct from the
> undertakings of those acting on its behalf, the distinctiveness
> requirement is not satisfied.

*Id.*

Like the alleged enterprise found deficient in *Brittingham*, Micron's purported

enterprise consists only of Rambus employees and attorneys conducting Rambus's affairs.

Micron expressly states that Rambus's "business model was to collect royalties based on its

patent portfolio."  (Cmplt. ¶ 2.)  All activities related to securing patents for Rambus and

asserting its patent rights thus fall squarely within Rambus's ordinary business affairs.  Such

activities, in turn, comprise the purportedly wrongful acts of the alleged "Corrupt Litigation

Enterprise."  (*E.g.*, Cmplt. ¶¶ 37-82.)  Micron's Section 1962(c) RICO claim therefore fails for

lack of an enterprise distinct from the defendant, Rambus.  *Brittingham*, 943 F.2d at 303; *Moffat Enters., Inc.* v. *Borden, Inc.*, 763 F. Supp. 143, 149 (W.D. Pa. 1990) (dismissing Section 1962(c) RICO claim where enterprise consisted of company, its employees and its advertising agency); *Fitzgerald*, 115 F.3d at 227.

### B.    Micron Has Not Pled A RICO Injury.

To establish standing to bring a private RICO claim, Section 1964(c) requires Micron to plead that it suffered an injury from one of the alleged predicate acts that underlie the alleged violation of Section 1962(c).  *See Holmes* v. *Securities Inv. Protection Corp.*, 503 U.S. 258, 265 (1992); *Sedima*, 473 U.S. at 496.  Micron lists several statutes, which concern mail and wire fraud and obstruction of justice, that Rambus purportedly violated, and identifies them as the predicate acts for its RICO claim.  (Cmplt. ¶¶ 100-01.)  The underlying conduct that allegedly violated these statutes consists of two categories of alleged actions by Rambus – the shredding of documents and false testimony.  (*Id.* ¶¶ 37-64, 69-76, 93, 97.)  Accordingly, to plead an injury sufficient to establish RICO standing, Micron must demonstrate that it suffered an injury to "its business or property" resulting from Rambus's alleged document destruction and false testimony.  It has not done so.

Micron's allegations of injury consist solely of having "been forced, among other things, to expend valuable resources, including attorneys' fees and management and employee time and attention, on litigation triggered by Rambus's inappropriate assertion of patent infringement and other claims."  (*Id.* ¶ 12.)  As an initial matter, expending "employee time and attention" does not constitute a proper RICO injury.  To have standing, a plaintiff must suffer an jury to its "business or property," which requires an out-of-pocket or financial loss.  *See Steele* v. *Hosp. Corp. of Am.*, 36 F.3d 69, 70-71 (9th Cir. 1994); *Dornberger* v. *Metro. Life Ins. Co.*, 961 F.

Supp. 506, 521 (S.D.N.Y. 1997); *see also Berg* v. *First Interstate Ins. Co.*, 915 F.2d 460 (9th Cir. 1990) (finding that personal injury not compensable under RICO). Micron does not allege that the "employee time and attention" expended on litigation resulted in an out-of-pocket loss, and therefore has not pleaded a RICO injury.

As for the payment of attorneys' fees and other litigation costs, Micron must plead not only a connection between the predicate acts and the injury, but also "must show that the connection is proximate, *i.e.*, not too remote." *Callahan* v. *A.E.V., Inc.*, 182 F.3d 237, 260 (3rd Cir. 1999); *see also Holmes*, 508 U.S. at 268. Micron fails to allege any causation, much less proximate causation, between the alleged document destruction and false testimony and its alleged injury. Indeed, *Micron* initiated the litigation in Case No. 00-792, and Micron never contends that the alleged improper document destruction and false testimony *caused* Micron to expend sums on attorneys' fees or other litigation costs.[11] Put differently, nowhere does Micron allege that absent Rambus's allegedly improper document destruction and false testimony, no litigation between the parties would have ensued. Furthermore, false testimony – in this case or other cases – cannot conceivably have *caused* Micron to incur attorneys' fees. Micron offers no explanation for why allegedly false testimony in other cases would impact *Micron's* litigation expenditures, and any alleged false testimony in this case necessarily occurred after litigation had already begun. In all events, Rambus has brought patent infringement claims against Micron because Micron has infringed Rambus's patents. There is no connection – and none has been alleged – between the alleged document destruction or false testimony and Rambus's assertion of

---

[11] At most, Micron alleges that Rambus planned document destruction as *a part* of its litigation plans (Cmplt. ¶ 7), but never alleges that Rambus asserted its claims "because of" the alleged document destruction. Also, Micron alleges that "its losses . . . are a result of the *conspiracy* set forth above" (Cmplt. ¶ 127 (emphasis added)), but a RICO injury is actionable only if it flows directly from a *predicate act*. *See Holmes*, 503 U.S. at 265; *Sedima*, 473 U.S. at 496.

its patent claims.  Thus, Micron's RICO claim fails for want of an injury sufficient to confer standing.  *See Holmes*, 508 U.S. at 276; *Callahan*, 182 F.3d at 267.

### C.   Micron's Allegations Of Mail And Wire Fraud Lack the Specificity Required By Rule 9(b).

To the extent that Micron bases its RICO claim on predicate acts grounded in fraud, the allegations of those predicate acts must satisfy the particularity requirements of Rule 9(b).  The Third Circuit summarized those requirements in the RICO context as follows:  "In order to satisfy Rule 9(b), plaintiffs must plead with particularity 'the circumstances' of the alleged fraud in order to put the defendant[] on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  *Lum* v. *Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004) (citation omitted).  Rule 9(b) obligates Micron to plead "the 'date, place or time' of the fraud" or to provide an "'alternative means of injecting precision and some measure of substantiation into [its] allegations of fraud.'"  *Id.* (citation omitted).  Micron "must also allege who made a misrepresentation to whom and the general content of the misrepresentation."  *Id.* (citing *Klein* v. *General Nutrition Co., Inc.*, 186 F.3d 338, 345 (3d Cir. 1999)).

Micron's allegations of mail and wire fraud do not even approach the required specificity described by the Third Circuit in *Lum*.  Such predicate acts are specific, fraud-based causes of action that contain particular elements and must be pleaded independently from the more general allegations of document destruction and false testimony.  Micron has not pleaded with the specificity required by 9(b) the actual instances of mail and wire fraud that purportedly occurred in connection with the alleged improper document destruction and false testimony.  Indeed, Micron does not identify a single specific instance of a misrepresentation conveyed via mail or the wires that would constitute fraud, let alone describe the nature of any such

misrepresentation.  Having failed to point out a specific instance of fraud, Micron necessarily

fails to provide the "date, place or time" of the purported fraud, or even to attempt an "alternate

means" of substantiating such fraud.  Additionally, Micron never identifies a single individual

who made an alleged misrepresentation that underlies a mail or wire fraud claim.

      Micron merely musters conclusory statements that, "as an integral part and result

of [the alleged] conduct and these acts and omissions," Rambus and the members of the alleged

RICO enterprise "used the mails in the U.S. or foreign commerce to commit one or more frauds"

and "used the wires in U.S. or foreign commerce to commit one or more frauds."  (Cmplt. ¶¶

100(a), (b); *see also id.* ¶ 102.)  Micron never identifies any single e-mail or specific use of the

telephone or mails in connection with any of the allegedly improper document destruction or

testimony.  Thus, at bottom, Micron's attempt to plead fraud consists of alleging that certain

litigation misconduct occurred, and then assuming that "one or more instances" of mail or wire

fraud must have taken place in connection with such activities.  The Third Circuit in *Lum*

rejected similar allegations of mail and wire fraud as predicate acts in a RICO lawsuit:

> [T]hese conclusory allegations do not satisfy Rule 9(b).  They do
> not indicate the date, time, or place of any misrepresentations; nor
> do they provide an alternative means of injecting precision and
> some measure of substantiation into the fraud allegations because
> they do not identify particular fraudulent financial transactions. . . .
> Nor do these allegations indicate which defendant(s) made
> misrepresentations to which plaintiffs.

*Lum*, 361 F.3d at 224-25 (citations omitted).  The same result obtains here.  Accordingly,

Micron's RICO claim fails to the extent it hinges upon mail or wire fraud.  *Id.* at 228.

### D.     Micron Fails To Plead A Viable Section 1962(d) Conspiracy Claim.

Micron's Section 1962(d) RICO conspiracy claim, set forth in Count II of the Complaint, should be dismissed on the merits for two reasons. *First*, because Micron has failed to assert a viable underlying RICO action against Rambus under Section 1962(c), Micron cannot maintain a claim against Rambus for conspiring to violate RICO. *Second*, Micron has not alleged, as it must, that the conspiracy extends beyond the commission of the predicate acts.

A Section 1962(d) cause of action for conspiring to violate RICO will not lie where the plaintiff has not first established an underlying RICO violation. *See, e.g.*, *Lighting Lube, Inc.* v. *Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient"); *Gatz* v. *Pomsoldt*, 397 F.Supp.2d 719, 732 n.21 (D. Del. 2003) (dismissing conspiracy claim under section 1962(d) where plaintiff failed to plead proper claims under 1962(b) and (c)). Accordingly, if the Court dismisses Micron's Section 1962(c) violation for any of the reasons discussed above, Micron's Section 1962(d) conspiracy claim must also be dismissed.

Micron's conspiracy claim also fails because Micron has not alleged a conspiracy to commit any act beyond the predicate acts. The Third Circuit has held that "mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." *Glessner* v. *Kenny*, 952 F.2d 702, 714 (3d Cir. 1991), *overruled on other grounds by Jaguar*, 46 F.3d at 267. Micron's Complaint contains the exact deficiency described in *Glessner*. Micron alleges only that Rambus and the other members of the alleged enterprise "conspired to manage, operate, conduct and participate in the conduct of the affairs of the 'Corrupt Litigation Enterprise' *through a pattern of racketeering activity*." (Cmplt. ¶ 129 (emphasis added); *see also*

*id.* ¶¶ 130-32.)   The "pattern of racketeering activity" of course constitutes only the predicate acts.  18 U.S.C. § 1961(1), (5).  Therefore, the only conspiracy Micron alleges is one to commit the predicate acts underlying the RICO enterprise, and consequently Micron's conspiracy claim cannot be sustained.  *See Glessner*, 952 F.2d at 714.

## IV.    MICRON'S STATE LAW CONSPIRACY CLAIM (COUNT III) FAILS BECAUSE A CORPORATION CANNOT CONSPIRE WITH ITSELF.

In Count III of the Complaint, Micron asserts a claim for civil conspiracy under Sections 18.2-499 and 18.2-500 of the Virginia Code.[12]  (Cmplt. ¶¶ 134-39.)  Those statutory provisions create a cause of action for a person "willfully and maliciously" injured "in his reputation, trade, business or association" by a conspiracy of "two or more persons."  *Selman* v. *American Sports Underwriters, Inc.*, 697 F. Supp. 225, 237 (W.D. Va. 1990).  Micron has not alleged a viable conspiracy claim under Virginia law.[13]

Well-settled Virginia law provides that a conspiracy among a corporation and its agents is "a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy law."  *Charles E. Brauer Co., Inc.* v. *Nationsbank of Virginia, N.A.*, 466 S.E.2d 382, 387 (Va. 1996) (referring to this principle as the "intracorporate immunity" doctrine); *see also Selman*, 697 F. Supp. at 238 (noting that "a corporation cannot conspire with itself, just as an individual cannot conspire with himself").  As with the alleged RICO enterprise, the members of the alleged conspiracy identified by Micron consist of Rambus and its management, employees and attorneys.  (Cmplt. ¶ 135; *see also id.* ¶¶ 16-22.)  Micron does not allege that any of the conspirators took any relevant actions outside of the scope of their duties

---

[12] Micron has alleged no basis for application of Virginia's civil conspiracy statute to this action, which is between two Delaware corporations headquartered in California and Idaho and involves a course of dealing between the parties that has no nexus with Virginia.

[13] A five-year statute of limitations applies to Rambus's civil conspiracy claim.  Rambus reserves the right to assert (if necessary) a statute or limitations, laches or similar time-bar defense to that claim.

for Rambus.  Accordingly, Micron's alleged civil conspiracy fails because it consists only of Rambus and its agents, and a conspiracy among that group is a "legal impossibility."  *See Brauer*, 466 S.E.2d at 387; *Hiers* v. *Cave Hill Corp.*, 51 Va. Cir. 208, 2000 WL 145359, at *4-5 (Jan. 6, 2000) (dismissing Virginia civil conspiracy claim against corporation and its employees); *Prousalis* v. *Jamgochian*, 38 Fed. Appx. 903, 905 (4th Cir. 2002) (finding under Virginia civil conspiracy law that an attorney cannot conspire with a client within the scope of the agency).[14]

The Fourth Circuit has held that an exception to the intracorporate immunity doctrine exists where the agent has a "personal stake" in the matter separate from the interests of the corporation.  *Greenville Pub. Co.* v. *Daily Reflector*, 496 F.2d 391 (4th Cir. 1974).  In an apparent attempt to invoke that exception, Micron avers that Rambus created "certain incentive stock plans for success in its litigations" that imbued the individual conspirators with "a personal stake in conspiring to injure Micron in its trade or business."  (Cmplt. ¶ 23.)  Micron's effort to establish the exception fails for two reasons.

*First*, the Virginia Supreme Court has never adopted a so-called "personal stake" exception to the intracorporate immunity doctrine, despite several opportunities to do so following the Fourth Circuit's 1974 decision in *Greenville*.  As the Virginia Circuit Court explained in *Hiers*:

> Although the Virginia Supreme Court has adopted the intracorporate immunity doctrine, it has not adopted this [personal stake] exception to this doctrine.  In fact, as recently as 1996, the Court decided a case citing the intracorporate immunity doctrine, however they failed to ever mention any exception to it.

*Hiers*, 2000 WL 145359 at *4 (citing *Brauer*, 466 S.E.2d 382); *see also Little Professor Book Co. of Reston Va., Inc.* v. *Reston North Point Village Ltd. P'ship*, 41 Va. Cir. 73, 1996 WL

---

[14] Additionally, if this case is not consolidated with Case No. 00-792 and the Court dismisses the federal RICO claims, the state law conspiracy claims are properly dismissed for want of supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c).

1065614, at *5-6 (Sept. 27, 1996) (same). Thus, because the Virginia Supreme Court has not recognized the "personal stake" exception, and this Court is not bound by the Fourth Circuit's decision in *Greenville*, Micron cannot rely on that exception to save its conspiracy claim.

        *Second*, even assuming *arguendo* that the "personal stake" exception to the corporate immunity doctrine was available to Micron, Micron's allegations do not meet the exception's requirements. Under the Fourth Circuit's *Greenville* decision, a corporation's agent must possess "a personal and independent benefit" that is "wholly separable from the more general and indirect corporate benefit present under the circumstances surrounding virtually any alleged corporate conspiracy." *Selman*, 697 F. Supp. at 239. The "personal stake" alleged by Micron consists solely of an "incentive stock plan." (Cmplt. ¶ 23.) Under such a stock plan, the individual participants in the alleged conspiracy would receive benefits if Rambus's stock price increases through success in litigation – circumstances that clearly would also benefit Rambus and all of its shareholders. That "personal stake" can hardly be characterized as "personal" to the purported conspirators and "independent" of Rambus's interest generally. Indeed, "incentive stock plans" are a ubiquitous feature of modern employee compensation (*e.g., In re InterCo. Inc.*, 128 B.R. 229, 231 (Bkrtcy. E.D. Mo. 1991)), and can hardly be deemed to create a "personal stake" separate from the corporation's interests. Micron's alleged personal stake thus stands in stark contrast to those found to satisfy the exception, which largely consist of the agent of the defendant corporation having a financial interest in a third-party company that also competed with the plaintiff company. *See, e.g., Greenville*, 469 F.2d at 399-400; *Am. Chiropractic Ass'n* v. *Trigon Healthcare, Inc.*, 151 F. Supp. 2d 723, 731 (E.D. Va. 2001). Micron has alleged no such interest here. Accordingly, the "personal stake" exception, even if available to Micron, does not apply to this case. *See Selman*, 697 F. Supp. at 239.

V.     THE *NOERR-PENNINGTON* DOCTRINE BARS MICRON'S COMPLAINT.

The *Noerr-Pennington* doctrine bars Micron's RICO and state law civil conspiracy claims because they seek to impose liability on Rambus for petitioning the courts to protect its patent rights.  The *Noerr-Pennington* doctrine arose out of two Supreme Court decisions that bestowed immunity from antitrust liability on parties accused of wrongdoing based upon their petitioning of the government.  *See Cheminor Drugs, Ltd.* v. *Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (citing *Eastern R.R. Presidents Conference* v. *Noerr Motor Freight*, 365 U.S. 127 (1961) and *United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657 (1965)).  The *Noerr-Pennington* doctrine is fundamentally grounded upon "the First Amendment's guarantee of 'the right of the people to petition the Government for a redress of grievances.'"  *Sosa* v. *Direct TV*, 437 F.3d 923, 929 (9th Cir. 2006) (citing U.S. Const. amend. I).  *Noerr-Pennington* "immunity extends to persons who petition all types of government entities – legislatures, administrative agencies and courts."  *Cheminor*, 168 F.3d at 122 (citing *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U.S. 509, 510 (1972)).  Also, *Noerr-Pennington* immunity covers not just actual lawsuits, but also conduct related to litigation, such as pre-suit demand letters.  *See, e.g., Sosa*, 437 F.3d at 942; *Pennepac Int'l, Inc.* v. *Rotonics Mfg., Inc.*, 2001 WL 569264, *9 (E.D. Pa., May 25, 2001) (doctrine encompasses "non-judicial acts that are 'reasonably and normally attendant upon protected litigation,'" including the decision to "threaten litigation" (citation omitted)).  Finally, the *Noerr-Pennington* doctrine provides immunity from nearly all causes of action that seek to inhibit access to the government or courts, including RICO actions and state law claims.  *See, e.g., Bath Petroleum Storage* v. *Market Hub Partners, L.P.*, 229 F.3d 1135, 2000 WL 1508873, *1 (2nd Cir., October 11, 2000) (citing *Int'l*

27

*Bhd. of Teamsters, Local 734 Health Workers and Welfare Trust* v. *Phillip Morris, Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) and *Cheminor*, 168 F.3d at 128-29); *Sosa*, 437 F.3d at 942.

There can be no question that, through its Complaint, Micron seeks to punish Rambus for seeking the assistance of the courts in protecting its patent rights. Indeed, Micron flatly contends in the opening paragraph of the Complaint that Rambus designed the "alleged scheme [] *to use litigation or the threat of litigation* to obtain massive royalties from DRAM manufacturers and the suppliers of other semi-conductor products." (Cmplt. ¶ 1 (emphasis added).) Micron also labeled the purported RICO enterprise a "Corrupt Litigation Enterprise" (*id.* ¶ 118), described the alleged "scheme" as one aimed at "[g]et[ting] all infringers to license [Rambus's] IP with royalties . . . OR sue" (*id.* ¶ 46) and identified its harm as "having been forced to expend valuable resources, including attorneys' fees and management and employee time and attention, *on litigation triggered by Rambus's inappropriate assertion of patent infringement and other claims*" (*id.* ¶ 12). Micron even seeks a permanent injunction to prevent Rambus from filing additional lawsuits. (*Id.* at p. 36.) Micron's Complaint thus constitutes a frontal assault on Rambus's exercise of its Constitutional right to seek protection from the courts for its patent rights. Consequently, the *Noerr-Pennington* doctrine shields Rambus from all liability that conceivably could flow from the federal RICO and state civil conspiracy claims set forth in Micron's Complaint. *See Cheminor*, 168 F.3d at 128; *Sosa*, 437 F.3d at 942; *Pennepac*, 2001 WL 569264 at *9.

It bears mention that Micron cannot establish that the so-called "sham litigation" exception to *Noerr-Pennington* immunity applies here. That exception provides that no protection is afforded to "petitions or lawsuits that are a 'mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a

28

competitor.'"  *Cheminor*, 168 F.3d at 122 (citing *Noerr*, 365 U.S. at 136).  The Third Circuit

explained the stringent requirements necessary to establish the exception:

> [T]he Supreme Court held that litigation is a sham if the lawsuit is
> "objectively baseless."  But "[t]he existence of probable cause to
> institute legal proceedings precludes a finding that an antitrust
> defendant has engaged in sham litigation."  [*Professional Real
> Estate Investors* v. *Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62
> (1993) ("*PRE*")]  The Court then stated, "Probable cause to
> institute civil proceedings requires no more than a reasonable
> belief that there is a chance that a claim may be held valid upon
> adjudication . . . . The existence of probable cause is an absolute
> defense."  *Id.* at 62-63.

*Id.*  The Third Circuit further noted that a lawsuit is "objectively baseless" under the Supreme

Court's test only if "no reasonable litigant could realistically expect success on the merits."  *Id.*

at 122-23 (citing *PRE*, 508 U.S. at 60).

Micron does not allege that Rambus's patent infringement claims are "objectively

baseless."  Rather, Micron focuses its allegations on purported misconduct surrounding

Rambus's claims – the document destruction and false testimony – and nowhere alleges that

Rambus cannot "reasonably expect success on the merits" of its patent claims.  Moreover,

Rambus prevailed on its patent infringement claims in the *Hynix* litigation – claims that involved

the very same patents at issue in this case – and was awarded $306 million in damages.  *See*

Hynix Special Verdict Form (attached hereto as Exhibit B).  That victory plainly establishes that

Rambus has an objectively reasonable "expectat[ion of] success" on its claims in this case.[15]

---

[15] If a court determines that a lawsuit is "objectively baseless," *Noerr-Pennington* immunity still obtains unless the "baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of government *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."  *Cheminor*, 168 F.3d at 122-23 (emphasis original) (citing *PRE*, 508 U.S. at 60-61).  Thus, even if Micron could establish that Rambus's patent claims are "objectively baseless" (and it cannot), Micron does not allege that Rambus asserted such claims a means of using the litigation process to interfere with Micron's business, as opposed to an attempt to obtain royalties and other damages, and the *Noerr Pennington* doctrine still applies.

Micron therefore cannot establish an exception to the immunity afforded by *Noerr-Pennington* doctrine,[16] and that doctrine operates to bar Micron's Complaint.

## CONCLUSION

For the reasons explained above, Rambus respectfully requests that the Court dismiss Micron's Complaint with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

V. Bryan Medlock, Jr.
Charles W. Douglas
Thomas K. Cauley, Jr.
SIDLEY AUSTIN LLP
Bank One Plaza
One South Dearborn Street
Chicago, IL  60603
(312) 853-7000

Gregory P. Stone
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071
(213) 683-9100

May 26, 2006

*/s/ Mary B. Graham (#2256)*

Mary B. Graham (#2256)
Rodger D. Smith (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Defendant Rambus Inc.*

---

[16] The fact that Micron accuses Rambus of fraud in connection with its patent claims does not alter that conclusion. *See Cheminor*, 168 F.3d at 122 (declining "to carve out a new exception to the broad immunity that *Noerr-Pennington* provides" by finding that allegations of fraud alter the Supreme Court's analysis of whether a lawsuit is "objectively baseless").

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 26, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Frederick L. Cottrell, III, Esquire
> RICHARDS LAYTON & FINGER
> One Rodney Square
> Wilmington, DE 19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on May 26, 2006 upon the following individuals in the manner indicated:

**BY E-MAIL**

Frederick L. Cottrell, III, Esquire
RICHARDS LAYTON & FINGER
One Rodney Square
Wilmington, DE 19801

**BY E-MAIL**

Matthew D. Powers, Esquire
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

*/s/ Mary B. Graham (#2256)*

_____

Mary B. Graham (#2256)

EXHIBIT A

**Comparison of Allegations in RICO Complaint in <u>Micron Technology, Inc. v. Rambus, Inc.</u>
To Findings In August 10, 2001 Order in <u>Rambus, Inc. v. Infineon Technologies</u>**

|    | **Allegation in <u>Micron Technology, Inc. v. Rambus, Inc.</u> (2006)** | **Allegation in <u>Rambus, Inc. v. Infineon Technologies</u> (2001)** |
|----|---|---|
| **1.** | "Richard Crisp gave false and misleading testimony regarding Rambus' patent strategies."  (citing <u>Rambus, Inc. v. Infineon Tech. A.G.</u>, 155 F.Supp.2d 668, 681 (E.D. Va. 2001))  (Compl. ¶ 18.) | Richard Crisp testified that he never participated in Rambus' patent drafting efforts, but subsequently was forced to admit that he was involved in that process. (<u>Rambus, Inc. v. Infineon Tech. A.G.</u>, 155 F. Supp. 2d 668, 681 (E.D. Va. 2001).) |
| **2.** | Geoffrey Tate "gave false and misleading testimony regarding Rambus' patent strategies."  (citing <u>Rambus, Inc. v. Infineon Tech. A.G.</u>, 155 F.Supp.2d 668, 681 (E.D. Va. 2001))  (Compl. ¶ 17.) | Geoff Tate testified that he did not believe that Rambus drafted claims to cover JEDEC's standard-setting work, but later admitted that Rambus was amending its patent application to cover the JEDEC SDRAM standard.  (<u>Id.</u>) |
| **3.** | "As a central part of [its] conspiracy, Rambus and its management adopted a litigation strategy premised on the destruction of any evidence undermining its anticipated litigation claims, including claims for patent infringement."  (Compl. ¶ 5.) | Rambus implemented a "document retention policy" beginning in 1998 for the purpose of getting rid of documents that might be harmful in anticipated litigation. (<u>Id.</u> at 682.) |
| **4.** | "On April 14, 2001, Rambus vice president of engineering Allen Roberts testified that Rambus vice president Karp had directed him to purge his files at least in part because 'such materials are discoverable in subsequent litigations.'" (Compl. ¶ 56.) | Allen Roberts testified that one of the reasons for the document destruction was that the documents might be discoverable in future litigation.  (<u>Id.</u>) |
| **5.** | "In response to specific and repeated instructions from Rambus, [Lester] Vincent substantially purged his Rambus-related files, including patent prosecution files of the patents Rambus asserted against Micron and others in litigation."  (Compl. ¶ 22.) | Lester Vincent testified that he destroyed some documents pursuant to instructions from Rambus just before litigation began but after Rambus sent a letter to Infineon accusing it of infringement.  (<u>Id.</u>) |

EXHIBIT B

FILED

**SPECIAL VERDICT FORM**                    APR 2 4 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

A.    **Instructions**

    For purposes of these questions, Rambus Inc. shall be referred to as "Rambus," and Hynix Semiconductor, Inc., Hynix Semiconductor America, Inc., Hynix Semiconductor U.K. Ltd. and Hynix Semiconductor Deutschland GmbH shall be referred to as "Hynix."

    The questions below contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

B.    **Findings on Rambus's Allegations of Patent Infringement by Hynix**

    1.    Has Rambus proven that it is <u>more likely than not</u> that Hynix's SDRAM products infringe any of the following claims of Rambus's patents?

    Answer "Yes" or "No" as to each claim:

        '918 Patent, Claim 24    _Yes_    ("yes" = infringed; "no" = not infringed)

        '916 Patent, Claim 9    _Yes_

        '916 Patent, Claim 28    _Yes_

    2.    Has Rambus proven that it is more likely than not that Hynix's DDR SDRAM products infringe any of the following claims of the Rambus patents?

    Answer "Yes" or "No" as to each claim:

        '105 Patent, Claim 34    _Yes_    ("yes" = infringed; "no" = not infringed)

        '918 Patent, Claim 24    _Yes_

        '918 Patent, Claim 33    _Yes_

        '020 Patent, Claim 32    _Yes_

        '020 Patent, Claim 36    _Yes_

        '916 Patent, Claim 9    _Yes_

        '916 Patent, Claim 28    _Yes_

        '916 Patent, Claim 40    _Yes_

C.    **Findings on Hynix's Allegations of Invalidity of Rambus's Patents**

3.    Has Hynix proven that it is highly probable that any of the following claims of Rambus's patents are invalid because the claims are "anticipated"?

Answer "Yes" or "No" with respect to each claim:

'918 patent, Claim 24    *NO*    ("yes" = anticipated; "no" = not anticipated)

'120 ~~'102~~ patent, Claim 33    *NO*

'020 patent, Claim 32    *NO*

'020 patent, Claim 36    *NO*

'916 patent, Claim 9    *NO*

'916 patent, Claim 28    *NO*

'863 patent, Claim 16    *NO*

4.    Has Hynix proven that it is highly probable that any of the following claims are invalid because the claimed invention would have been obvious at the time the invention was made to a person having ordinary skill in the art?

Answer "Yes" or "No" as to each claim:

'105 Patent, Claim 34    *NO*    ("yes" = obvious; "no" = not obvious)

'918 Patent, Claim 24    *NO*

'918 Patent, Claim 33    *NO*

'120 Patent, Claim 33    *NO*

'020 Patent, Claim 36    *NO*

'916 Patent, Claim 9    *NO*

'916 Patent, Claim 28    *NO*

'916 Patent, Claim 40    *NO*

'863 Patent, Claim 16    *NO*

2

5.    Has Hynix proven that it is highly probable that any of the following claims are invalid because the written description does not support the claim (i.e., does not satisfy the written description requirement)?

Answer "Yes" or "No" as to each claim:

'105 Patent, Claim 34 __NO__ ("yes" = invalid because written description requirement not satisfied; "no" = not invalid because written description satisfied)

'918 Patent, Claim 24 __NO__

'918 Patent, Claim 33 __NO__

'120 Patent, Claim 33 __NO__

'020 Patent, Claim 32 __NO__

'020 Patent, Claim 36 __NO__

'916 Patent, Claim 9 __NO__

'916 Patent, Claim 28 __NO__

'916 Patent, Claim 40 __NO__

'863 Patent, Claim 16 __No__

**D.    Findings on Rambus's Claim for Damages for Infringement [If Applicable]**

6.    If you have found a claim infringed and have not found that claim invalid, or you have found that either Claim 33 of the '120 patent or Claim 16 of the '863 patent is not invalid, then you are to find the damages which Rambus has proven that it more likely than not suffered as a result of Hynix's infringement. If you have not found a claim infringed and you have found that both Claim 33 of the '120 patent and Claim 16 of the '863 patent are invalid, then you have no further questions to answer, and you should proceed to Section E.

[If applicable] What damages has Rambus proven it more likely than not suffered as a result of infringement by Hynix's SDRAM product?

$ __30,538,165__

[If applicable] What damages has Rambus proven it more likely than not suffered as a result of infringement by Hynix's DDR SDRAM product?

$ __276,429,107__

3

E. **Checking and Signing of Verdict Form**

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the verdict form in the spaces below and notify the Security Guard that you have reached a verdict. The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

DATED: 4/24, 2006

By: [signature]

Presiding Juror

EXHIBIT C



**H** Briefs and Other Related Documents
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA2 s
0.23 for rules regarding the citation of unpublished
opinions.)

United States Court of Appeals, Second Circuit.
BATH PETROLEUM STORAGE, INC., Plaintiff-
Appellant,
v.
MARKET HUB PARTNERS, L.P., Market Hub
Partners, Inc., TPC Corporation, and Coalition for
Resources and Environment in the Southern Tier,
Inc., Defendants-Appellees.
**No. 00-7302.**

Oct. 11, 2000.

Appeal from the United States District Court for the
Western District of New York, Siragusa, J.

Jerry William Boykin, McLean, VA, The Jefferson
Law Firm, PLC, for appellant.
John B. Wyss, Washington, DC, Wiley, Rein &
Fielding; Market Hub Partners, L.P. & Market Hub
Partners, Inc., David M. Connors, Salt Lake City,
UT, LeBoeuf, Lamb, Green & MacRae, LLP; TPC
Corporation, Alan J. Knauf, Rochester, NY, Knauf
Koegel & Shaw, LLP; Coalition for Resources and
Environment in the Southern Tier, Inc., for appellees.

Present JACOBS, STRAUB, and SACK, Circuit
Judges.

*SUMMARY ORDER*

**\*1** UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED that the
judgment of the district court be AFFIRMED.

Bath Petroleum Storage, Inc. ("Bath") appeals from
the judgment of the United States District Court for
the Western District of New York (Siragusa, *J.*)
dismissing its suit against Market Hub Partners, L.P.,
Market Hub Partners, Inc., TPC Corporation, and
Coalition for Resources and Environment in the
Southern Tier, Inc. (collectively "Appellees")

pursuant to Rule 12(b)(6), Federal Rules of Civil
Procedure.

A detailed factual record is set out by the district
court; familiarity with the record is assumed. *See*
*Bath Petroleum Storage v. Market Hub Partners,*
*L.P.,* No. 98-CV-6138 CJS, 2000 WL 1279160, at
*2-12 (W.D.N.Y. Feb. 25, 2000).* Briefly, the action
arises out of Bath's attempt to enter the natural gas
storage market. Bath claims that Appellees made
false statements before various administrative bodies
regulating the industry (specifically, regulating Bath's
entry into the industry). Bath claims these false
statements led to delays, and that these delays caused
its partner (CNG Transmission Corp.) to breach a
lease agreement it had with Bath.

The district court's dismissal of the suit was entirely
appropriate. In order to succeed, Bath must first
surmount the significant hurdles imposed by the
"Noerr Pennington" Doctrine, established by the
United States Supreme Court in *Eastern Railroad*
*Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961), and *United Mine Workers of*
*America v. Pennington,* 381 U.S. 657 (1965).
Essentially, the Doctrine protects under the First
Amendment efforts to influence governmental action
through litigation, lobbying, and the like. Such
activities are immunized from antitrust liability,
provided the activities are more than a mere "sham."
*See Prof'l Real Estate Investors, Inc. v. Columbia*
*Picture Indus.,* 508 U.S. 49, 56-57 (1993). Noerr
Pennington immunity is applicable to RICO actions
and to state-law claims such as fraud and tortious
interference. *See Int'l Bhd. of Teamsters, Local 734*
*Health Workers and Welfare Trust v. Phillip Morris,*
*Inc.,* 196 F.3d 818, 826 (7th Cir.1999) (RICO suits);
*Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119,
128-29 (3d Cir.1999) (tortious interference and unfair
competition); *cf. Hirschfeld v. Spankos,* 104 F.3d 16
(2d Cir.1997) (applying Noerr Pennington to § 1983
action).

In order to demonstrate that the Appellees' conduct
was a sham, Bath must first prove that the behavior
was "objectively baseless in the sense that no
reasonable [person] could realistically expect success
on the merits." *Prof'l Real Estate Investors, Inc.,* 508
U.S. at 51 (referring to litigants and lawsuits, but
with application to the broad scope of activities

229 F.3d 1135                                                                                     Page 2
229 F.3d 1135, 2000 WL 1508873 (C.A.2 (N.Y.)), RICO Bus.Disp.Guide 10,043, Util. L. Rep. P 14,339, 2000 -2
Trade Cases  P 73,061
**(Cite as: 229 F.3d 1135)**

covered by the Noerr-Pennington Doctrine). The
district court's decision reviews each of the
administrative processes at which Bath alleges
Appellees committed fraud and finds that in each
instance, the Appellees' behavior cannot be said to be
"objectively baseless." *See Bath, 2000 WL 1279160,
at \*15-17*. We agree with the district court for
substantially the same reasons.

**\*2** Bath also argues that the district court
impermissibly relied upon evidence outside the
record-namely, documents related to the proceedings
before the various agencies that regulate Bath's entry
into the natural gas storage market. This Court has
consistently held that, in considering a motion to
dismiss, a trial court may rely upon public documents
of which the plaintiff had notice that are integral to
the plaintiff's claim. *See, e.g., Cortec Indus. v.. SUM
Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991);
Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74
(2d Cir.1991)*. Accordingly, the district court
committed no error in this regard.

For the reasons set forth above, the judgment of the
district court is hereby AFFIRMED.

C.A.2 (N.Y.),2000.
Bath Petroleum Storage, Inc. v. Market Hub Partners,
L.P.
229 F.3d 1135, 2000 WL 1508873 (C.A.2 (N.Y.)),
RICO Bus.Disp.Guide 10,043, Util. L. Rep. P
14,339, 2000-2 Trade Cases  P 73,061

Briefs and Other Related Documents (Back to top)

• 2000 WL 34468120 (Appellate Petition, Motion
and Filing) Petition for Rehearing En Banc (Oct. 25,
2000) Original Image of this Document with
Appendix (PDF)
• 00-7302 (Docket) (Mar. 20, 2000)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D



Circuit Court of Virginia.
Phillip T. HIERS, Plaintiff
v.
CAVE HILL CORPORATION And Walter M.
Hopkins and Stacey Sinnett, Defendants
**No. CL99-117788.**

Jan. 6, 2000.

OPINION AND ORDER

MCGRATH, J.

**\*1** This case is currently before this court on Defendants' demurrers, to all but Count One of Plaintiff's Motion for Judgment. For purposes of ruling on the demurrers, this court, under well established principles, must accept as true the allegations contained in Plaintiff's Motion for Judgment; however a court need only consider those facts which are *properly* plead; it does not have to consider allegations that are in the nature of conclusory allegations. *See Arlington Yellow Cab v. Transportation Inc., 207 Va. 313, 319 149 S.E.2d 877 (1966).*

The alleged facts are as follows. In 1993, Plaintiff, Heirs, pursuant to a five year fixed-term employment contract began to work for Atlantic Fabritech, a division of Defendant, Cave Hill. Around the beginning of 1998, Hiers and Defendant, Hopkins, the president and secretary of Cave Hill, began to negotiate a new contract. This contract, that was subsequently signed on September 9, 1998, guaranteed Hiers employment with the company until August 2003, with a $25,000 yearly salary and a 5% annual cost of living increase. The contract further guaranteed that Hiers would approve and process all sales negotiations; for those sales quoted, processed, generated and sold by Hiers, he would receive a 2% commission.

In July of 1998, Hopkins and Defendant Stacey Sinnett agreed that the company would hire Sinnet. Also in July 1998, Hopkins assured Hiers that he would supervise Sinnett and that all of Sinnett's negotiations and contracts would be approved and processed by Hiers. Sinnett was ultimately hired in September 1998 and in October was given the position of General Manager of Atlantic Fabritech.

After obtaining this position, Sinnett began to set up sales networks separate from those established and used by Hiers and began to negotiate and approve sales contracts without Hiers' approval. Due to Sinnett's actions, Hiers was denied payment of commissions because he did not process and approve the sales. When Hiers complained to Hopkins, Hopkins told him "I am the boss. I do not care about the contract." Between the months of October 1998 and May 1999, Sinnett "dismantled sales networks previously established by Hiers and replaced them with sales networks that answered only to Sinnett." During this time, Hiers made further complaints to Hopkins regarding this practice. In February 1999, Sinnett began to criticize and cite Hiers with accusations of inadequate job performance. Subsequently, in May 1999, Sinnett terminated Hier's employment with Cave Hill and Atlantic Fabritech. This court will address each count of the complaint and each demurrer to it in order.

Count Two of Plaintiff's Motion for Judgment alleges fraudulent inducement by Cave Hill Corporation, and Count Three alleges fraudulent inducement by Hopkins. Plaintiff claims that in order to induce Hiers to enter into the contract, Hopkins falsely represented that Hiers would remain employed until 2003, that Cave Hill would allow Hiers to approve and process all sales negotiations and contracts, that Sinnett would be supervised by Hiers, and that Sinnett would have all of his sales negotiations and contracts approved and processed by Hiers. Plaintiff alleges that these were all misrepresentations and that they were made intentionally and knowingly. The same standard of law applies to both counts.

**\*2** The Virginia Supreme Court has clearly stated that a claim for fraudulent inducement will not lie where there is merely a breach of contract, and not a misrepresentation that lies outside of the contract. *See Richmond Metropolitan Authority v McDevitt Street Bovis, Inc., 256 Va. 553, 507 S.E.2d 334 (1998). In Richmond Metropolitan Authority,* the Court found that because the claims for "fraudulent inducement" that the Plaintiff cited were actually material breaches of the contract, there was only an action for breach of contract and not for the tort of fraudulent inducement. For a fraudulent inducement claim, there must be a breach of a common law duty, not a duty that exists merely because of a contract between the two parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d
Not Reported in S.E.2d, 51 Va. Cir. 208, 2000 WL 145359 (Va. Cir. Ct.)
(Cite as: 2000 WL 145359 (Va. Cir. Ct.))

*Id.* In the case at hand, the plaintiff is alleging that Cave Hill's and Hopkins' "misrepresentations" included: stating that Hiers would remain employed until 2003, that Cave Hill would allow Hiers to approve and process all sales negotiations and contracts, that Sinnett would be supervised by Hiers, and that Sinnett would have all of his sales negotiations and contracts approved and processed by Hiers. Each of these "misrepresentations" is a material element in the employment contract. The contract, according to Plaintiff's own motion for judgment, guaranteed a term of employment (Motion for Judgment, ¶ 8), a salary, (Motion for Judgment, ¶ 9), and that Hiers would be allowed to approve and process all sales negotiations (Motion for Judgment, ¶ 10). Furthermore, the contract itself, Plaintiff's exhibit A, states that Hiers would "develop and coordinate all sales staff." These provisions cover all of the "misrepresentations" that Plaintiff alleges constitute "fraudulent inducement."

Secondly, Plaintiff has failed to void what he claims was a "voidable" contract; a contract that was formed due to fraudulent inducement is voidable and not void ab initio. According to Plaintiff's own Motion for Judgment, Plaintiff repeatedly complained to Hopkins that he in violation of "the contract." One cannot rely on a contract and subsequently claim that he was "fraudulently induced" to enter into it. In Virginia, a contract fraudulently entered into is voidable; generally it must be voided when plaintiff discovers the fraud. *See Link Associates v Jefferson Standard Life Ins. Co.,* 223 Va. 479, 291, S.E.2d 212 (1982). However, if a plaintiff delays in voiding the contract and "the delay results from a reasonable expectation that the wrongdoer will fulfill the repeated assurances of its agent to grant the relief to which plaintiff is entitled," then such a delay will not amount to a waiver. *Id* (citing *White v. American National Life Insurance Co.,* 115 Va. 305, 309-10,78 S.E. 582, 583 (1913)). Plaintiff, relying on *Link* asserts that his delay in this case was based on such a reasonable expectation, however Plaintiff's delay in disaffirming the contract in the case at bar cannot possibly fall under this exception to *Link. Link* requires that the delay result from "reasonable expectations that the wrongdoer will fulfill the *repeated assurances* of its agent." According to the Plaintiff's own allegations in his Motion for Judgment, there were no "repeated assurances" that Cave Hill would live up to the contract. In fact, Plaintiff alleges that when he first complained about the problem, Hopkins told him "I am the boss. I do not care about the contract." (Plaintiff's Motion for Judgment, ¶ 20. Furthermore, Plaintiff contends that

the actions by Hopkins, Cave Hill Corp and Sinnett went on for nine months; a reasonable person would conclude after only a few that this problem was not going to be remedied. Plaintiff did not disaffirm the contract, instead he accepted it and relied upon it until he was ultimately terminated.

**\*3** Because Plaintiff has not alleged any "misrepresentation" or "fraudulent inducement" that lies outside of any duty owed under the contract, and because Plaintiff failed to timely void what he claims is a "void" contract, Defendants' demurrers to Counts Two and Three will be sustained.

Count Four of Plaintiff's Motion for Judgment alleges "Conspiracy to harm in reputation, trade, business or profession by Walter M. Hopkins and Cave Hill, Corporation;" Count Five alleges the same with regard to Stacey Sinnett and Cave Hill Corporation. Count Six alleges "Attempted to conspire to harm in reputation, trade, business or profession by Stacey Sinnett." Plaintiff alleges that Hopkins and Sinnett acted for the purpose of injuring Hiers' business reputation, making it "difficult or impossible for him to find subsequent employment" in that field. Count Four alleges that Hopkins was acting outside of the scope of his employment and that Sinnett was acting within the scope of his employment. Count Five alleges that Hopkins was acting within the scope of his employment and that Sinnett was acting outside the scope of his employment. Defendant has stipulated that at all times both Hopkins and Sinnett were acting within the scope of their employment.

Defendants assert two bases on which this claim should be denied. First, Defendants claim that because Plaintiff is "complaining about nothing more than the loss of or injury to his employment" that the claim is not valid. In support of this contention, they have cited to a long "unbroken" line of federal district cases that have interpreted this very statute. This line of cases begins with *Federated Graphics Companies, Inc. v. Napotnik,* 424 F.Supp. 291, (E.D.Va.1976) and continues through to include the 1989 case of *Jordan v. Hudson,* 690 F.Supp. 502 (E.D.Va.1989), aff'd, 879 F.2d 98 (4th Cir.1989). This long chain of cases makes it quite clear that a right of action under § 18.2-499 and 500 is only valid when the conduct is directed at one's business, not a personal interest. Moreover, the federal courts have found that one's employment is a personal interest, not a business one. Federal courts have found that this doctrine applies to both corporations as well as those individual persons who own or operate his or her own business. See

Not Reported in S.E.2d
Not Reported in S.E.2d, 51 Va. Cir. 208, 2000 WL 145359 (Va. Cir. Ct.)
(Cite as: 2000 WL 145359 (Va. Cir. Ct.))

*Moore v. Allied Chem. Corp.* 480 F.Supp. 364 (E.D.Va.1979); *Welch v Kennedy Piggly Wiggly Stores, Inc.* 63 Bankr.888 (W.D.Va.1986). Plaintiff relies on a circuit court case and a Virginia Supreme Court case, *Greenspan v. Osheroff,* 232 Va. 388 (1986), that allowed damages to an individual for a violation of this statute. While the Circuit court case, *Johnson v. Plaisance,* 25 Va. Cir. 264 (Cir.Court, City of Charlottesville) (Swett, J.), is persuasive, it is not binding on this court.

Furthermore, what *Johnson* and Plaintiff have both failed to note is that the Plaintiff in *Greenspan* was the owner of the business, Osheroff, Inc. When the Supreme Court of Virginia allowed damages in *Greenspan,* they were in accordance with the long chain of federal cases that have precluded recovery based on loss of employment. In *Greenspan,* Osheroff owned the business, and, as the federal courts have held, a business owner is entitled to recover for such damages, an individual, such as Hiers, claiming damages for loss of employment is not entitled to recover under this provision. This Court believes that federal precedent, although not binding, is correct in its analysis and adopts it for disposition of this demurrer.

**\*4** The second ground that Defendants assert precludes Plaintiff's claim is that of intracorporate immunity. This doctrine states that since conspiracy requires two or more persons, and a single entity, like a corporation, cannot conspire with itself, and there cannot be a valid claim where it is alleged that an employee or agent of the corporation is alleged to have conspired with the corporation. *See Fox v. Deese,* 234 Va. 412, 428, 362 S.E.2d 699, 708 (1987). The Fourth Circuit, in 1974 announced an exception to this immunity doctrine. *See Greenville Publishing Co. V Daily Reflector,* 496 F .2d 391 (4th Cir.1974).; *See also Levine v. McLeskey,* 881 F.Supp. 1030 (E.D.Va.1995), vacated in part on other grounds, 164 F.3d 21-(4th Cir.1998). This exception states that if a person steps out of the scope of his or her employment and can be shown to have a "personal stake" in the matter, then they can be found to have conspired with their employer. *Id.* Although The Virginia Supreme Court has adopted the intracorporate immunity doctrine, it has not adopted this exception to this doctrine. In fact, as recently as 1996, the Court decided a case citing the intracorporate immunity doctrine, however they failed to ever mention any exception to it. *See Charles E. Brauer Inc. v. NationsBank of Virginia, N.A.,* 251 Va. 28, 466 S.E.2d 382 (1996). Aside from the fact that the Virginia Supreme Court has not

adopted the exception, for it to be dispositive either Sinnett or Hopkins would have had to have been acting outside the scope of his employment. Plaintiff has alleged in each count that one or the other was doing so, however he has no factual basis to back this up. A court, in considering a demurrer must consider all facts which are properly plead; it does not have to consider allegations that are formed on facts not stated therein. *See Arlington Yellow Cab, Supra.* The allegations of the Motion for Judgment show on their face that all of the acts being taken by the two employees were actions taken in their capacity as officers and employees of the corporation.

Plaintiff claims further that, the claim against Sinnett should stand because he has alleged conspiracy before Sinnett was actually hired. Despite this assertion in court, Plaintiff's Motion for Judgment never alleges such. In fact, the actions alleged by Sinnett in the Motion for Judgment occur during or after October 1998. Sinnett was hired in September 1998.

Because Plaintiff has stated a claim based on loss of employment, not loss of a "business interest" and because the intracorporate immunity doctrine applies in this case to block this claim, the demurrers to Counts Four, Five, and Six will be sustained.

Finally, Count Seven of Plaintiff's Motion for Judgment alleges "Tortious Interference With Contract by Walter M. Hopkins" and Count Eight alleges the same with regard to Stacey Sinnett. In each count, Plaintiff alleges that the relative defendant was acting "independently and for personal motives separate from Cave Hill's business and separate from the scope of his employment and corporate responsibilities with Cave Hill." These allegations, however, are not grounded in any sort of factual basis, and, as stated earlier, a demurrer does not admit "inferences or conclusions from facts not stated." *See Arlington Yellow Cab supra.* Moreover, as noted earlier, Defendants have stipulated that both men were acting, at all times, within the scope of his employment. Plaintiff has alleged in ¶ 5 and ¶ 15 of his Motion for Judgment that both men were employees of Cave Hill. It is a well-settled rule of law that a person cannot interfere with a contract to which he is a party. *See Fox v. Deese, Supra.* Furthermore, if an employee is acting within the scope of his employment, he is acting as an agent of his employer, and cannot be labeled as "an interferor or third party." *See Haigh v. Matsushaita Elec. Corp.,* 676 F.Supp. 1332 (E.D.Va.1987). Because of this, the assertion that either defendant "interfered" with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d

Not Reported in S.E.2d, 51 Va. Cir. 208, 2000 WL 145359 (Va. Cir. Ct.)

**(Cite as: 2000 WL 145359 (Va. Cir. Ct.))**

the contract between Cave Hill Corp and Hiers is a legal impossibility. Neither of them could have interfered in a contract with Cave Hill, while they were working as Cave Hill employees. Since there was no third party involved in this action, the allegations that either Sinnett or Hopkins interfered with this contract is not valid. In light of this, Defendants' demurrers to both counts seven and eight are sustained.

**\*5** In light of the fact that the demurrers to Counts two through eight have been sustained, this case will proceed on Count One alone. Since that count is only a breach of contract claim against Defendants Cave Hill Corp and Hopkins, and the demurrers to the only claims against Defendant Sinnett have been sustained, Plaintiff's Motion for Judgment against Sinnett is hereby dismissed.

The Clerk of the Court is directed to send certified copies of this order A. Gene Hart, Esq., Counsel for Plaintiff, One Court Square, Suite 210, Harrisonburg, Va. 22801; Thomas E. Ullrich, Esq., Wharton, Aldhizer & Weaver, Counsel for Defendant, Stacey Sinnett, 100 South Mason Street, P.O. Box 20028, Harrisonburg, Va. 22801, and Timothy E. Cupp, Esq., Cupp & Cupp, Counsel for Defendants Cave Hill Corp. and Walter M. Hopkins., P.O. Box 589, Harrisonburg, Va. 22801.

Not Reported in S.E.2d, 51 Va. Cir. 208, 2000 WL 145359 (Va. Cir. Ct.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E



Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 1458768 (M.D.Pa.), RICO Bus.Disp.Guide 10,906
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents

United States District Court,M.D. Pennsylvania.
Kevin HOCKENBERRY and Judy Hockenberry,
Plaintiffs,
v.
DIVERSIFIED VENTURES, INC., d/b/a Forward
Financial Company, et al ., Defendants.
No. 4:04CV1062.

June 20, 2005.

*MEMORANDUM*
MCCLURE, J.

*BACKGROUND:*

**\*1** Plaintiffs Kevin and Judy Hockenberry, husband
and wife, initiated this civil action by filing a
praecipe for a writ of summons with the Court of
Common Pleas for Centre County on December 1,
2003. Plaintiffs subsequently alleged in their eight-
count complaint that the above-named defendants
colluded to overcharge plaintiffs for certain services
and fees in connection with plaintiffs' purchase of
real property and a mobile home on or about
December 1, 1997. Plaintiffs allege two violations of
the Racketeering Influenced and Corrupt
Organizations Act (RICO), 18 U.S .C. § 1961 et seq.
(Counts I & II), a violation of the Pennsylvania
Unfair Trade Practices and Consumer Protection Law
(UTPCPL), 73 P.S. § 201 et seq. (Count III), an
agency liability claim against Diversified Ventures,
Inc. based on the allegedly fraudulent acts of its
agent, Gene J. De Feudis (Count IV), a common law
fraud claim (Count V), a breach of fiduciary duty
claim against G & M Land Development, Inc. and
MDM Group (Count VI), a civil conspiracy claim
(Count VII), and a claim for punitive damages (Count
VIII).

The action was removed to this court on or about
May 12, 2004. Subsequently, numerous defendants
filed motions to dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6). By Memorandum & Order
dated November 17, 2004, the court dismissed all of
plaintiffs' claims as to certain defendants and directed
plaintiffs to file an amended complaint.

Following the filing of plaintiffs' amended complaint
on December 17, 2004, various defendants filed a
total of three motions to dismiss plaintiffs' amended
complaint pursuant to Rule 12(b)(6). Moving
defendants all argue that plaintiffs' claims are barred
by the applicable statutes of limitations or are not
pled with sufficient particularity.

Now, for the following reasons, the court will grant
the motions in part and deny them in part.

*DISCUSSION:*

*I. Standard of Review*

The court will only dismiss claims pursuant to Rule
12(b)(6) if "it is clear that no relief could be granted
under any set of facts that could be proved consistent
with the allegations." *Hishon v. King & Spaulding,*
467 U.S. 69, 73 (1984); *Doe v. Delie,* 257 F.3d 309,
313 (3d Cir.2001). A claim will survive a motion to
dismiss if plaintiffs allege sufficient facts to put
defendants on notice of the essential elements
supporting the claim. *Langford v. City of Atlantic
City,* 235 F.3d 845, 847 (3d Cir.2000).

When reviewing a Rule 12(b)(6) motion, the court
must accept as true all factual allegations of the
complaint and draw all reasonable inferences in the
light most favorable to plaintiffs. *Morganroth &
Morganroth v. Norris, McLaughlin, & Marcus, P.C.,*
331 F.3d 406, 411 (3d Cir.2003). The court, however,
need not "credit bald assertions or legal conclusions
improperly alleged in the complaint." *In Re
Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d
198, 216 (3d Cir.2002). Defendants bear the ultimate
burden of demonstrating that no relief could be
granted. *Gould Elecs., Inc. v. United States,* 220 F.3d
169, 178 (3d Cir.2000).

*II. Brief Statement of Relevant Facts*

**\*2** We briefly reiterate the concise material facts of
this case:

Sometime in 1997, plaintiffs sought to purchase real
property and a mobile home in Centre County,
Pennsylvania. Plaintiffs and the sellers, the latter of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1458768 (M.D.Pa.), RICO Bus.Disp.Guide 10,906
**(Cite as: Not Reported in F.Supp.2d)**

whom are not parties to this action, agreed on a purchase price of $25,000.

Plaintiffs applied to defendant Mobile Masters Financial for a purchase-money mortgage loan. Allegedly, at settlement, numerous additional and heretofore undisclosed fees appeared on the HUD-1 settlement sheet, including additional fees to be paid to Robert M. Melhorn, appraiser, attorneys' fees to Goodge, Makoul & Cohen, a conveyancing fee to Miller & Miller, and title insurance fees to Parkway Abstract. Ultimately, plaintiffs borrowed about $38,521.40, with the sales price listed as $41,000 instead of $25,000.

Following settlement, plaintiffs allegedly learned that numerous defendants operated under fictitious names and through layered entities. Plaintiffs also allegedly learned that various defendants colluded to defraud buyers like plaintiffs by overcharging for services and fees associated with real estate transactions.

### III. Defendants' Motions

Defendants attack plaintiffs' claims on the grounds that they are untimely, not pled with sufficient particularity, or are otherwise not cognizable. We address each claim or set of claims separately.

### A. Federal RICO Claims

As we stated in our earlier memorandum and order, RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156 (1987). In this circuit, the statute of limitations begins to run from when plaintiffs knew or should have known of their injury and when plaintiffs knew or should have known the source of that injury. *Forbes v. Eagleson,* 228 F.3d 471, 485 (3d Cir.2000); *accord Prudential Ins. Co. v. U.S. Gypsum Co.,* 359 F.3d 226, 233 (3d Cir.2004).

Plaintiffs plainly knew or should have known of their injury and source of that injury when they signed the HUD-1 form on December 1, 1997. That form listed all of the amounts to be paid, and to whom. If any improper amounts were being paid to certain parties, plaintiffs would know, or should have known, simply be looking at and signing the form. Plaintiffs apparently conceded this point, as they did in opposing the motions to dismiss their original complaint, insofar as they only argue that the statute of limitations should be equitably tolled.

Equitable tolling of the statute of limitations may be appropriate if plaintiffs adequately allege that: (1) defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their claims; (2) plaintiffs exercised reasonable diligence to uncover facts supporting their claims; and (3) plaintiffs were not aware, nor should they have been aware, of facts supporting their claim until a time within the limitations period measured backwards from the filing of their complaint. *See Forbes,* 228 F.3d at 486-87; *accord Prudential Ins.,* 359 F.3d at 237-38. Allegations of fraudulent concealment must be pled with sufficient particularity. *See* Fed.R.Civ.P. 9(b); *Byrnes v. DeBolt Transfer, Inc.,* 741 F.2d 620, 626 (3d Cir.1984).

**\*3** Assuming, *arguendo,* that defendants actively misled plaintiffs regarding the facts supporting their claims and that plaintiffs used reasonable diligence to investigate their claim, the first and third elements, plaintiffs still fail to allege any facts regarding the third element. With respect to the third element, plaintiffs were aware, or should have been aware, of the facts supporting their claim by June of 1999 at the latest. Plaintiffs learned something was amiss with their mortgage when they attempted to refinance in or about May of 1999. (*See* Am. Compl., Rec. Doc. No. 36, at ¶ 78.) They filed a consumer complaint against one defendant, G & M, with the Attorney General's Office shortly thereafter. (*Id.* at ¶ 79.) G & M responded to the complaint by letter dated June 1, 1999. (*Id.* at ¶ 81.)

So, if plaintiffs somehow never knew of their injury and source of their injury after making mortgage payments for one and one-half years, they knew of their injury and source of their injury by May or, at the latest, June of 1999. In which case, the four-year statute of limitations ran until June of 2003, six months before plaintiffs filed their praecipe for a writ of summons on December 1, 2003. Thus, plaintiffs' RICO claim are time-barred.

### B. State Law Claims

Plaintiffs also allege a number of state law claims. We will continue to exercise jurisdiction over these claims, *see* 28 U.S.C. § 1367(c), because the court's familiarity with the case will speed resolution of this matter and will conserve judicial resources.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 3
Not Reported in F.Supp.2d, 2005 WL 1458768 (M.D.Pa.), RICO Bus.Disp.Guide 10,906
**(Cite as: Not Reported in F.Supp.2d)**

*1. Violation of the Pennsylvania Unfair Trade Practices Law (Count III)*

A claim brought under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. § 201 *et seq.,* is subject to a six-year statute of limitations. *See Santana Products, Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 138-39 (3d Cir.2005); *In re Cabbagestalk,* 272 B.R. 865, 866 (W.D.Pa.2002). Even using December 1, 1997 as the date the limitations period began to run, the action was timely filed as to this claim on December 1, 2003.

The UTPCPL prohibits the use of "unfair methods of competition" and unfair or deceptive acts or practices" involved in a transaction between the parties that constitutes "trade or commerce ." *See* 73 P.S. § 201-3. A wide range of activities constitute "unfair or deceptive acts or practices." *See* 73 P.S. § 201-2(4)(i)-(xxi). Plaintiffs do not plead which subsections they bring suit under; in their brief they argue that their complaint establishes that defendants violated the UTPCPL by advertising goods or services with intent not to sell them as advertised, *see* 73 P .S. § 201-2(4)(ix), by making solicitations for sales of services without expressly stating the nature of the services, *see* 73 P.S. § 201-2(4)(xvii), and by "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding," *see* 73 P.S. § 201-2(4)(xxi).

**\*4** The exact elements of UTPCPL claims based on the above subsections are still unclear. It is sometimes stated that the common law elements of fraud must be pled to establish a violation of UTPCPL based on subsection (xxi). *See, e.g., Piper v. American Nat'l Life Ins. Co.,* 228 F.Supp.2d 553, 560 (M.D.Pa.2002). A liberal reading of other authority suggests something less than all the elements of fraud, such as scienter, is necessary for UTPCPL claims based on other subsections, or even on "deceptive acts" under subsection (xxi) instead of "fraud." *See Santana Products,* 401 F.3d at 136-37. Regardless of which subsection plaintiffs bring their suit under, however, they must allege that they justifiably relied on defendants' wrongful conduct or representation and that they suffered harm as a result. *Yocca v. Pittsburgh Sports, Inc.,* 854 A.2d 425, 438 (Pa.2004).

We do not explore the precise contours of plaintiffs' UTPCPL claim because the allegations of their complaint, if true, sufficiently state a UTPCPL claim with enough particularity to put defendants on notice

of the operative events underlying this claim. A liberal reading of plaintiffs' complaint reveals that, allegedly, plaintiffs justifiably relied on the misstatements and/or deceptive acts of defendants and they suffered harm as a result. This adequately states a claim under the UTPCPL. *Cf. Tran v. Metropolitan Life Ins. Co.,*-F.3d-, 2005 WL 1229696 (3d Cir. May 25, 2005) (remanding UTPCPL claims where insurance agent misled plaintiff as to terms of life insurance policy, who justifiably relied on agent's representations).

*2. Common Law Fraud (Count V)*

Pennsylvania has a two-year statute of limitations for common law fraud claims. *See* 42 Pa.C.S.A. § 5524(7). The statute of limitations begins to run from the moment the right to bring an action arises, regardless of lack of knowledge, mistake, or misunderstanding. *See Calle v. York Hosp.,* 232 F.Supp.2d 353, 359-60 (M.D.Pa.2002); *Fine v. Checcio,* 870 A.2d 850, 857 (Pa.2005). The statute of limitations may be tolled under either the discovery rule or the doctrine of fraudulent concealment. Under the discovery rule, the statute of limitations "does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Fine v. Checcio,* 870 A.2d at 859. The doctrine of fraudulent concealment, "provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine,* 870 A.2d at 860. Similar to the discovery rule, "[a] statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id.* at 861.

Plaintiffs base their common law fraud claim on the same occurrences as their RICO claims. As discussed in the context of the RICO claims, plaintiffs knew or should have known their injury and source of their injury by June of 1999, at the latest. Thus, even if the two-year statute of limitations was tolled under either the discovery rule or the doctrine of fraudulent concealment, the limitations period ended June of 2001, some two and one-half years before plaintiffs filed their praecipe for a writ of summons on December 1, 2003. Plaintiffs' common law fraud claim, therefore, is time-barred.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2005 WL 1458768 (M.D.Pa.), RICO Bus.Disp.Guide 10,906
**(Cite as: Not Reported in F.Supp.2d)**

*3. Agency Liability for Fraudulent Representations
(Count IV)*

**\*5** An agency liability claim based on fraudulent
misrepresentation is governed by the two-year statute
of limitations for fraud claims. *See* 42 Pa.C.S.A. §
5524(7); *Powell v. First Republic Bank,* 274
F.Supp.2d 660, 677 (E.D.Pa.2003). Accordingly, this
claim is time-barred for the same reasons as
plaintiffs' common law fraud claim.

*4. Breach of Fiduciary Duty (Count VI)*

The two-year statute of limitations governs breach of
fiduciary duty claims as well. *See In re Mushroom
Transp. Co., Inc.,* 382 F.3d 325, 336 (3d Cir.2004).
Consequently, this claim is time-barred for the same
reasons as plaintiffs' common law fraud claim.

*5. Civil Conspiracy (Count VII)*

The two-year statute of limitations governs civil
conspiracy claims. *See Calihan v. A.E.V., Inc.,* 182
F.3d 237, 246 n. 7 (3d Cir.1999). Consequently, this
claim is time-barred for the same reasons as
plaintiffs' common law fraud claim.

*6. Punitive Damages (Count VIII)*

Typically, a claim for punitive damages is derivative
of a tort claim, not available in contract. *See Haugh v.
Allstate Ins. Co.,* 322 F.3d 227, 235 (3d Cir.2003).
The UTPCPL, the basis for the only remaining claim,
permits recovery of treble damages in some
circumstances, *see* 73 P.S. § 201-9.2(a), but such
damages are not the equivalent of punitive damages.
*See Samuel-Bassett v. KIA Motors America, Inc.,* 357
F.3d 392, 401-02 (3d Cir.2004). Consequently, we
will dismiss plaintiffs' punitive damages claim
without prejudice to their ability to recover under the
UTPCPL's treble damages provision, if applicable.

*CONCLUSION:*

All counts will be dismissed except the UTPCPL
claim. An appropriate order follows.

*ORDER*

For the reasons set forth in the accompanying

memorandum,

IT IS ORDERED THAT:

1. Defendants' motions to dismiss (Rec. Doc. Nos.
41, 42, & 49), are granted in part and denied in part.

2. All counts of the amended complaint are dismissed
as time-barred except count III (alleged violation of
the Pennsylvania Unfair Trade Practices and
Consumer Protection Law (UTPCPL)).

M.D.Pa.,2005.
Hockenberry v. Diversified Ventures, Inc.
Not Reported in F.Supp.2d, 2005 WL 1458768
(M.D.Pa.), RICO Bus.Disp.Guide 10,906

Briefs and Other Related Documents (Back to top)

• 2005 WL 2613069 (Trial Pleading) Answer of
Defendant, Diversified Ventures, Inc. d/b/a Forward
Financial Company, To Cross-Claims of Defendant,
Standard Federal Bank, N.A., With Affirmative
Defenses (Aug. 18, 2005)
• 2005 WL 2613405 (Trial Motion, Memorandum
and Affidavit) Answer of Defendant, Gene J.
Defeudis to Cross-Claims of Defendant, Standard
Federal Bank, N.A., With Affirmative Defenses
(Aug. 18, 2005)
• 2004 WL 2276896 (Trial Pleading) Defendant,
Gene J. DeFeudis' Answer to Cross-Claim of
Defendant, Standard Federal Bank, Inc. (Jul. 8, 2004)
• 2004 WL 2276899 (Trial Pleading) Defendant,
Diversified Ventures, Inc. d/b/a Forward Financial
Company's Answer to Cross-Claim of Defendant,
Standard Federal Bank, Inc. (Jul. 8, 2004)
• 2004 WL 2276909 (Trial Pleading) Answer to
Cross-Claims of Defendant, Standard Federal Bank
by Defendants Goodge and Makoul, PC, Goodge-
Makoul-Cohen, and Richard Makoul t/a Parkway
Abstract (Deceased) (Jul. 2004)
• 2004 WL 2276879 (Trial Pleading) Answer of
Defendant Standard Federal Bank, N.A. with
Affirmative Defenses and Cross-Claim Against All
Co-Defendants (Jun. 29, 2004)
• 2004 WL 2276869 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Reply to
Plaintiffs' Brief in Opposition to Motion of
Defendants, Diversified Ventures, Inc. d/b/a Forward
Financial Company and Gene J. DeFeudis to Dismiss
the Complaint for Failure to State a Claim Pursuant
to Federal Rule of C ivil Procedure 12(b)(6) (Jun. 19,
2004)
• 2004 WL 2276841 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Brief in Opposition to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1458768 (M.D.Pa.), RICO Bus.Disp.Guide 10,906
**(Cite as: Not Reported in F.Supp.2d)**

Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P 12(b)(6) (2004)
- 2004 WL 2276853 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Defendants Diversified Ventures, Inc.'s d/b/a Forward Financial and Gene J. Defeudis', d/b/a Forward Financial, Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) (2004)
- 2004 WL 2276864 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Defendant Goodge, Makoul & Cohen's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) (2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT F

Westlaw.

Not Reported in S.E.2d                                                                 Page 1
Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)
**(Cite as: 1996 WL 1065614 (Va. Cir. Ct.))**

C

Circuit Court of Virginia, Fairfax County.
LITTLE PROFESSOR BOOK COMPANY OF
RESTON, VIRGINIA, INC., ET AL.
V.
RESTON NORTH POINT VILLAGE LIMITED
PARTNERSHIP, ET AL.
**AT LAW 151199.**

September 27, 1996.

*1 This matter is before the Court upon Reston North Point Village Limited Partnership's, the Lerner Corporation's, Peter Henry's and John Henry's ("Defendants") Plea in Bar and Demurrer to Little Professor Book Company of Reston, Virginia, Inc.'s, James Holsinger's and Marilyn Holsinger's ("Plaintiffs") Amended Motion for Judgment. This suit arises out of a lease dispute between the Plaintiffs and Defendants. Plaintiffs and Defendants entered into a commercial lease for property located at Reston North Point Village Shopping Center in Reston, Virginia. Plaintiffs contend that Defendants fraudulently induced them into entering into the lease by purposefully underestimating the common area maintenance charges and real estate taxes for the premises. The issues presented to the Court are as follows:

Gerald Bruce Lee, Judge.

(1) whether Plaintiffs' fraud claims are barred by a settlement agreement entered into by the parties in prior litigation;

(2) whether Plaintiffs' Amended Motion for Judgment states a claim for fraud based upon alleged misrepresentations made by Defendants;

(3) whether Virginia recognizes an exception to the intracorporate conspiracy doctrine which will allow a principal and agent to conspire to injure a business or trade within Virginia Code Sections 18.2-499-500 and to tortiously interfere with a contract;

Having considered the authorities and arguments of counsel, the Court holds that Defendants' Plea in Bar is sustained, Defendants' Demurrer is sustained and Plaintiffs' Amended Motion for Judgment will be dismissed.

FACTS

This suit arises out of a lease dispute between Little Professor Book Company and Reston North Point Village Limited Partnership. Reston North Point Village Limited Partnership and Little Professor Book Company of Reston entered into a lease ("Lease") for commercial property located at Reston North Point Village Shopping Center. Little Professor Book Company is owned and operated by James and Marilyn Holsinger. Peter Henry and John Henry are employees of Reston North Point Village Limited Partnership and Lerner Corporation. The Holsingers signed the Lease in their personal capacity as guarantors of Little Professor's obligations under the Lease. Lerner Corporation manages Reston North Point Village Shopping Center as agent for Reston North Point Village Limited Partnership ("RNPVLP").

The dispute centers around the estimated common area maintenance charges ("CAM") and real estate taxes. Under the Lease, the parties agreed that RNPVLP would collect the estimated CAM charges and real estate taxes for the first year of tenancy on a monthly basis. Each subsequent year, the parties agreed that RNPVLP would adjust the CAM charges and real estate taxes collected based on the CAM charges and real estate taxes incurred during the prior year. Prior to the execution of the Lease, the Holsingers asked Defendants whether the estimates for the CAM charges and real estate taxes contained in the Lease were reasonable. The Holsingers expressed concern that the estimates were above market and unusually high for the marketplace. In response to the Holsingers' inquiry, Defendants assured the Holsingers that the estimates of the CAM and real estate taxes were reliable and accurate. Defendants further assured Plaintiffs that they should not expect to pay any more for the CAM charges and real estate taxes than the estimated figures contained in the Lease. Plaintiffs allege that Defendants fraudulently provided the Holsingers with artificially low estimates for the CAM charges and real estate taxes to induce the Holsingers to execute the Lease.

*2 I. Plea In Bar

Little Professor Book Company of Reston previously filed a Bill of Complaint ("Lawsuit I") against Reston North Point Village Limited Partnership, John Henry, Peter Henry, and Capstone Realty. In Lawsuit

Not Reported in S.E.2d                                                                                                    Page 2
Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)
**(Cite as: 1996 WL 1065614 (Va. Cir. Ct.))**

I, Little Professor alleged that Defendants defrauded Little Professor by falsely representing to the Holsingers that Reston North Point Village Shopping Center would be the last shopping center built in Reston. Lawsuit I alleged two counts: Count I, Constructive Fraud, and Count II, Actual Fraud. On the second day of trial, the parties settled the case. The parties executed an agreement ("Settlement Agreement") which represents the terms of their agreement. Defendants argue that the Settlement Agreement executed between the parties in connection with prior litigation, Lawsuit I, bars Plaintiffs from asserting its fraud claims in the present action. In response, Plaintiffs contend that the Settlement Agreement was not a "global settlement agreement" and that the Settlement Agreement creates an exception with respect to claims arising from trash collection.

The Court holds that the Settlement Agreement entered into on December 21, 1994, precludes Plaintiff from asserting fraud claims in its Amended Motion for Judgment. In Lawsuit I, Plaintiffs allege that Defendants fraudulently induced Plaintiffs into entering a Lease by misrepresenting to Plaintiffs that North Point would be the last shopping center constructed in Reston, Virginia. In the present action, Plaintiffs allege in their Amended Motion for Judgment that Defendants fraudulently induced them into entering into a Lease by misrepresenting the estimates of the CAM costs and real estate taxes.

The issue presented to the Court is whether the Settlement Agreement entered into on the second day of trial in Lawsuit I bars Plaintiffs from asserting their fraud claims in the present action. The Court holds that the Settlement Agreement bars Plaintiffs from pursuing their fraud claims. The Settlement Agreement states in part:

James Holsinger and Marilyn Holsinger, [FN1] their heirs, successors and assigns do hereby release RNPVLP, its predecessors, successors, partners, employees, agents and assigns, Capstone, its predecessors, successors, officers, employees, agents and assigns, John Henry and Peter Henry from any and all liability, claims, damages, actions and/or causes of action, whether currently existing or not, and whether known or unknown, relating to or arising from the claims and allegations made and/or set forth in the Lawsuit.

FN1. In Paragraph 11 of the Settlement Agreement, Little Professor releases Defendants from liability by the same

language found in Paragraph 12.

Settlement Agreement, para. 12.

The Settlement Agreement further states:

RNPVLP, its partners, successors and assigns do hereby release Little Professor, its successors, shareholders, officers, employees and agents, James Holsinger and Marilyn Holsinger from any and all liability, claims, damages, actions or causes of action relating to any presently existing claims RNPVLP may have against Little Professor, its officers, agents and employees, James Holsinger and/or Marilyn Holsinger, except for the payment by Little Professor for trash service at the North Point Village Center.

**\*3** Settlement Agreement, para. 13.

In Paragraphs 11 and 12 of the Settlement Agreement, Plaintiffs release Defendants from any and all claims currently existing or unknown relating to claims arising from Lawsuit I. In Paragraph 13, Defendant RNPVLP releases Plaintiffs from any and all claims except for the payment by Plaintiff Little Professor for trash service. In Lawsuit I, Plaintiffs allege that Defendants fraudulently induced Plaintiffs into executing the Lease by misrepresenting that North Point was the last shopping center to be built in Reston. The present action alleges fraudulent inducement relating to the same Lease but on a different theory--- Defendants' misrepresentation of CAM and real estate charges. The language of the Settlement Agreement releases Defendants from liability with respect to fraudulent inducement to enter into the Lease. Although Plaintiffs have alleged different factual theories, Paragraphs 11 and 12 clearly release RNPVLP from all liability with respect to fraudulent inducement to enter the Lease.

The Court finds that Paragraph 13 of the Settlement Agreement does not carve out an exception with respect to "trash collection" in favor of Plaintiffs. Paragraph 13 reflects that Defendant RNPVLP releases Plaintiffs from any liability except for trash services. The language in the Settlement Agreement does not reflect RNPVLP's liability to Plaintiffs with respect to trash collection. Paragraphs 11 and 12 of the Settlement Agreement govern RNPVLP's liability with respect to the Plaintiffs. Accordingly, Defendants' Plea in Bar to Counts I and II of Plaintiffs' Amended Motion for Judgment is sustained.

II. Demurrer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                Page 3
Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)
**(Cite as: 1996 WL 1065614 (Va. Cir. Ct.))**

A demurrer challenges the legal sufficiency of factual allegations in order to determine whether the motion for judgment states a cause of action upon which relief can be granted. Fun v. Virginia Military Institute, et al., 245 Va. 249, 427 S.E.2d 181 (1993); Va. Code ' 8.01-273 (1992). A demurrer admits the truth of all facts properly pleaded and inferences properly drawn from the facts alleged. Rosillo v. Winters, 235 Va. 268, 270, 367 S.E.2d 717, 717 (1988). The facts admitted are those expressly alleged, those which fairly can be viewed as impliedly alleged and those which may be fairly and justly inferred from the facts alleged. Id. The Supreme Court of Virginia has cautioned trial courts against incorrectly short circuiting litigation at the pretrial stage without permitting the parties to reach trial on the merits. Catercorp, Inc. v. Catering Concepts, Inc. et al., 246 Va. 22, 431 S.E.2d 277 (1993).

A. Fraud Claims

In order to properly allege a fraud claim, the Plaintiffs must allege: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. Bryant v. Peckinpaugh, 241 Va. 172, 175 (1991). [FN2] The Court holds that Defendants' Demurrer to Count I and Count II of Plaintiffs' Amended Motion for Judgment is sustained.

> FN2. The elements of constructive fraud are as follows: (1) a false representation, (2) of material fact, (3) made innocently or unknowingly, (4) reliance by the party misled, and (5) resulting damage to the party misled. See Nationwide Mutual Ins. Co. v. Hargraves, 242 Va. 88 , 92 (1991). The Court sustains Defendants' Demurrer to Count II (Constructive Fraud) of Plaintiffs' Amended Motion for Judgment for the same reasons it sustains Defendants' Demurrer to Plaintiffs' actual fraud claim.

**\*4** The Court holds that Plaintiffs' fraud claims fail because Plaintiffs have failed to allege misrepresentations of material fact. Plaintiffs allege that Defendants misrepresented the estimates of the CAM charges and real estate taxes. (See AMJ para. 14, 15, 16). Defendants' alleged misrepresentations, however, fail to amount to more than statements of opinion. Poe v. Voss, 196 Va. 821 (1955). The Supreme Court in Poe v. Voss opined "What is

susceptible of exact knowledge when the statement is made is usually considered as a matter of fact." Id at 826. The estimates [FN3] that Defendants provided Plaintiffs with respect to the CAM charges and real estate taxes are merely "estimates" or "approximations" and were not susceptible of exact knowledge when they were provided to Plaintiffs. The word "estimate" means an approximation. The Lease executed between the parties provides that future adjustments will be made based upon actual costs. Defendants' statements that the estimates are accurate is akin to the defendant's statement in Watson v. Avon Street Business Center, 226 Va. 614, 311 S.E.2d 795 (1984) that the roof was a "25 year roof" and "a good roof." The Court in Watson held that these statements were expressions of opinion and seller's talk insufficient to frame a jury issue for deceit. Id. The Court holds therefore that Defendants' Demurrer to Count I (Actual Fraud) and Count II (Constructive Fraud) is sustained.

> FN3. Webster's Dictionary defines estimate as follows: (1) an opinion or judgment of the nature, character, or quality of a person or thing; (2) a rough or approximate calculation. Webster's Ninth New Collegiate Dictionary 426 (9th ed. 1989).

Additionally, the Court holds that Plaintiffs' fraud claims fail because Plaintiffs have failed to sufficiently allege reasonable reliance. Defendants contend that Plaintiffs' inquiries regarding the reasonableness of the CAM charges and real estate taxes put them on notice for a possible misrepresentation and that Plaintiffs could not have relied upon the alleged misrepresentations. In response, Plaintiffs argue that Defendants were among the only persons capable of calculating and estimating the CAM charges and real estate taxes. See AMJ para. 17. Plaintiffs also state that they did not have access to calculate the charges and taxes themselves. See AMJ para. 18.

The general rule espoused in Poe v. Voss is that if a purchaser is given or secures information as to the condition of property that would make a reasonable man suspicion, he is under a duty to ascertain the true condition for himself and cannot rely upon the representations of the vendors. See Poe v. Voss, 196 Va. 821 (1955). The exception, however, is that the vendor must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make. Plaintiffs alleged that they made inquiries with respect to the CAM charges and real

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                      Page 4
Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)
(Cite as: 1996 WL 1065614 (Va. Cir. Ct.))

estate taxes and that Defendants made representations in response to their inquiries.

**\*5** The Court holds that Plaintiffs have failed to allege that they reasonably relied on Defendants' misrepresentations with respect to the CAM charges and real estate taxes. The figures provided in the Lease with respect to the CAM charges and real estate taxes were estimates. The Lease provided that the Plaintiffs would be charged for the actual amounts. The Court holds that Plaintiffs could not have reasonably relied upon the fact that Defendants' estimates would in fact be lower or the same as the actual costs.

B. Business Conspiracy

Defendants contend that a conspiracy between Defendant RNPVLP and Defendant Lerner is a legal impossibility because the Plaintiffs have alleged an agency relationship between Lerner and RNPVLP. See AMJ para. 3; Charles E. Brauer Company v. NationsBank of Virginia, 466 S.E.2d 382 (1996). In response, the Plaintiffs argue that they have alleged an exception to the intracorporate conspiracy doctrine. Greenville Publishing Company Inc. v. Daily Reflector, 406 F.2d 391 (1974). The Court holds that the Plaintiffs' business conspiracy claim fails for several reasons.

First, a business conspiracy may not exist between RNPVLP and Lerner as a matter of law. In order to properly allege a claim for business conspiracy, the plaintiff must allege that: (1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff. Va. Code ' 18.2-499 (1996); See also Va. Code ' 18.2-500 (1996); Allen Realty Corp. v. Holbert, 227 Va. 441, 318 S.E.2d 592 (1984). The Court holds that Plaintiffs have failed to sufficiently allege that Defendants "conspired or combined" to injure Plaintiffs' business. Plaintiffs allege that Lerner is an agent of RNPVLP. See AMJ para. 3. The Supreme Court of Virginia held in Fox v. Deese, 234 Va. 412, 362 S.E.2d 699 (1987) that an agent cannot conspire with its principal. Id at 428. The Supreme Court of Virginia opined that "by definition, a single entity cannot conspire with itself."

Id.

Second, the Court holds that the exception to the intracorporate conspiracy doctrine carved out in Greenville Publishing Company, Inc. v. Daily Reflector Inc., 496 F.2d 391 (1974), which addressed

violations of the Sherman Act [FN4] has not been adopted by the Virginia Supreme Court and therefore does not apply to the instant action. In Greenville, the Fourth Circuit opined that an exception to the intracorporate conspiracy doctrine exists when the directors and officers of a corporation can be shown to have an independent personal stake in achieving a corporation's illegal objective. Id at 399. Another Fourth Circuit decision which addresses the exception to the intracorporate conspiracy doctrine is Oksanen v. Paige Memorial Hospital, 945 F.2d 696 (1991). The Oksanen court criticized the intracorporate exception created in Greenville and opined that "the exception threatened to swallow the rule." Id at 705.

> FN4. The Eastern District in Levine v. McLeskey, 881 F.Supp. 1059 (E.D.Va. 1995) opined that where the directors and officers of a corporation can be shown to have a personal stake in achieving a corporation's illegal objective, they can be treated as separate entities for conspiracy purposes. Citing Selman v. American Sports Underwriter, Inc., 697 F.Supp. 225, 239 (W.D.Va.). Levine at 1059.

**\*6** Third, the Supreme Court of Virginia in Charles E. Brauer Company v. NationsBank of Virginia, 466 S.E.2d 382 (1996) recently reaffirmed the general rule in Virginia that a conspiracy between a principal and an agent is a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy statute. Brauer, however, is silent on whether or not Virginia recognizes the exception to the intracorporate conspiracy doctrine articulated in Greenville.

Finally, the Court is not bound by a prior ruling of this Court on this same issue raised on a Plea in Bar to Plaintiffs' Motion for Judgment. [FN5] Accordingly, the Defendants' Demurrer to Count III (Business Conspiracy) is sustained.

> FN5. The Supreme Court of Virginia refuted 'the law of the case' argument in Turner v. Wexler, 244 Va. 124, 418 S.E.2d 886 (1992). The Court held: 'A trial court is empowered to change a legal determination as long as it retains jurisdiction over the proceedings before it.' The Court further opined: 'Here, there is no question that the trial court retained jurisdiction over Turner's action and, hence, the court, albeit with a different judge presiding, had the power to

Not Reported in S.E.2d                                                    Page 5
Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)
**(Cite as: 1996 WL 1065614 (Va. Cir. Ct.))**

change its earlier determination.' The trial court retains jurisdiction over an action until a final order is entered and the action is no longer within the breast of the court. Accordingly, the Court on Defendants' Demurrer to Plaintiffs' Amended Motion for Judgment may rule inconsistently with the ruling of a different judge in the same court to Defendants' Plea in Bar to Plaintiffs' Motion for Judgment.

C. Conspiracy/Tortious Interference

In order to allege a claim for tortious interference with contracts, the plaintiff must allege: (1) the existence of a valid contractual relationship or business; (2) intentional interference inducing or causing a breach or termination of the relationship or expectancy; (3) damage resulting to the party claiming disruption of the relationship or expectancy. Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).

The Court holds that Count IV (Conspiracy/Tortious Interference) of Plaintiffs' Amended Motion for Judgment fails because a person or entity cannot intentionally interfere with its own contract. See Fox v. Deese, 234 Va. 412, 362 S.E.2d 699 (1987). Plaintiffs have alleged in Paragraph 3 of their Amended Motion for Judgment that Lerner is an agent of RNPVLP. Thus, RNPVLP and Lerner are the same entity for purposes of this demurrer. Therefore, Plaintiffs have failed to state a claim upon which relief can be granted because the Virginia Supreme Court has not recognized an exception to the intracorporate conspiracy doctrine. Accordingly, for the reasons stated previously with respect to Plaintiffs' business conspiracy claim, Defendants' Demurrer to Count IV (Conspiracy/Tortious Interference) is sustained.

**\*7 III. Conclusion**

The Court sustains Defendants' Plea in Bar and Demurrer. [FN6] The Plaintiffs' fraud claims are barred in their entirety by the settlement agreement entered into by the parties in prior litigation. Additionally, Plaintiffs' fraud claims are dismissed because Plaintiffs have failed to allege misrepresentations of fact. Plaintiffs' business conspiracy claim and conspiracy/tortious interference claim are dismissed without leave to amend. Virginia has not recognized the exception to the intracorporate conspiracy doctrine and the allegations of a conspiracy between principal an agent fail to state a

cause of action. The Court is mindful that a demurrer, unlike a motion for summary judgment, does not allow the court to evaluate and decide the merits of a claim. A demurrer only tests the legal sufficiency of well pleaded factual allegations to determine if the motion for judgment states a cause of action. In the interest of both judicial economy and preservation of the parties' resources, the Court does not think it is prudent to test whether the Virginia Supreme Court recognizes an exception to the intracorporate conspiracy doctrine by a trial on the merits. The Court finds that it is within the purview of the appellate courts to decide this issue. Accordingly, Defendants' Plea in Bar and Demurrer are sustained.

FN6. The Courts determination of Defendants' Demurrer with respect to the Plaintiffs' punitive damage claims and request for attorneys' fees is rendered moot by the determination of Defendants' Plea in Bar and Demurrer to Plaintiffs' fraud claims, business conspiracy claim, and tortious/interference claim.

Counsel for Defendants is directed to prepare an appropriate order embodying the Court's ruling preserving Plaintiffs' exceptions and present it to the Court not later than October 11, 1996.

Not Reported in S.E.2d, 41 Va. Cir. 73, 1996 WL 1065614 (Va. Cir. Ct.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases  P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

United States District Court, E.D. Pennsylvania.
PENNPAC INTERNATIONAL, INC.,
plaintiff/counterclaim defendant,
v.

ROTONICS MANUFACTURING, INC.,
defendant/counterclaim plaintiff, third-party plaintiff,
v.

RUSH SMITH, third-party defendant/third-party
plaintiff.[FN1]

> **FN1.** By Order of October 4, 2000 (Doc.
> No. 52), the claims against third-party
> defendants John F.A. Earley, P.C. and
> Harding, Earley, Follmer & Frailey were
> terminated.

**No. CIV. A. 99-CV-2890.**

May 25, 2001.

*MEMORANDUM AND ORDER*

YOHN.

**\*1** Plaintiff PennPac International, Inc. ["PennPac"]
brings this action against defendant Rotonics
Manufacturing, Inc. ["Rotonics"] alleging violation
of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2,
and setting forth various state law claims, including
unfair competition, defamation, commercial
disparagement, and tortious interference with existing
and prospective relationships. Pending before the
court is Rotonics' motion for summary judgment on
all counts of plaintiff's complaint (Doc. No. 43).
Because plaintiff has failed to substantiate its
allegation that Rotonics engaged in predatory,
anticompetitive conduct, judgment will be entered in
favor of Rotonics as to Count I of plaintiff's
complaint. Furthermore, because the parties concede
that Pennsylvania law against unfair competition is
co-extensive with federal antitrust law, judgment
likewise will be entered for Rotonics on Count II of
plaintiff's complaint. Finally, because each of the
remaining state law claims is barred by *Noerr-
Pennington* immunity and fails on the merits,
judgment will also be entered in favor of Rotonics on
Counts III, IV, and V.

I. *Background*

The following facts are undisputed. On February 3,
1992, Rotonics, formerly known as Koala
Technologies Corporation, acquired all of the stock
of Plastech International, Inc. ["Plastech"], including
its intellectual property, for a purchase price of $1.7
million. Plastech's intellectual property included
patent application number 07/170,143 [" '143
Application"] relating to a rotationally molded plastic
bulk container with an inner flat bottom and having a
detachable pallet base. At that time, Rush Smith was
President and CEO of Plastech and owned 27 percent
of Plastech's stock. A number of people, including
Smith, handled the negotiations for the sale of
Plastech. The sale was consummated pursuant to a
Stock Purchase Agreement executed January 7, 1992.
Section 2.2.13 of the Stock Purchase Agreement
represented that "no claim exists that any of the
Intellectual Property or Proprietary Information is not
valid or enforceable by [Plastech]." Moreover,
Section 2.2.22 of the agreement represented that
"[t]here is no fact presently actually known to any of
the officers or directors of the Company or Plastech
... which materially and adversely affects the
Company business." Rush Smith signed this
agreement in his corporate capacity as President and
in his individual capacity as seller. Smith continued
as Divisional President at Rotonics until he was
discharged in December 1994.[FN2]

> **FN2.** As a result of the discharge, Smith
> instituted a wrongful discharge suit against
> Rotonics in the Eastern District of
> Pennsylvania which ultimately was resolved
> pursuant to a settlement agreement.

During the '143 Application process, Smith
advocated the patentability of the invention by
making declarations in support of the '143
Application. On April 21, 1992, the '143 Application
matured into Patent Number 5,105,947 [" '947
Patent"]. After the issuance of the '947 Patent, Smith
took action to enforce the patent. On July 16, 1992,
Smith sent identical letters to Peter Connors,
President of Remcon Plastics ["Remcon"] and to
John Cali, Sr., General Manager of Bonar Plastics,
Inc., ["Bonar"] alleging that certain of their products
appeared to infringe the '947 Patent. Bonar's counsel
responded denying infringement and claiming that
the '947 Patent was invalid due to prior art revealed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases  P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

in "literature which has been available since the 1970's which shows that the claimed container having a replaceable pallet base has been in the public domain more than one year prior to the filing of the patent application of [the '947 Patent]." Apparently, Remcon's counsel likewise responded to Rotonics' allegations of infringement.

In July 1995, Smith formed PennPac to sell rotationally molded products and more specifically, large bulk containers. In mid-1997, after discovering containers that were substantially similar to its patented containers, Rotonics advised both PennPac and the suspected purchasers of those containers by letter of possible '947 Patent infringement. In June 1999, PennPac initiated the instant action.

## II. *Standard of Review*

**\*2** Either party to a lawsuit may file a motion for summary judgment, and it will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). " 'Facts that could alter the outcome are "material", and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, LTD.,* 90 F.3d 737, 743 (3d Cir.1996) (citation omitted). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant bears the burden of persuasion at trial, the movant satisfies this initial burden by "identifying [the evidence] which it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323. Where the nonmovant bears the burden of persuasion at trial, the moving party may meet its initial burden and shift the burden of production to the nonmoving party "by 'showing'- that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Thus, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

When a court evaluates a motion for summary

judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* However, " '[s]ummary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.' " *Ideal Dairy,* 90 F.3d at 744 (citation omitted). At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson,* 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

## III. *Discussion*

**\*3** Federal Antitrust and Pennsylvania Unfair Competition Claims

In Count I of the complaint, plaintiff alleges that defendant Rotonics violated § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, because it achieved or attempted to achieve monopoly power in the market for rotationally molded pallet-based containers in the United States when it threatened to enforce a patent against plaintiff's customers and contract manufacturers with the intent to destroy competition in the relevant market. Rotonics argues that judgment should be entered in its favor on this antitrust claim for three reasons: (1) PennPac failed to define a proper relevant market; (2) PennPac failed to introduce specific evidence of Rotonics' market power; and (3) PennPac has offered no proof of exclusionary or anticompetitive conduct. PennPac counters that it has met the requisite burden of proof and that issues of material fact exist which preclude the entry of summary judgment.

" 'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen,

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases  P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

or historic accident.' " *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 437 (3d Cir.1997) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (citation omitted)), *cert. denied,* 523 U.S. 1059 (1998). In order to establish a § 2 claim of attempted monopolization, a plaintiff must demonstrate that the defendant "(1) had specific intent to monopolize the relevant market, (2) engaged in anticompetitive or exclusionary conduct, and (3) possessed sufficient market power to come dangerously close to success." *Barr Laboratories, Inc. v. Abbot Laboratories,* 978 F.2d 98, 112 (3d Cir.1992) (citations omitted). Both the monopolization and attempted monopolization claims require PennPac to present specific evidence to permit a jury to find that Rotonics possessed the requisite market power necessary to constitute a monopoly. This market power analysis must begin with a definition of the relevant market. Moreover, plaintiff bears the burden of defining adequately this market. *See generally Pastore v. Bell Tel. Co.,* 24 F.3d 508, 512 (3d Cir.1994).

"The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.' " *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991) (quoting *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), *cert. denied,* 505 U.S. 1221 (1992)). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza,* 124 F.3d at 437 (citation omitted). In other words, reasonable interchangeability is indicated by "cross-elasticity of demand between the product itself and reasonable substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Moreover, in evaluating reasonable interchangeability, "[f]actors to be considered include price, use and qualities." *Tunis Bros.,* 952 F.2d at 722.

PennPac submits that the relevant market "was universally defined by the description of the large bulk storage containers or bins used in the food service or other industries given by John Cali, Sr., President of Bonar." Rotonics, however, argues that PennPac's definition must fail as a matter of law because PennPac has neglected to include products reasonably interchangeable with these large plastic containers used for transporting and storing bulk

materials. Specifically, Rotonics submits that the record indicates that there are many uses and even many substitutes for these products, including steel drums, wood, fiberboard and corrugated boxes. *See* Def. Mem. at 6-7 (citing, *inter alia,* Smith Dep. at 63 (various types of containers can be and are used interchangeably with rotomolded plastic containers); Alex Dep. at 37-38 (same)). Thus, the parties have each assumed classic positions concerning the relevant market: plaintiff desires to define a narrow market while defendant seeks to expand that definition as much as possible.

**\*4** While the court recognizes that a plaintiff's market definition will be insufficient as a matter of law where the proposed relevant market clearly does not include all interchangeable substitute products, *see Queen City Pizza,* 124 F.3d at 436, and where the plaintiff's definition of the relevant market is incurably vague, *see generally id.,* it is not clear from the limited deposition excerpts cited by Rotonics whether a reasonable jury could find that steel drums, wood, fiberboard and corrugated containers are substitutes for the rotomolded bulk plastic containers. Thus, I find that there exists a genuine issue of material fact regarding the relevant market definition and therefore, summary judgment on this issue will be denied. *See generally Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 199 (3d Cir.1992) (evaluating whether there existed sufficient evidence to support a jury's finding regarding the relevant market and stating that "the determination of a relevant product market ... is a highly factual one best allocated to the trier of fact.") (citations omitted), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).

Once the relevant market has been defined, a plaintiff must next demonstrate that the defendant possessed the requisite power in that market. In the context of a monopolization claim, "monopoly power is the power to control prices or to exclude competition." *Barr Labs.,* 978 F.2d at 111-12 (citing *Pennsylvania Dental Ass'n v. Medical Serv. Assoc. of Pa.,* 745 F.2d 248, 255 (3d Cir.1984)). In the context of an attempted monopolization claim, plaintiff has the burden of establishing that defendant "possesses 'sufficient market power' to come dangerously close to success within the market." *Pastore,* 24 F.3d at 513. A dangerous probability of obtaining such monopoly power exists where "the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct." *Barr Labs.,* 978 F.2d at 112. However, while "the size of a defendant's market share is a significant

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: Not Reported in F.Supp.2d)

determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive." *Id.* (citations omitted). Other factors relevant to the inquiry "include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Id.* (citation omitted).

Rotonics argues that PennPac has failed to substantiate its claim that Rotonics "possesses a substantial share of the market for rotationally molded pallet-based containers in the United States." Specifically, Rotonics claims that PennPac has failed first, to provide Rotonics' market share percentage, or any other figure, and second, to produce evidence concerning any additional factors relevant to the inquiry. In short, Rotonics argues that regardless of the definition of the relevant market, PennPac has not met its burden of showing that Rotonics possesses either monopoly power or " 'sufficient market power' to come dangerously close to success within the market." *Pastore,* 24 F.3d at 513.

**\*5** Without providing citations to the record, PennPac responds with the conclusory argument that "[t]he depositions and other discovery clearly show that the market is, in fact, dominated by four major suppliers: Rotonics, Bonar, Remcon, and PennPac, the newest entrant." PennPac then suggests that summary judgment is inappropriate at this stage because the jury should be able to consider other relevant factors. PennPac, however, simply has failed to produce sufficient evidence to determine Rotonics' market share, let alone any other evidence relevant to the determination whether Rotonics possesses the requisite market power.

Conversely, Rotonics points the court to uncontroverted evidence that suggests that the market contains numerous competitors, *see* Def. Mem at 9-11 (citing Cali Dep. at 15-16 (stating that there are several other manufacturers of roto-molded containers, including Meese Orbitron and "various small players throughout Minnesota, Indiana."); McKinniss Dep. of 7/18/2000 at 24-25 (estimating that there are a total of 15 to 20 manufacturers of rotationally molded material handling equipment, the two largest being Bonar and Remcon); *Plastics News* Article of Aug. 7, 2000, *available at* <http://www.plasticsnews.com/subscriber/rankings/listroto.html> (listing over 50 rotational molders in just the food-processing category)), and that Rotonics does not possess a substantial share of that market. *See id.* at 10 n. 3 (citing information in *Plastic News* that

suggests that Rotonics' percentage of sales amongst rotational molders in the food-processing category was 8.65 percent in the year 2000). Accordingly, judgment will be entered in favor of Rotonics on Count I of plaintiff's complaint.

Assuming that PennPac had demonstrated that Rotonics possessed sufficient power in the relevant market, PennPac also has the burden to present specific evidence that Rotonics engaged in anticompetitive conduct. Rotonics argues that PennPac has failed to meet this burden because Rotonics' assertion of its rights as a valid '947 Patent holder is shielded pursuant to the *Noerr-Pennington* doctrine and therefore, was not anticompetitive under the antitrust laws. PennPac answers that Rotonics cannot be afforded *Noerr-Pennington* immunity because its assertion of patent rights falls within the "mere sham" exception to the *Noerr-Pennington* doctrine.

The *Noerr-Pennington* doctrine provides that a party who petitions the government for redress generally is immune from antitrust liability. *See Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 122 (3d Cir.) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)), *cert. denied,* 528 U.S. 871 (1999). Thus, "[a] patent owner who brings a lawsuit to enforce the statutory right to exclude others from making, using or selling the claimed invention is exempt from the antitrust laws, even though such suit may have an anticompetitive effect, unless the infringement defendant 'proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.,* ... or (2) that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*" *Glass Equip. Dev., Inc. v. Besten, Inc.,* 174 F.3d 1337, 1343 (Fed.Cir.1999) (internal citations omitted).[FN3] Furthermore, "[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 709 (Fed.Cir.1992). Such notice, however, will become actionable where the patentee lacks a good faith belief in the validity of its patent. *Id.* at 710 (citations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases ¶ 73,282
**(Cite as: Not Reported in F.Supp.2d)**

**FN3.** Federal Circuit law applies to all antitrust claims premised on the bringing of a patent infringement suit. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed.Cir.1998). It follows that antitrust claims premised on notice given to infringers is also governed by Federal Circuit law. Nevertheless, the law of the regional circuit continues to apply "to issues involving other elements of antitrust law such as relevant market, market power, damages, etc., as those issues are not unique to patent law, which is subject to [the] exclusive jurisdiction [of the Federal Circuit]." *Id.* (citations omitted).

**\*6** PennPac asserts that Rotonics cannot hide behind *Noerr-Pennington* immunity because the threatened action of patent enforcement was a sham. [FN4] Presumably, PennPac seeks to argue that the allegations of invalidity against the '947 Patent by both Remcon and Bonar's counsel in 1992, coupled with the fact that Rotonics did not thereafter seek to enforce the '947 Patent against either of these competitors, supports the inference that Rotonics had knowledge that its patent was invalid. Thus, the argument goes, in 1997, when Rotonics sought to notify PennPac and its customers of infringement of that same patent, Rotonics was acting in bad faith.

> **FN4.** The first exception to the *Noerr-Pennington* doctrine, obtaining the patent through knowing and willful fraud, is not here at issue.

By analogy, the Supreme Court has held that litigation is a sham if the lawsuit is "objectively baseless." *See Professional Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ["*PRE* "]; *see also Cheminor Drugs,* 168 F.3d at 122. In *PRE,* the Court announced a two-step inquiry: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits ... Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation ... [and] focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationship of a competitor, though the use of governmental *process*-as opposed to the *outcome* of that process-as a competitive weapon." *Id.* at 60-61 (citations omitted) (emphasis in original). I conclude that no reasonable judge or jury could conclude an infringement suit by

Rotonics would be a sham or objectively baseless.

First, I note that by statute, patents are presumed to be valid. *See* 35 U.S.C. § 282 (1994). Second, the following uncontested facts demonstrate that Rotonics did investigate whether PennPac products were infringing the '947 patent before it sent the 1997 letters: [FN5] (1) in June 1997, Midwestern sales representative Thomas Stafford obtained a diagram that depicted the product being offered for sale by PennPac; (2) the diagram was sent to Rotonics' Plastech Division in Warminster, Pennsylvania and to Rotonics' patent counsel; (3) when the inventor of the '947 patent, Thomas Wise, saw this diagram, he remarked that the container was "clearly ... a knock-off" of Rotonics' patented container; (4) William Lehr, then the Plastech Division's sales manager, asked sales representatives to gather information, including drawings or photographs, concerning the allegedly infringing PennPac containers; (5) Stafford visited two customer facilities using the PennPac containers, Doskocil Food Service and Stella Foods, where he observed that they were substantially similar to Rotonics' patented container; (6) Stafford took photographs of the containers in use at Stella Foods; (7) Rotonics attempted to obtain physical samples of the PennPac containers by offering to trade two of its containers for one allegedly infringing container; and (8) before it sent the 1997 letters, Rotonics obtained the advice of patent counsel. *See* Def. Statement of Material Facts at ¶¶ 27-40. Thus, an enforcement action could not be considered a sham.

> **FN5.** Paragraph ten of the court's scheduling order requires the opposing party to file a separate statement of material facts responding to each of the numbered paragraphs in the moving party's statement of material facts. Although Rotonics filed its statement, PennPac has failed to respond. As such, the court may accept Rotonics' statement of material facts as undisputed.

**\*7** PennPac counters that Remcon and Bonar's counsel both alleged in 1992 that the '947 Patent was invalid, but this is clearly not sufficient evidence from which a judge or jury could reasonably conclude that no reasonable litigant could reasonably expect success on the merits when Rotonic notified PennPac and three of its customers of possible infringement in 1997. *See Argus Chem. Corp. v. Fibre-Glass-Evercoat Co., Inc.,* 812 F.2d 1381, 1386 (Fed.Cir.1987) ("The allegation by an accused

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases ¶ 73,282
**(Cite as: Not Reported in F.Supp.2d)**

infringer that the patent is invalid-an assertion frequently made by those charged with infringement-cannot be turned into evidence that the patentee knew the patent was invalid."). Nor is Smith's deposition testimony that in 1992, after he discussed the substance of the letter from Remcon's attorney with Rotonics' patent counsel, counsel stated, "well, I guess I missed one" sufficient evidence from which a reasonable judge or jury could conclude that Rotonics' claim in 1997 was "objectively baseless."

I conclude that Rotonics' assertion of patent rights does not fall within the "mere sham" exception to the *Noerr-Pennington* doctrine.

Moreover, the doctrine of assignor estoppel necessitates that PennPac should now be estopped from challenging the validity of the '947 Patent. Assignor estoppel is an equitable doctrine that precludes an assignor of a patent (or patent application) from thereafter attacking its utility, novelty or validity against anyone claiming the patent right under his assignment. *See Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 349, 45 S.Ct. 117, 69 L.Ed. 316 (1924); Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 150 F.3d 1374, 1379 (Fed.Cir.1998); Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed.Cir.1988).* "As to the rest of the world, the patent may have no efficacy and create no right of monopoly; but the assignor cannot be heard to question the right of his assignee to exclude him from its use." *Westinghouse Elec., 266 U.S. at 349.* This is not to say, however, that an assignor of a patent is without any means to defend a subsequent infringement suit. The assignor is permitted to introduce evidence of prior art to narrow the scope of the assigned patent's claims in an effort to show that the accused device falls outside the scope of the assigned patent. *See Westinghouse Elec., 266 U.S. at 350-51; Diamond Scientific, 848 F.2d at 1226.* Nevertheless, if this argument proves successful, the result will be a finding of non-infringement, not patent invalidity.

The estoppel will also operate against "parties in privity with the assignor, such as a corporation formed by the assignor." *Diamond Scientific, 848 F.2d at 1224* (citation omitted). Privity is determined upon a balance of the equities and whether two parties are in privity will depend upon the nature of the relationship between them. *See Mentor Graphics, 150 F.3d at 1379; Shamrock Tech., v. Medical Sterilization, Inc., 903 F.2d 789, 793 (Fed.Cir.1990).* " 'The closer the relationship, the more the equities

will favor applying the doctrine' of assignor estoppel." *Mentor Graphics, 150 F.3d at 1379* (citation omitted).

**\*8** Considering the balance of the equities and the relationship between Smith and PennPac, I find that no genuine issue of material fact exists regarding privity and the application of assignor estoppel. Accordingly, PennPac will be estopped from claiming here that the '947 Patent is invalid. [FN6] Furthermore, PennPac cannot now allege that Rotonics' notice of possible infringement of the very patent Smith assigned to Rotonics years earlier is predatory and anticompetitive. The undisputed facts are: (1) on October 2, 1985, Thomas Wise, inventor of an invention entitled "Container Having a Replaceable Pallet Base," assigned to Plastech International, Inc. his entire interest in the invention and any patent resulting therefrom; (2) on February 3, 1992, Rotonics, formerly known as Koala Technologies Corporation, acquired all of the stock of Plastech International, Inc., including its intellectual property, for a purchase price of $1.7 million; (3) Plastech's intellectual property included the '143 Application relating to a rotationally molded plastic bulk container with an inner flat bottom and having a detachable pallet base; (4) at this time, Rush Smith was President and CEO of Plastech and owned 27 percent of Plastech's stock; (5) a number of people, including Smith, handled the negotiations for the sale of Plastech; (6) the Stock Purchase Agreement represented that no claim existed that any of Plastech's intellectual property was invalid; (7) Rush Smith signed the Stock Purchase Agreement in his corporate capacity as President and in his individual capacity as seller; [FN7] (8) Smith continued as Divisional President at Rotonics until he was discharged in December 1994; (9) during the '143 Application process, Smith advocated the patentability of the invention by making declarations in support of the '143 Application; (10) in July 1995, Smith formed PennPac to sell rotationally molded products and more specifically, large bulk containers; and (11) in mid-1997, after discovering containers that were allegedly substantially similar to its patented containers, Rotonics advised by letter both PennPac and the suspected purchasers of those containers of possible '947 Patent infringement. Accordingly, it is clear that Smith was an assignor of the '947 Patent and that PennPac is in privity with him. As such, PennPac is estopped from now challenging the validity of the '947 Patent. *See generally Shamrock Tech., Inc. v. Medical Sterilization, Inc., 903 F.2d 789, 793-94 (Fed.Cir.1990)* (collecting cases regarding privity,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 7
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases  P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

including instance where court found privity between assignor and company of which he was principal, stockholder, president, and general manager).

> FN6. Based upon an assignor estoppel theory, Rotonics also moves the court to enter judgment in its favor on the affirmative defense of invalidity and unenforceability of the '947 Patent asserted by PennPac in response to Rotonics' counterclaim for patent infringement. This argument will be addressed when the court considers PennPac's motion for summary judgment on all counts of Rotonics' counterclaims (Doc. No. 48) also pending before me.

> FN7. PennPac submits that Smith signed the Stock Purchase Agreement only in his official capacity as President of Plastech. This statement, however, is contradicted by the plain language of the agreement which clearly shows that Smith signed as President of Plastech Holdings, Inc., as President of Plastech International, Inc., and as an individual seller. Indeed, while Joseph L. Ponce signed individually and as attorney in fact for each of the other sellers, Smith's name was crossed from that list and separately listed and signed in Smith's personal capacity. As such, it is clear that Smith was also an individual party to the Stock Purchase Agreement.

For the foregoing reasons, judgment will be entered in favor of Rotonics on Count I of plaintiff's complaint.[FN8]

> FN8. Because the parties concede that Pennsylvania law against unfair competition is co-extensive with federal antitrust law, judgment likewise will be entered in favor of Rotonics on Count II of plaintiff's complaint.

**\*9 State Law Causes of Action**

Rotonics argues that the *Noerr-Pennington* doctrine also provides it immunity from liability pursuant to PennPac's state law causes of action. Other than arguing that Rotonics is not entitled to any *Noerr-Pennington* immunity, PennPac does not address this assertion. While the Supreme Court has not ruled

whether the doctrine extends beyond the antitrust context, many courts to consider the issue have expanded the scope of *Noerr-Pennington* immunity to include "non-judicial acts that are 'reasonably and normally attendant upon protected litigation.' " *Alexander Binzel Corp. v. Nu-Tecsys Corp.,* No. 91-C-2092, 2000 WL 310304, \*3 (N.D.Ill. March 24, 2000) (collecting cases and finding that "[i]n instances involving attendant publicity, a party who 'has probable cause to threaten litigation and makes no assertions beyond the legal and factual bases [of the suit] may enjoy *Noerr-Pennington* immunity [.]' ") (alteration in original) (citations omitted); *see also, e.g., Mallinckrodt,* 976 F.2d at 709 ("[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers."); *Matsushita Elecs.Corp. v. Loral Corp.,* 974 F.Supp. 345, 359 (S.D.N.Y.1997) (holding that acts incidental to protected litigation, such as sending letters threatening court action, are likewise entitled to *Noerr-Pennington* immunity and that such acts are additionally immune from state law tort liability) (citing *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1367 (5 [th] Cir.1983)); *Aircapital Cablevision, Inc. v. Starlink Communications Group, Inc.,* 634 F.Supp. 316, 326 (D.Kan.1986) (extending immunity to press releases publicizing the lawsuit and threatening further legal action).

Moreover, this circuit has extended the immunity so as to bar state law tort claims based upon the very same conduct already immunized by the *Noerr-Pennington* doctrine in federal claims. *See Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 160 (3d Cir.1988) (holding that state tort liability cannot be imposed for damage caused by the protected conduct of inducing legislative, administrative, or judicial action); *Cheminor Drugs,* 168 F.3d at 128 (holding that while the New Jersey Supreme Court has not decided whether *Noerr-Pennington* immunity extends to state law causes of action, "we have been presented with no persuasive reason why these state tort claims, based upon the same petitioning activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine.") [FN9]; *see also Bristol-Meyers Squibb Co. v. Ivax Corp.,* 77 F.Supp.2d 606, (D.N.J.2000) (applying *Brownsville* and *Cheminor* and dismissing state law claim of unfair competition). Accordingly, absent any argument to the contrary, this court is satisfied that judgment must also be granted in favor of Rotonics concerning PennPac's remaining state law tort claims (Counts III, IV, and V). Moreover, as explained in the following sections, despite this bar to recovery,

Not Reported in F.Supp.2d                                                     Page 8
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

Rotonics also is entitled to judgment in its favor on the merits of these state law claims.

> FN9. While *Cheminor* concerned New Jersey state law claims and the construction thereof, the parties have not pointed to and the court has not found any Pennsylvania cases which suggest that the Pennsylvania Supreme Court would hold otherwise.

Defamation and Commercial Disparagement Claims

**\*10** In Count III of the complaint, PennPac alleges that it was defamed by certain statements made by Rotonics in letters sent to PennPac's customers. The Supreme Court of Pennsylvania has defined "defamatory" in the following manner: " '[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *MacElree v. Philadelphia Newspapers, Inc.,* 544 Pa. 117, 674 A.2d 1050, 1055 (Pa.1996) (quoting *Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 460, 442 A.2d 213, 215 (Pa.1981)). Moreover, the meaning of an allegedly defamatory statement is determined as follows:

The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

The words must be given by judges and juries the same signification that other people are likely to attribute them.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 923 (3d Cir.1990) (quoting *Corabi v. Curtis Publ'g Co.,* 441 Pa. 432, 273 A.2d 899 (Pa.1971) (abrogated on other grounds)) (alteration in original). PennPac complains of being defamed by letters sent by Rotonics' counsel to three of PennPac's customers, Doskocil Co., Inc., Beef Products, Inc., and Stella Foods, stating that:It has come to the attention of our client that you are using flat bottom bulk tanks which appear to be the same as those shown and claimed in U.S. Patent No. 5,105,947, and would appear to be an infringement of that patent. These flat bottom bulk tanks may have been purchased from PennPac International, Inc. of Wyndmoor, Pennsylvania....

Our client has not authorized PennPac to make, use, offer for sale, or sell bulk tanks which infringe U.S. Patent No. 5,105,947.

PennPac and Rush Smith J.A. (Doc. No. 48), Exs. 30-32. PennPac argues that these letters are defamatory because the statements falsely accuse PennPac of violations of federal patent law. Applying the above test, the court finds that the statements in Rotonics' letters could be understood to mean that PennPac was manufacturing products that infringed on Rotonics' patent and that anyone who purchased them would likewise be infringing on the '947 Patent. If untrue, such statements are capable of defamatory meaning.

Even if a statement is defamatory, however, it may not be actionable. For example, a defamatory opinion is not actionable if the factual basis for the opinion is disclosed because "a listener may choose to accept or reject [the opinion] on the basis of an independent evaluation of the facts." *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir.), *cert denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985). A defamatory opinion is actionable, however, "if [the] opinion is stated in a manner that implies that it draws upon unstated facts for its basis [because] the listener is unable to make an evaluation of the soundness of the opinion." *Id.* The burden is on plaintiff to show that the communicated opinion implies either an assertion of defamatory fact or the existence of undisclosed defamatory facts justifying the opinion. *See U.S. Healthcare,* 898 F.2d at 923; *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987).

Rotonics argues implicitly that the letter statements are ones of opinion and thus, are not actionable. Defendant is partially correct. Statements of opinion are not actionable unless they imply the existence of underlying defamatory facts. *See U.S. Healthcare,* 898 F.2d at 923; *Baker,* 532 A.2d at 402. The statements by Rotonics, however, could be found to imply that the plaintiff's products actually infringe on Rotonics' patent and that anyone purchasing those products would also be infringing. Giving the benefit of every doubt to PennPac, those facts are capable of defamatory meaning. *See U.S. Healthcare,* 898 F.2d at 923; *Baker,* 532 A.2d at 402. Therefore, because the statements are actionable as defamatory opinions, Rotonics will not be entitled to judgment pursuant to this ground.

**\*11** Rotonics also argues, however, that the statements are privileged because a patentee has the right to inform potential infringers and the public that they may be infringing. Under Pennsylvania law, at trial, a defendant bears the burden of proving the following affirmative defenses to a defamation claim: (1) The truth of the defamatory communication.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282

**(Cite as: Not Reported in F.Supp.2d)**

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

42 Pa. Cons.Stat. § 8343(b) (1998). Rotonics submits that while the affirmative defense of privilege ordinarily includes a requirement of good faith, under the Federal Circuit's decision in *Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340 (Fed.Cir.1999), the plaintiff has the burden of proving bad faith in all cases based upon the assertion of patent rights. Rotonics is correct.

In *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1336 (Fed.Cir.1998), *overruled on other grounds,* 175 F.3d 1356 (Fed.Cir.1999), the Federal Circuit addressed whether state law torts were in conflict with federal patent law and consequently preempted where a plaintiff bases its tort action on conduct protected by the patent law. *Id.* at 1335. The court started with the premise that "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patentholder acted in bad faith." *Id.* at 1336 (citations omitted). Moreover, the court declared that this patent law presumption mandated that the same conduct cannot be the subject of state tort liability. *Id.* As such, the court concluded as follows:

Accordingly, in a case involving a patentholder's conduct in obtaining or publicizing its patent, if the plaintiff were to fail to allege that the defendant patentholder was guilty of ... bad faith in the publication of a patent, then the complaint would be dismissed for failure to state a claim upon which relief can be granted because of federal preemption. If the complaint were sufficient but the proof were not to show such conduct, then the claim would fail on the merits.... Although to state and maintain a claim under a state law tort, a plaintiff may not be required to allege or prove that the patentholder ... acted in bad faith in the marketplace, to escape preemption, the plaintiff would need to allege and prove ultimately such conduct.

*Id.* at 1336-37. Thus, in all cases involving state tort claims premised on the conduct of a patentholder's publication of patent rights, the court placed the burden on plaintiff to demonstrate bad faith in order to avoid federal preemption, regardless of whether bad faith is a required element of the state claim.

**\*12** In *Zenith Elecs.,* the Federal Circuit extended this rationale to include claims brought under § 43(a)

of the Lantham Act and Illinois common law for tortious interference. The court, noted that in prior cases such as *Hunter Douglas,* it held that "to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proved, even if bad faith is not otherwise an element of the tort claim." *Zenith Elecs.,* 182 F.3d at 1355. Accordingly, the court concluded that "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith," despite the fact that bad faith is not a requisite element in § 43(a) claim. *Id.* at 1353. Thus, it is clear that because PennPac is asserting state tort claims premised upon Rotonics' publication and assertion of patent rights, it has the added burden of proving bad faith in order to avoid federal preemption.[FN10] *See, e.g., The Gleason Works v. Oerlikon Geartec, AG,* No. 98-CV-6275L, 2001 WL 388807, \*6 (W.D.N.Y. March 30, 2001) (party asserting unfair competition claim against patentee is "charged with the task of coming forward with some affirmative evidence of bad faith in order to survive a motion for summary judgment."); *Polyclad Laminates, Inc. v. MacDermid, Inc.,* No. CIV. 99-162-M, 2001 WL 274722, \*6 (D.N.H. Feb.13, 2001) (same-tortious interference claim); *System Mgmt. Arts Inc. v. Avesta Tech., Inc.,* 87 F.Supp.2d 258, 271 (S.D.N.Y.2000) (same).

> FN10. While neither party addresses the issue in terms of federal preemption, Rotonics does assert that *Zenith Elecs.* places the burden of proving bad faith on PennPac.

Nevertheless, as the moving party Rotonics has the initial burden of pointing out the absence of evidence to support PennPac's claims and specifically that PennPac has failed to carry its burden of showing bad faith.[FN11] As already discussed, Rotonics has met this burden. Next, the burden will shift to PennPac to show the existence of the essential elements of its claim, including the element of bad faith. As already discussed, this PennPac has failed to do. As such, judgment will be entered in favor of Rotonics as to Count III of the complaint.

> FN11. Rotonics submits that the court's opinion in *Patient Transfer Sys., Inc. v. Patient Handling Solutions, Inc.,* No. CIV. A. 99-1568,1999 WL 1212189, \*2 (E.D.Pa.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases  P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

Dec.17, 1999), misapprehended the full import of *Zenith,* which requires a plaintiff to show bad faith in all cases premised upon a patentholder's publication of patent rights. Defendant, however, is incorrect. In *Patient Transfer,* the use of the phrase "initial burden" to describe a movant's burden to point out the existence of a privilege is consistent with the court's language today, that the movant's initial burden is to show the absence of evidence to support plaintiff's case. Nevertheless, to the extent that the language employed in *Patient Transfer* is unclear, the court today has clarified its intent.

Count IV of PennPac's complaint asserts that these same letter statements were also commercially disparaging. A commercially disparaging statement is one "which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, ... if the matter is so understood by its recipient." *Menefee v. Columbia Broadcasting Sys., Inc.,* 458 Pa. 46, 329 A.2d 216 (Pa.1974) (citation omitted). According to Pennsylvania law, in order to recover for commercial disparagement, a plaintiff must prove: (1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; (2) that no privilege attaches to the statement; and (3) that the plaintiff suffered a direct pecuniary loss as a result of the disparagement. *See Menefee,* 329 A.2d at 216 (citation omitted); *see also U.S. Healthcare,* 898 F.2d at 924 (same).

Rotonics again asserts that the statements in the infringement letters were privileged because a patentee may inform potential infringers of their infringement. At trial, the plaintiff bears the burden of showing the absence of any privilege in order to succeed with his commercial disparagement claim. *See U.S. Healthcare,* 898 F.2d at 924. Moreover, *Zenith Elecs.* requires that PennPac demonstrate that Rotonics acted in bad faith. *Zenith Elecs.,* 182 F.3d at 1353-55. Despite this burden being placed on the plaintiff at trial, the defendant, as the party moving for summary judgment, bears the initial burden of pointing out to the court an absence of evidence that a privilege did not exist. *See Celotex,* 477 U.S. at 325. As already discussed, Rotonics has met this initial requirement thereby shifting the burden to PennPac. Moreover, I have already found that PennPac has failed to demonstrate that Rotonics acted in bad faith. As such, judgment in favor of

Rotonics will be entered as to Count IV of the complaint.

**\*13** Tortious Interference Claims

Pennsylvania law recognizes two distinct branches of tortious interference: with existing contractual relations and with prospective contractual relations. Nevertheless, these two distinct claims share essentially the same elements. In order to establish either claim, a plaintiff must prove:
(1) the existence of a contractual, or prospective contractual relation between itself and a third party;
(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring;
(3) The absence of a privilege or justification on the part of the defendant;
(4) the occasioning of actual legal damage as a result of the defendants' conduct; and
(5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir.1998) (citations omitted). Rotonics essentially argues that PennPac has adduced no set of facts to satisfy this test, including in some instances a failure to demonstrate an actual or likelihood of a contract, that it suffered any actual legal loss, that Rotonics intentionally interfered with any contracts, and that Rotonics' communications with any alleged customers were not privileged. PennPac again sets forth conclusory allegations of bad faith, arguing that *Noerr-Pennington* immunity cannot apply, and states without support that it "has provided to Rotonics detailed financial documents relating to the direct monetary and temporal impact on PennPac's business resulting from the defamation advice [sic] of Rotonics to three of PennPac's customers." Pl. Mem. at 41.

I find that as a matter of law, because PennPac has failed "to make a showing sufficient to establish the existence of an element essential to [its] case," judgment will be entered for Rotonics as to Count V of the complaint. *See Celotex,* 477 U.S. at 322. By way of example, PennPac has not demonstrated the absence of privilege on the part of Rotonics. Section 768 of the Restatement (Second) of Torts sets forth the competitor's privilege to a contractual interference claim.[FN12] One element of the competitor's privilege is that "the actor [Rotonics] does not employ wrongful means." *Brokerage Concepts,* 140 F.3d at 530 (quoting *Restatement*

Not Reported in F.Supp.2d                                                                                          Page 11
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
**(Cite as: Not Reported in F.Supp.2d)**

(Second) of Torts § 768(1)(b) (1979)). Wrongful means are employed when the competitor commits conduct that is independently actionable. *See, e.g., DP-Tek, Inc. v. AT & T Global Info. Sol'ns Co.,* 100 F.3d 828, 833-35 (10th Cir.1996); *see also Brokerage Concepts,* 140 F.3d at 531-32 (noting that the Supreme Court of Pennsylvania has not defined the term "wrongful means," that other courts have limited the term "wrongful means" to independently actionable conduct, and making no suggestion that the Supreme Court of Pennsylvania would hold independently actionable conduct not to constitute wrongful means). Because I have already found that PennPac has failed to demonstrate that the statements contained in Rotonics' letters are independently actionable (do not give rise to actions for antitrust, unfair competition, defamation, and for commercial disparagement), no genuine issue of material fact exists as to whether Rotonics employed wrongful means by sending the aforementioned letters. Accordingly, Rotonics' competitor privilege remains intact.

FN12. Section 768 has been recognized by Pennsylvania courts. *See Brokerage Concepts,* 140 F.3d at 530 (citing cases). That section provides:

§ 768. Competition as Proper or Improper Interference.

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Therefore, for the foregoing reasons, judgment will be entered in favor of Rotonics as to Counts I, II, III, IV, and V of the complaint.

*ORDER*

**\*14** AND NOW, this _____ day of May, 2001, upon consideration of defendant Rotonics Manufacturing, Inc.'s motion for summary judgment and memoranda in support thereof (Doc. Nos.43, 51) and plaintiff's response thereto (Doc. No. 47), IT IS HEREBY ORDERED that the motion for summary judgment is GRANTED and judgment is entered in favor of Rotonics Manufacturing, Inc. and against PennPac International, Inc. on all counts of plaintiff's complaint.

E.D.Pa.,2001.
PennPac Intern., Inc. v. Rotonics Mfg., Inc.
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.